**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CAROL ROUGVIE *et al.*, | Case No. 2:15-cv-00724-MAK |
| Plaintiffs, | **OBJECTION BY ROBERT GALLAGHER, REBECCA JOINER, ANDREA KALLAY, DAVID LEGENDRE, YANETSY LOOR, DIANA AMAYA, TERRI HOLCOMB, DORLENE GOLDMAN AND EMILY MOHR TO CLASS SETTLEMENT IN** *ROUGVIE ET AL v. ASCENA RETAIL GROUP, INC., ET AL* |
| v. | |
| ASCENA RETAIL GROUP, INC. *et al.*, | |
| Defendants. | |

**Identification Of Objectors**

*See* attached signature pages of all Objectors.

**Documents Establishing Objectors As Class Members**

*See* **Exhibit A** attached.

**Notice Of Intention To Appear At Final Approval Hearing**

The Objectors will appear at the Final Approval Hearing through their counsel identified at the end of this Objection.

**List Of Witnesses Who May Be Called At Final Approval Hearing**

William Pietragallo, II
Kevin E. Raphael
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
1818 Market Street, Suite 3402
Philadelphia, PA 19103

Ernest Mansour
Anthony Coyne
Brenon P. Friesen
Manour Gavin, LPA
1001 Lakeside Avenue, Suite 1400
Cleveland, OH 44114

Edward J. Westlow
Bank of America Center
1111 East Main Street, 16th Floor
Richmond, VA 23219

Robert Mansour
23611 Chagrin Blvd., Suite 270
Beachwood, OH 44122

Gregory T. Parks
Ezra D. Church
Christopher J. Mannion
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103

Carol Rougvie
Marguerite Sinkler Gilder
Caroline Mansour
Melinda Mehigan
Fonda Kubiak
Carol Cowhey
Kara Bell
Tiffany Bolton

Defendants' corporate representatives

## List Of Exhibits Which May Be Offered At The Final Approval Hearing

1. July 2, 2015 term sheet between Plaintiffs and Defendants (attached hereto as **Exhibit B**);
2. September 9, 2015 letter from Objectors to Plaintiffs' counsel  (attached hereto as **Exhibit C**);
3. Filings in this case:
   a. Preliminary Approval Motion and attachments [Doc. No. 71]; and
   b. Final Approval Motion and attachments [Doc. Nos. 98 & 100];
4. *Perez v. Tween Brands* – Plaintiff's Motion for Final Approval and Order granting same (attached hereto as **Exhibit D**);
5. All documents Defendants produced to Class Counsel (subject to a confidentiality provision and therefore not attached to this Objection);
6. Ascena Retail Group, Inc. Annual Reports (from 10K) (attached as **Exhibit E**); and
7. Ascena Retail Group, Inc. Investor Conference (dated October 9, 2013) (attached hereto as **Exhibit F**).

<u>**MEMORANDUM IN SUPPORT OF OBJECTION**</u>

**I.   <u>Introduction</u>**

This case is about a whopper. Not a sandwich sold at Burger King, but a lie of epic proportions told by Defendants. Defendants told *all* of their customers in *all* of their stores in *every* jurisdiction in which they do business that their products were being sold at a 40% discount, when, in fact, the 40% discount was fictitious.

Defendants do not dispute that the purported discounts were fictitious. Nor have Defendants presented evidence that their lie was a mistake. Defendants implicitly concede that a conscious decision to lie to all of their customers was made at the highest levels of the company. Why would a company decide to lie to all of its customers? To make money. In this case, Defendants apparently calculated that the big lie would generate enormous profits, and, when sued for consumer fraud, they could cook up a collusive settlement. Whether Defendants will be permitted to succeed with this scheme is the issue now before this Court.

The proposed settlement should not be approved. One of the key purposes of state consumer protection statutes is to deter deceptive conduct. And this settlement does not deter deceptive conduct.

While the settlement purports to be valued at over $425 million, Defendants will almost certainly pay out less than $7 million in cash to class members to settle damages claims worth approximately $800 million, with no minimum payout required. That is because any unclaimed funds will revert back to Defendants.  The unclaimed money will likely exceed $20 million, as Defendants well know, based on historical claims rates in similar settlements. Such a reverter undermines the deterrent purpose of the state consumer protection laws that class counsel are purportedly seeking to enforce. With the reverter, the proposed settlement is nothing more than a

wink and nod at Defendants' illegal conduct. This is further illustrated by the fact that any amount of the $14 million in attorneys' fees not awarded to Plaintiffs' counsel reverts back to Defendants.

This settlement is unreasonable and final approval should not be granted without modification to the settlement agreement.

## II.   The Damages In This Case Are, Based On The Parties' Representations, Approximately $800 Million.

Under the terms of the settlement, the maximum recovery of any class member is a voucher representing 50% of their damages. *See* Plaintiffs' Memo in Support (Doc No. 98), pg. 35 of 94, n. 9 and 10. The total possible voucher value of the class is $400 million. *Id.* at pg. 18 of 94. Because the vouchers represent a maximum recovery of half of a class member's damages, this means that the parties have concluded that the total value of the class claim is over $800 million. That $800 million presumably represents a fictitious discount of 40% off of $2 billion in sales.

## III.   The Settlement Has Defendants Paying Less Than 1% Of The Total Value Of The Damages Claim In Cash.

To compensate the class members for their $800 million in damages, the parties have negotiated for the creation of a settlement fund of $27.8 million against which class members can make claims. The $27.8 million equals 3.5% of the total damages. But even that 3.5% of the total damages will not be paid out in cash. Of the approximately 500,000 class members who have filed claims to date, 72% chose to receive cash. *See* Plaintiffs' Memo in Support (Doc. No. 98), pg. 33 of 94. Assuming, very generously, that all of those approximately 360,000 class members who chose cash are treble recovery class members entitled to recover $20, the total cash claims to date would amount to $7.2 million. (Obviously, that assumption is not correct, as some class members are from single and limited recovery states and will only receive $13 and $7; thus, Defendants will pay out significantly less than $7.2 million in cash. But, given the paucity of the data that the parties have provided in their briefing, a guesstimate is the best information available.) That means

that less than 1% of the total value of the damages claim will be paid out in cash. What happens to the remaining $20 million plus of unclaimed cash? Astonishingly, this amount reverts to Defendants. Settlement Agreement (Doc. No. 71-1) at ¶ 41. So, for the 18 million class members who have been identified (Plaintiffs' Memo in Support (Doc. No. 98), pg. 26 of 94), Defendants will pay out less than 40 cents per class member in cash. That is where the proposed settlement fails.

The proposed settlement, which allows Defendants to pay out less than 1% of the total damages in cash, defeats the purpose of state consumer protection laws and should not be approved.

IV.    **The Purpose Of Consumer Protection Statutes Is To Deter Deceptive Conduct In Consumer Transactions. This Settlement, As Drafted, Will Do Nothing To Deter Violations Of Any Consumer Protection Statute In The Country.**

   A.    **An Essential Purpose Of Consumer Protection Statutes Is To Deter Deceptive Conduct. The Cash Available For Class Members Represents A Miniscule Percentage Of The Total Damages.**

Consumer protection laws were drafted, not with the intent of stuffing money into the pockets of class action attorneys, but to nip deceptive practices in the bud. For example:

- Under Illinois law, the "purpose of [Illinois'] Consumer Fraud Act [is] to deter all forms of unfair and deceptive conduct[.]" *Heastie v. Community Bank of Greater Peoria,* 690 F. Supp. 716, 722 (N.D. Ill. 1988);

- The Texas Deceptive Trade Practices Act has an "announced purpose" of deterring violations of the Act. *Mercer v. Long Mfg. N.C., Inc.,* 665 F.2d 61, 74 (5th Cir. 1982);

- The New Jersey Consumer Fraud Act "was enacted to deter fraudulent practices by merchants in the marketplace[.]" *Boyko v. Am. Int'l Group, Inc.,* 2012 U.S. Dist. LEXIS 59125, at *57 (D. N.J. Apr. 26, 2012);

- The D.C. Consumer Protection Act "is meant to protect the public and deter potentially fraudulent conduct[.]" *Wells v. Allstate Ins. Co.,* 2006 U.S. Dist. LEXIS 4694, at \*17-18 (D. D.C. Jan. 24, 2006);

- Under Colorado law, the "'CCPA is a remedial statute intended to deter … deceptive trade practices committed by businesses in dealing with the public.'" *Seabron v. Am. Family Mut. Ins. Co.,* 2012 U.S. Dist. LEXIS 59650, at \*7 (D. Col. Apr. 30, 2012);

- The legislative intent of the Idaho CPA is to deter deceptive trade practices. *State ex rel. Lance v. Hobby Horse Ranch Tractor & Equip. Co.,* 129 Idaho 565, 567 (1996); and

- North Dakota's Consumer Fraud Act is intended "to deter future seller misconduct[.]" *A & R Fulgeberg Farms, Inc. v. Triangle Ag, LLC,* 2010 U.S. Dist. LEXIS 34325 (D. N.D. Apr. 7, 2010).

The current settlement, which will allow the vast majority of the purported settlement fund to revert back to Defendants, will not deter future seller misconduct.

**B.      Dishonest Corporations Are Deterred From Committing Deceptive Practices By Being Compelled To Disgorge Their Ill-Gotten Gains.**

Dishonest conduct is deterred by requiring a defendant to disgorge its ill-gotten gains. The Supreme Court of California observed that protecting "'unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society[,]'" *Fletcher v. Sec. Pac. Nat'l Bank,* 23 Cal.3d 442, 451 (1979). In furtherance of that goal, the *Fletcher* court observed that disgorgement of "improperly obtained moneys" serves as a "strong deterrent." *Id.* at 450. The *Fletcher* court cited the Southern District of New York for the proposition that "'[t]o permit the [retention of even] a portion of the illicit profits, would impair the full impact of the

deterrent force that is essential if adequate enforcement [of the law] is to be achieved. One requirement of such enforcement is a basic policy that those who have engaged in proscribed conduct surrender all profits flowing therefrom.'" *Id.* at 451, quoting *Securities & Exchange Comm'n v. Golconda Mining Co.,* 327 F. Supp. 257, 259-60 (S.D. N.Y. 1971).

Other courts agree that disgorgement deters future violations of the law. "The Seventh Circuit has explained that disgorgement is a remedial measure to deter future violations of the securities laws and to deprive wrongdoers of their ill-gotten gains…. In determining the amount of disgorgement, all doubts should be resolved against the defrauding party." *SEC v. Randy,* 38 F. Supp. 2d 657, 674 (N.D. Ill. 1999). The Tenth Circuit noted that "[d]isgorgement, which deprives wrongdoers of their ill-gotten gains, deters violations of the law by making illegal activity unprofitable." *United States v. Rx Depot, Inc.,* 438 F.3d 1052, 1061 (10th Cir. 2006).

Here, the parties offer no evidence that Defendants have disgorged their ill-gotten gains. The parties' briefs do not disclose Defendants' profits on their scheme. Instead, the evidence submitted by the parties indicates that amount disgorged into the settlement fund will mostly revert back to Defendants—resulting in nothing more than temporary, illusory disgorgement.   Such minimal disgorgement is highly unlikely to deter retailers contemplating implementing such schemes in the future.

### C.      Where, As Here, Deterrence Is A Statutory Goal, A Settlement That Permits Unclaimed Funds To Revert To Defendants Have Not Been Approved.

Under Third Circuit law, "[r]eversion to the defendant risks undermining the deterrent effect of class actions by rewarding defendants for the failure of class members to collect their share of the settlement." *In re Baby Prods. Antitrust Litig.,* 708 F3d 163, 172 (3d Cir. 2013). Here, the concern is undermining the deterrent effect of state consumer protection statutes. In *Six Mexican Workers,* 904 F.2d 1301, 1308 (9th Cir. 1990), the Ninth Circuit explained that "reversion

to the defendant *may* be appropriate when *deterrence is not a goal* of the statute[.]" (Emphasis added.) But, "reversion is not appropriate where deterrence is a statutory goal[.]" *Harris v. Vector Mktg. Corp.,* 2011 U.S. Dist. LEXIS 48878, at *38 (N.D. Cal. 2011). "[W]hen faced with statutes that have deterrence as a goal, courts have declined to allow reversion of unclaimed settlement funds to a settling defendant[.]" *Diamond Chem. Co. v. Akzo Nobel Chems. B.V.,* 517 F. Supp. 2d 212, 218 (D. D.C. 2011).

In *La Parne v. Monex Deposit Co.,* No. SACV 08-0302 DOC (MLGx), 2010 WL 4916606 (C.D. Cal. Nov. 29, 2010), Plaintiffs brought an FLSA claim. In rejecting a reverter to the defendant, the court noted that "Congress intended the FLSA to have a deterrent effect." *Id.* at *4. "Requiring Defendant to pay the full amount of the settlement fund serves this deterrent goal." *Id.* The court expressly rejected the defendant's argument that a low claims rate made a reverter appropriate: "Relatively low interest in the settlement does not mean that Defendant should receive a windfall benefit as a result of absent class members failing to submit claims…. Requiring Defendant to pay the full amount of the settlement fund serves this deterrent goal." *Id.*

Here, deterrence is a statutory goal, and a settlement that allows such a substantial reversion to Defendants should not be approved. In this case, it appears that under the settlement as currently structured approximately $20 million of unclaimed class funds will revert to Defendants, with Defendants paying less than $7 million in cash as compensation for 18 million defrauded class members across the country.

In comparison, in *Perez v. Tween Brands*, Lake County, Ohio Common Pleas Case No. 14C001119, a case challenging the same practice in Ohio involving 588,474 known class members, one of the counsel for the objectors, Dworken & Bernstein, acting as class counsel in *Perez*, negotiated for a minimum payment by the defense of $3 million. That is *one* state. There are *fifty* states involved in this case, and Defendants are paying out only a little more than double

the Ohio settlement.  This is inexcusable in the context of consumer protection claims with deterrence as a goal. Additionally, other courts have indicated that reverter clauses raise concerns of collusion: "[R]everter clauses are generally 'suspect' and need to be viewed cautiously since they 'undercut [] the deterrent effect of class actions' and can 'suggest a lack of full diligence in representing the class.'" *Sylvester v. Cigna Corp.,* 369 F. Supp. 2d 34, 45 (D. Me. 2005).

### D. The Coupon Settlement In This Case Will Not Deter Dishonest Conduct.

As one district court noted, in passing the Class Action Fairness Act, "Congress put significant limits on so-called 'coupon settlements' which produce hardly any tangible benefits for the members of the plaintiff class, but generate huge fees for the class attorneys." *Kearns v. Ford Motor Co.,* 2005 U.S. Dist. LEXIS 41614 (C.D. Cal. 2005) (overruled on other grounds). Vouchers that require a class member to do business with the defendant are coupons. *Martina v. L.A. Fitness International, LLC,* No. 2:12-cv-2063 (WHW), 2013 WL 5567157, *5 (D.N.J. Oct. 8, 2013). The majority of "vouchers" that are offered to class members here are just that. The coupons available to the majority of class members only offer a discount off of a purchase of $25 or more. Settlement Agreement (Doc. No. 71-1) at ¶ 40 ("limited recovery" class members receive a coupon for $10 off a purchase of $25 or more, and "single recovery" class members receive a coupon for $20 off a purchase of $25 or more).

Coupon settlements pose three common problems: "they often do not provide meaningful compensation to class members; they often fail to disgorge ill-gotten gains from the defendant; and they often require class members to do future business with the defendant in order to receive compensation." *Figueroa v. Sharper Image Corp.,* 517 F. Supp. 2d 1292, 1302 (S.D. Fla. 2007). Those problems are present here.

The issuance of coupons by Defendants is not meaningful compensation to the class members. The class members in this case who have indicated a preference for cash or coupons have overwhelmingly chosen cash. Of the class members who responded to class notice, 72% of them rejected Defendants' coupons. Plaintiffs' Memo in Support (Doc. No. 98), pg. 33 or 94. That is not surprising. After all, not everyone who was purchasing children's apparel in 2012 is still purchasing children's apparel today. The coupons are also not meaningful compensation because they require the class members to do future business with Defendants in order to use the "benefit." A Massachusetts court described one coupon settlement as "little more than a $2.58 million marketing program that will benefit class members only if they continue to use [the defendant's] products[.]" *In re Massachusetts Smokeless Tobacco Litig.,* 23 Mass. L. Rptr. 719 (Sup. Ct. 2008). The same is true here.

The settlement will also not result in Defendants disgorging their ill-gotten gains. As discussed above, the settlement results in Defendants paying out, at most $7 million in cash (less than 1% of the damages at issue). The coupons do not add anything significant to the amount Defendants will have to pay out. First, as mentioned above, the majority of the vouchers are actually coupons which require the class member to spend money at the Defendant's stores. Second, while some vouchers are redeemable like gift cards, the parties have provided no evidence as to the cost to the defense. The parties have provided no information regarding the likely redemption rate of people using these vouchers, and no information regarding the cost to Defendants of honoring the vouchers. After all, a retailer's marginal cost of honoring a coupon is not the same as the face value of the coupon. See *Martina,* 2013 WL 5567157, at *7. Finally, the parties have not discussed the benefits to Defendants in issuing thousands of coupons to encourage current and former customers to shop at Defendants' stores, and how that benefit will offset any detriment to Defendants incurred in issuing the coupons.

In sum, the parties have introduced no evidence that this settlement would serve one of the primary purposes of state consumer protection statutes on which the claims are based: deterring dishonest conduct by retailers. The evidence is that Defendants made hundreds of millions of dollars in sales based on a deceptive marketing campaign, which promised class members savings of 40%. Those savings were fictional. Although the parties have recognized that the class members have hundreds of millions of dollars in damages, less than 1% of those damages will be compensated in cash. This settlement will result in Defendants' retaining the lion's share of their ill-gotten gains. Put another way: the bigger the lie, the bigger the profits.

### E.   The Reverter Of Unawarded Attorneys' Fees Will Not Deter Defendants' Dishonest Conduct.

Not only will Defendants get a reverter for any unclaimed funds by class members, they also negotiated for themselves a reverter of any unawarded attorneys' fee. This does not promote deterrence goals, but rather suggests collusion. "[W]hen the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund," that is a sign of collusion. *In re Bluetooth,* 654 F.3d at 947, citing *Mirfasihi v. Fleet Mortg. Corp.,* 356 F.3d 781, 785 (7th Cir. 2004). The Ninth Circuit describes such an agreement a "kicker arrangement." *In re Bluetooth,* 654 F.3d at 949. The Ninth Circuit explained: "If the defendant is willing to pay a certain sum in attorneys' fees as part of the settlement package, but the full fee award would be unreasonable, there is no apparent reason the class should not benefit from the excess allotted for fees. The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.*

**V.    The Full Amount Of Attorneys' Fees Requested By Plaintiffs' Counsel Is Not Justified Because Objectors' Counsel Contributed Benefit To The Settlement.**

Objectors' counsel was provided with a signed term sheet, dated July 2, 2015. The term sheet was the product of months of negotiations between the parties, and, according to the language included in the document, was "**To Be Finalized in Formal Settlement Agreement**[.]"

Objectors' counsel reviewed the term sheet, and found it to be deficient in a number of respects. With the goal of correcting the deficiencies contained in the term sheet, Objectors' counsel sent class counsel a letter dated September 9, 2015. Among the deficiencies identified in that letter was the parties' failure to "ensure the broadest possible adequate class notice, including publication and media coverage[.]" Sept. 9 letter, § G. The term sheet was silent as to publication notice, and expressly stated: "No press releases by either party." Objectors' counsel also noted the impropriety of the defense and Plaintiff's counsel splitting any remaining funds of the $8 million set aside for notice. Sept. 9 letter, § F. Objectors' counsel contended this money should revert to the class fund, for the class members' benefit. Id.

These changes argued for by the Objectors were ultimately included in the Settlement Agreement the parties submitted to the Court. Under the terms of the settlement agreement, the Claims Administrator issued a press release via a "national distribution list which is comprised of approximately 4,200 print and broadcast and 5,500 online press outlets in the United States." Settlement Agreement (Doc. No. 71-1), pg. 45 of 147. They also added publication notice in "People" and "Parade" magazine, and added a website. *Id.* And any leftover funds from the 8 million set aside for administration was to be added to the class fund. *Id.* at 52.

Plaintiffs and Defendants will deny, of course, that Objectors' efforts had anything to do with the changes to the settlement. This is nonsense. The parties claim to have negotiated this settlement for months prior to producing the term sheet. *See* Plaintiffs' Memo in Support (Doc 71-

1), pgs. 3 and 4 of 147. What is the likelihood that, after months of negotiations, the notice provisions or the settlement administrator reverter provision would have improved in the absence of our letter? Zero.

The Third Circuit and Pennsylvania district courts have recognized that objectors' counsel is entitled to a fee if they improve the settlement. *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 743 (3d Cir. 2001); *McDonough v. Toys "R" Us, Inc.,* 80 F. Supp. 3d 626, 658 (E.D. Pa. 2015) ("'objectors are entitled to compensation for attorneys' fees and expenses if the settlement was improved as a result of their efforts'"); *Lan v. Ludrof,* No. 1:06cv114-SJM, 2008 WL 763763 (W.D. Pa. Mar. 21, 2008). A fee award may be appropriate even in the absence of a monetary benefit to the class. *See In re Vista Check/Mastermoney Antitrust Litig.,* No. CV-96-5238, 2005 WL 2077286, *14-16 (E.D. N.Y. 2005) (objectors were entitled to a fee for ensuring that the notice was available in Spanish). The Third Circuit has held that attorneys' fees "are awardable even though the benefit conferred [on the class] is purely nonpecuniary in nature." *Merola v. Atlantic Richfield, Co.,* 515 F.2d 165, 169-70 (3d Cir. 1975).

Here, "[t]here are an estimated 1.2 million members of the Class who cannot be identified through Justice's records." Plaintiffs' Memo in Support (Doc. No. 98), pg. 15 of 94. Those 1.2 class members would have received *no* notice of the settlement but for Objectors' efforts to improve the settlement. This additional notice is a benefit to those 1.2 million class members—ensuring that they had an opportunity to make claims.

## VI.    <u>Relief Requested</u>

Objectors request this Court deny the motion for final approval of this Settlement in its current form, and order the parties to, at a minimum, revise the settlement to implement the following changes:

1.) For the vouchers which require class members to spend a minimum amount of money to use the voucher (i.e., see Settlement Agreement (Doc. No. 71-1) at ¶ 40 ("limited recovery" class members receive a coupon for $10 off a purchase of $25 or more, and "single recovery" class members receive a coupon for $20 off a purchase of $25 or more): these vouchers should eliminate the requirement that the class member make a purchase of $25. In other words, the vouchers should function as gift cards, as opposed to coupons.

2.) Defendants shall disgorge a minimum of $27.8 million to the class (the amount set aside for the class fund) through combined cash payments and *redeemed* vouchers which function as a gift card (as opposed to containing a minimum spending requirement). Should this not result in a disbursement of $27.8 million, the uncashed checks and gift cards shall be re-issued until the minimum amount is reached, or alternatively, a cy distribution to charities approved by the Court should be made in the amount of the difference.

3.) Out of the $14 million allocated to be paid to Plaintiffs' counsel for attorneys' fees and Plaintiffs for incentive compensation, Objectors and their counsel shall be paid $6.6 million ($6,000 to each Objector, and the remainder in attorneys' fees.) This amount is reasonable. Should the Court order the changes requested above, Objectors would be creating a more than $20 million benefit to the class in the form of a minimum payment ($6.6 million is 1/3 of the benefit, which is a standard fee in contingency class action cases). Additionally, Objectors have already created an immeasurable benefit, by causing publication notice to be sent to 1.2 million customers who otherwise would not have received notice.

Objectors also request that all of the documents produced to class counsel in this case be brought to the final approval hearing and shown to the Court.

Respectfully submitted,

/s/ *Gerard M. McCabe*
Maurice R. Mitts, Esq.
Gerard M. McCabe, Esq.
Jennifer M. Adams, Esq.
**MITTS LAW, LLC**
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0120 (telephone)
(215) 866-0121 (facsimile)
Email: *mmitts@mittslaw.com*
       *gmccabe@mittslaw.com*
       *jadams@mittslaw.com*

Daniel P. Goetz, Esq. (*pro hac vice*)
**WEISMAN KENNEDY BERRIS CO., L.P.A.**
1600 Midland Building
101 Prospect Avenue West
Cleveland, OH 44115
(216) 781-1111 (216) 781-6747 Fax
Email: *dgoetz@weismanlaw.com*

Patrick J. Perotti, Esq. (#0005481OH)
Nicole T. Fiorelli, Esq. (#0079204OH)
Frank A. Bartela, Esq. (#0088128OH)
**DWORKEN & BERNSTEIN CO., L.P.A.**
60 South Park Place
Painesville, Ohio 44077
(440) 352-3391 (440) 352-3469 Fax
Email: *pperotti@dworkenlaw.com*

Christopher J. Morosoff, Esq. (#200465CA)
**Law Office of Christopher J. Morosoff**
77-760 Country Club Drive, Suite G
Palm Desert, CA 92211
(760) 469-5986 (760) 345-1581 Fax
Email: *cjmorosoff@morosofflaw.com*

Douglas Caiafa, Esq. (#107747CA)
**Douglas Caiafa, A Professional Law Corp.**
11845 West Olympic Boulevard, Suite 1245
Los Angeles, CA 90064
(310) 444-5240 (310) 312-8260 Fax
Email: *dcaiafa@caiafalaw.com*

William T. Dowd, Esq. (#39648MO)
Alex R. Lumaghi, Esq. (#56569MO)
**Dowd & Dowd, P.C.**
211 North Broadway, Suite 4050
St. Louis, Missouri   63102
(314) 621-2500 (314) 621-2503 Fax
Emails: *bill@dowdlaw.net*
           *alex@dowdlaw.net*

Hassan Zavareei, Esq. (456161DC)
Andrea Gold, Esq. (502607DC)
**Tycko & Zavareei, LLP**
1828 L. Street NW, Suite 1000
Washington D.C. 20036
(202) 973-0900 (202) 973-0950 Fax
Email Addresses: *hzavaree@tzlegal.com*
                *agold@tzlegal.com*

Michael J. Deem, Esq. (#02037-1998NJ)
**R.C. Sea & Associates, LLP**
244 Main Street
P.O. Box 2627
Toms River, NJ 08753
(732) 505-1212 (732) 600-2548 Fax
Email Address: *mdeem@reshea.com*

**COUNSEL FOR OBJECTORS**

I, Robert Gallagher have read the foregoing Objection and submit it in support of my opposition to the settlement in Rougvie, et al v. Ascena Retail, Inc., et al, Eastern District of Pennsylvania, Case No. 2:15-cv-00724-MAK.

Respectfully Submitted,

_Robert Gallagher_

I, Rebecca Joiner have read the foregoing Objection and submit it in support of my opposition to the settlement in Rougvie, et al v. Ascena Retail, Inc., et al, Eastern District of Pennsylvania, Case No. 2:15-cv-00724-MAK.

Respectfully submitted,

_Rebecca Joiner_

I, Andrea Kallay have read the foregoing Objection and submit it in support of my opposition to the settlement in Rougvie, et al v. Ascena Retail, Inc., et al, Eastern District of Pennsylvania, Case No. 2:15-cv-00724-MAK

Respectfully submitted,

*Andrea Kallay*

I, David Legendre have read the foregoing Objection and submit it in support of my opposition to the settlement in Rougvie, et al v. Ascena Retail, Inc., et al, Eastern District of Pennsylvania, Case No. 2:15-cv-00724-MAK.

Respectfully submitted,

*David Legendre*

THERESA M. LUCAS
Commission # 2388779
Notary Public, State of New Jersey
My Commission Expires
August 20, 2019

20

I, Yanetsy Loor have read the foregoing Objection and submit it in support of my opposition to the settlement in Rougvie, et al v. Ascena Retail, Inc., et al, Easter District of Pennsylvania, Case No. 2:15-cv-00724-MAK.

Respectfully submitted,

_____

*Yanetsy Loor*

I, Diana Amaya have read the foregoing Objection and submit it in support of my opposition to the settlement in Rougvie, et al v. Ascena Retail, Inc., et al, Easter District of Pennsylvania, Case No. 2:15-cv-00724-MAK.

_Diana Amaya_

I, Terri Holcomb have read the foregoing Objection and submit it in support of my opposition to the settlement in Rougvie, et al v. Ascena Retail, Inc., et al, Easter District of Pennsylvania, Case No. 2:15-cv-00724-MAK.

Respectfully submitted,

*Terri Holcomb*

I, Dorlene Goldman have read the foregoing Objection and submit it in support of my opposition to the settlement in Rougvie, et al v. Ascena Retail, Inc., et al, Easter District of Pennsylvania, Case No. 2:15-cv-00724-MAK.

Respectfully submitted,

Dorlene Goldman

I, Emily Mohr have read the foregoing Objection and submit it in support of my opposition to the settlement in Rougvie, et al v. Ascena Retail, Inc., et al, Easter District of Pennsylvania, Case No. 2:15-cv-00724-MAK.

Respectfully submitted,

*Emily Mohr*

25

## <u>CERTIFICATE OF SERVICE</u>

As of the date set forth below, I served a copy of the foregoing Objection and related exhibits electronically on all counsel of record through the Court's ECF filing system.

/s/ Gerard M. McCabe
Gerard M. McCabe

As of the date set forth below, I served by U.S. Mail, First Class, postage pre-paid, a copy of the foregoing Objection and related exhibits on all counsel of record. I also served by U.S. Mail, First Class, postage pre-paid the original signed Objection and related exhibits on the settlement administrator.

/s/ Nicole T. Fiorelli
Nicole T. Fiorelli

Dated: April 15, 2016