# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CAROL ROUGVIE, et al.,

                  vs.

ASCENA RETAIL GROUP, INC., et al.

CLASS ACTION

No. 15-724

## DEFENDANTS' OMNIBUS RESPONSE TO OBJECTIONS TO SETTLEMENT APPROVAL

# TABLE OF CONTENTS

**Page**

I.  THE STRUCTURE OF THE SETTLEMENT DOES NOT PROVIDE A "REVERSION," BUT RATHER IS A MECHANISM TO FUND VOUCHERS FOR THE CLASS ................................................................................ 2

    A.  The Structure Here Is Fair And Reasonable. ........................................ 4

    B.  Even If This Were A Reversion, That Is Not Impermissible ................ 5

    C.  Justice Agrees That Any Unawarded Attorneys' Fees May Be Redirected At The Court's Discretion ...................................................... 7

II.  THE VOUCHERS PROVIDED TO THE CLASS AS PART OF THE SETTLEMENT HAVE SIGNIFICANT VALUE ........................................... 8

III.  THE CLAIMS-MADE PARTICIPATION RATES HERE ARE IN LINE WITH SETTLEMENTS THAT COURTS REGULARLY APPROVE AND THOSE CLASS MEMBERS WHO DID NOT PARTICIPATE WILL RECEIVE DIRECT BENEFITS ........................................................................... 11

IV.  THE NOTICE PROGRAM IS THE BEST NOTICE PRACTICABLE ......... 15

V.  THE OVERALL VALUE TO THE CLASS IS FAIR, ADEQUATE AND REASONABLE ...................................................................................... 17

VI.  REQUIRING RECEIPTS FOR INCREASED CASH PAYOUTS WAS APPROPRIATE ...................................................................................... 19

VII.  ATTORNEYS' FEES ................................................................................ 21

VIII.  THE SETTLEMENT COMPARES FAVORABLY TO THE OHIO SETTLEMENT ...................................................................................... 23

IX.  THE SCOPE OF SETTLEMENT PERIOD IS NOT A VALID CONCERN ................ 26

X.  TENNESSEE CLASS MEMBERS ARE ABLE TO RECOVER UNDER THE SETTLEMENT ...................................................................................... 27

XI.  CONCLUSION ...................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

<small>**CASES**</small>

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997).................................................................................................17

*Barel v. Bank of Am.*,
   255 F.R.D. 393 (E.D. Pa. 2009)...............................................................................7

*Blessing v. Sirius XM Radio Inc.*,
   507 F. App'x 1 (2d Cir. 2012) ..................................................................................5

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
   761 F.3d 732 (7th Cir. 2014) ..................................................................................17

*Cohorst v. BRE Properties, Inc.*,
   No. 10CV2666, 2012 WL 153754 (S.D. Cal. Jan. 18, 2012) ..................................22

*Esslinger v. HSBC Bank Nevada, N.A.*,
   No. 10-3212, 2012 WL 5866074 (E.D. Pa. Nov. 20, 2012) .............................15, 26

*Foos v. Ann, Inc.*,
   No. 11CV2794 L MDD, 2013 WL 5352969 (S.D. Cal. Sept. 24, 2013)...................9

*Friedman v. Lansdale Parking Auth.*,
   No. CIV. A. 92-7257, 1995 WL 141467 (E.D. Pa. Mar. 31, 1995).........................6

*Girsh v. Jepson*,
   521 F.2d 153 (3d Cir. 1975)....................................................................................17

*Hall v. Best Buy Co., Inc.*,
   274 F.R.D. 154 (E.D. Pa. 2011)..............................................................................13

*In re Baby Prods. Antitrust Litig.*,
   708 F.3d 163 (3d Cir. 2013)........................................................................10, 22, 24

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) ........................................................................5, 7, 8, 22

*In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*,
   269 F.R.D. 468 (E.D. Pa. 2010)..............................................................................15

*In re Comcast Corp. Set-Top Cable Tel. Box Antitrust Litig.*,
   311 F.R.D. 145 (E.D. Pa. 2015)..............................................................................20

## TABLE OF AUTHORITIES
(continued)

**Page**

*In re Domestic Air Transp. Antitrust Litig.*,
  141 F.R.D. 534 (N.D. Ga. 1992)............................................................12

*In re Nat'l Football League Players Concussion Injury Litig.*,
  No. 15-2206 ..........................................................................................4

*In re Online DVD—Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) ...............................................................11

*In re Processed Egg Prods. Antitrust Litig.*,
  302 F.R.D. 339 (E.D. Pa. 2014)...........................................................12

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998)............................................................7, 14

*In re Serzone Products Liab. Litig.*,
  231 F.R.D. 221 (S.D.W. Va. 2005)......................................................12

*In re Warfarin Sodium Antitrust Litig.*,
  212 F.R.D. 231 (D.Del. 2002), *aff'd* 391 F.3d 516 (3d Cir. 2004)........27

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004).................................................................17

*Jackson v. Wells Fargo Bank, N.A.*,
  No. 2:12-CV-01262, 2015 WL 5732090 (W.D. Pa. Sep. 30, 2015).......11

*LaGarde v. Support.com, Inc.*,
  No. C12-0609 JSC, 2013 WL 1283325 (N.D. Cal. Mar. 26, 2013) .........6

*Landsman & Funk, P.C. v. Skinder-Strauss Associates*,
  No. 15-2485, 2016 WL 611441 (3d Cir. Feb. 16, 2016) ........................5

*Lee v. Enter. Leasing Co.-W.*,
  No 3:10-cv-00326, 2015 WL 2345540 (D. Nev. May 15, 2015) .............9

*Lee v. Ocwen Loan Servicing, LLC*,
  No. 14-CV-60649, 2015 WL 5449813 (S.D. Fla. Sept. 14, 2015) .........12

*Lemus v. H&R Block Enters. LLC*,
  No. 09-3179, 2012 WL 3638550 (N.D. Cal. Aug. 22, 2012) ...................6

*McDonough v. Toys R Us, Inc.*,
  80 F. Supp. 3d 626, 642 (E.D. Pa. 2015) .....................................4, 5, 6

**TABLE OF AUTHORITIES**
(continued)

**Page**

*McKinnie v. JP Morgan Chase Bank, N.A.*,
     678 F. Supp. 2d 806 (E.D. Wis. 2009)...................................................................5, 6

*Meijer, Inc. v. 3M*,
     No. CIV.A. 04-5871, 2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) .......................6

*Montoya v. PNC Bank, N.A.*,
     No. 14-20474, 2016 WL 1529902 (S.D. Fla. Apr. 13, 2016) ...................................5

*Mulder v. Kohl's Dept. Stores, Inc.*,
     No. 15-11377, 2016 WL 393215 (D. Mass. Feb. 1, 2016) .....................................17

*O'Brien v. Brain Research Labs, LLC*,
     No. CIV.A. 12-204, 2012 WL 3242365 (D.N.J. Aug. 9, 2012) ................................9

*Perez v. Asurion Corp.*,
     501 F. Supp. 2d 1360 (S.D. Fla. 2007) ......................................................12, 23, 24

*Perez v. Tween Brands, Inc.*,
     No. 14CV001119 .....................................................................................................23

*Perry v. FleetBoston Fin. Corp.*,
     229 F.R.D. 105 (E.D. Pa. 2005)..............................................................................18

*Poertner v. Gillette Co.*,
     No. 6:12-CV-00803, 2014 WL 4162771 (M.D. Fla. Aug. 21, 2014), *aff'd* 618
     F. App'x 624 (11th Cir. 2015) .................................................................................12

*Powers v. Lycoming Engines*,
     272 F.R.D. 414 (E.D. Pa. 2011)..............................................................................18

*Reynolds v. Beneficial Nat. Bank*,
     288 F.3d 277 (7th Cir. 2002) ...................................................................................22

*Rose v. Bank of Am. Corp.*,
     No. 5:11-CV-02390-EJD, 2014 WL 4273358 (N.D. Cal. Aug. 29, 2014) .............12

*Shaulis v. Nordstrom, Inc.*,
     120 F. Supp. 3d 40, 50-52 (D. Mass. 2015).............................................................17

*Spark v. MBNA Corp.*,
     157 F. Supp. 2d 330 (D. Del. 2001).........................................................................6

*Sullivan v. DB Invs., Inc.*,
     667 F.3d 273 (3d Cir. 2011) (en banc).....................................................................12

e


**TABLE OF AUTHORITIES**
(continued)

**Page**

*Tait v. BSH Home Appliances Co.*,
No. SACV 10-0711, 2015 WL 4537463 (C.D. Cal. July 27, 2015).........................................19

*Wallace v. Powell*,
No. 3:09-cv-286 ...................................................................................................................15

*Wilson v. Airborne, Inc.*,
No. EDCV 07-770, 2008 WL 3854963 (C.D. Cal. Aug. 13, 2008) ......................................16

*Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*,
758 F.2d 86 (3d Cir. 1985)..................................................................................................15

**STATUTES**

28 U.S.C. § 1715....................................................................................................................8

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ................................................................................................1, 14, 15, 16, 22

Defendants Ascena Retail Group, Inc. and Tween Brands, Inc. d/b/a "Justice" (together, "Justice") hereby respond to various objections to the proposed settlement of this class action.[1] None of the objections provide a valid ground to withhold approval of the Settlement, but in fact actually highlight the Settlement's fairness and value to the Class.  As more fully set forth below, and contrary to what some objections contend:   (1) the features of the Settlement that some objectors improperly characterize as a "reversion" are not a reversion but rather provide a fair mechanism to fund vouchers for those members of the Class who elected to receive vouchers; (2) the fact that Class Members had the option to select or automatically receive vouchers is not a reason to reject this Settlement, but rather demonstrates the flexibility and increased value of the Settlement to the Class; (3) the participation and claims made rates involved here fall squarely within the range of where courts approve settlements and even those Class Members who did not make a claim will still receive direct benefits in the form of vouchers; (4) the notice program was the best practicable as required by Rule 23; (5) the overall value to the Class is fair, adequate and reasonable; (6) it is fair and reasonable to require Class Members who wanted to prove that they had higher than average purchases to prove those purchases; (7) the attorneys' fees involved and the process by which they were negotiated are no reason to void the entire Settlement; (8) those objectors who were proponents of the Ohio Settlement have no grounds to object to this Settlement given how much better this Settlement is to Class Members; (9) the scope of the Settlement period is not a valid concern; and (10) Tennessee Class Members get value from this Settlement and the alleged failure to include a specific cause of action under Tennessee law is

---

[1] The Court's Order of October 27, 2015 granting preliminary approval of the Settlement in this action expressly allowed that the parties may respond to any unresolved objections by April 29, 2016.  Dkt. No. 78.  Consistent with the requirement that unresolved objections be attached to the responses, Justice understands that Class Counsel has attached the unresolved objections in full to its papers, which respond to each objection in turn.  In an effort to maximize efficiency for the Court, Justice incorporates by reference the unresolved objections attached to Class Counsel's brief rather than attaching them here.  If, however, the Court would prefer for Justice to provide those unresolved objections again, it is willing to do so.

not a valid reason to withhold approval.  For these reasons and the reasons more fully set forth in the materials Justice and Class Counsel previously submitted, Justice respectfully submits that the Settlement should be approved.

By way of broad overview, two of the core values of this Settlement are choice and flexibility.  This Settlement had to address 18.4 million identified Class Members in all fifty states, many of which have different laws.  Those Class Members have different needs and goals.  They also had different purchase histories at Justice stores.  Accordingly, the parties to the Settlement allowed Class Members a number of choices:  (1) making an affirmative and simple claim for either a set amount of cash or a voucher of a certain amount, both of which varied by state, based on average purchase amounts at Justice; (2) electing to pursue a higher cash amount or voucher if the Class Member could prove that he or she made purchases from Justice in amounts significantly greater than average amounts; or (3) taking no action and receiving a voucher based on an average purchase amount.  In order to facilitate those choices, the Settlement needed a flexible structure.  In many instances, the objectors attempt to cast flexibility as a problem rather than recognizing the value it actually creates.

I.     **THE STRUCTURE OF THE SETTLEMENT DOES NOT PROVIDE A "REVERSION," BUT RATHER IS A MECHANISM TO FUND VOUCHERS FOR THE CLASS**

Several of the objections assail what they refer to as a "reversion" in the Settlement.  In fact, there is no reversion.  A reversion is where amounts of money in a settlement fund go back to the defendants to inure to their sole benefit rather than going to the class.  That is not what is happening here.  Rather, there is a flexible funding mechanism that allows some of the cash not claimed by Class Members to be used to fund vouchers.  Class Members had the option of either claiming cash from the Settlement fund or selecting a voucher (affirmatively or passively).  The amount of the cash settlement fund was carefully negotiated to be sure that if more than the

expected number of Class Members selected cash, there would be enough cash in the fund to pay

those Class Members.  But, for every Class Member that did not claim cash, Justice will have to

send that Class Member a voucher.  As more Class Members claimed cash, fewer vouchers

would be distributed.  As more Class Members preferred vouchers, more vouchers would be

distributed.  Those vouchers are not funded through the Settlement fund, but rather come directly

from Justice.  That is why the parties provided that unclaimed amounts in the Settlement fund

would go to Justice – **to pay for the vouchers**.

        In fact, more Class Members demonstrated an affinity for vouchers – both in affirmative

claims and in electing to take no action.  As a result, Justice will pay out more to fund the

vouchers than was expected.  To put some finer points on it:

- More than 170,000 Class Members submitted an affirmative claim for vouchers. Justice will have to send vouchers totaling approximately $6.5 million to this group.[2]

- The cash fund was designed to accommodate up to 420,000 **more** Class Members who may have claimed cash.  But, many more Class Members appeared to prefer to take no action and receive a voucher.  Justice will have to fund and send vouchers to this group in an amount that is more than $10.5 million.

- Between the claimed vouchers, the Class Members who were expected to claim cash but instead elected to receive a voucher, and those who were expected to and did prefer to take no action and receive a voucher, Justice will be sending out over $350 million worth of vouchers.  Had the cash fund been fully claimed, Justice would have been sending out approximately $297 million worth of vouchers.[3]  The difference is $53 million additional dollars Justice must fund.

---

[2] These vouchers vary in amount from $10 to $30 for Class Members who did not submit proofs of purchase and average more than $120 for Class Members who submitted proofs of purchase and requested vouchers.

[3] If approximately 2 million Class Members had claimed an average of $13 in cash, that would have fully used up the amounts in the fund for cash.  Sending the vouchers to those 2 million individuals will cost Justice approximately $47,000,000.

*See generally* Dkt. No. 137 at ¶¶ 16-18 (Decl. of Kevin E. Raphael).[4]  In sum, no matter how the Court views it, there is no actual reversion and certainly no windfall to Justice.  Rather, the structure of the Settlement allows money to flow to Justice in order to fund the excess vouchers as a direct benefit to the Class.  This was the parties' specific contemplation during the Settlement negotiations—the structure of the Settlement would need to cause unclaimed monies to go to Justice to fund the distribution of vouchers outside the fund.  Moreover, this feature of the Settlement was highlighted to the Court at the preliminary approval hearing on October 19, 2015—long before any of the current objections were filed.

In light of this economic reality, the objections crying "reversion" must be overruled because:  (a) the structure of the Settlement that they call a reversion is in fact fair and reasonable; (b) even if this were considered a reversion, many courts in the Third Circuit have approved reversion-based settlements; and (c) Justice agrees that the Court may elect to direct that amounts of attorneys' fees not awarded to Class Counsel to the Class or to other counsel at the Court's discretion.

### A.     The Structure Here Is Fair And Reasonable.

In reviewing a settlement, the district court's role is to "determine whether the compromises reflected in the settlement—including those terms relating to the allocation of settlement funds—are fair, reasonable and adequate when considered from the perspective of the class as a whole."  *See McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 642 (E.D. Pa. 2015) (emphasis added) (quoting *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173-74 (3d Cir. 2013) ("The role of the district court is not to determine whether the settlement is the fairest possible solution.")); *see also In re Nat'l Football League Players Concussion Injury Litig.*, No.

---

[4] Additional detail, and updated numbers, on the participation rates will be provided by the Settlement Administrator in advance of the Final Approval Hearing.  *See* Dkt. No. 98 at 12.

15-2206, *et seq.*¸ 2016 WL 1552205, at *29 (3d Cir. Apr. 18, 2016) (affirming the approval of a class action settlement and noting "[t]hough not perfect, it is fair.").  Here, given the fact that the amounts from the Settlement fund that are going back to Justice are necessary to fund the vouchers, this feature of the Settlement is certainly fair and reasonable.

**B.      Even If This Were A Reversion, That Is Not Impermissible**

Even if the features some objectors criticize were considered to be a "reversion," that is not grounds to reject the Settlement.  Contrary to objectors' implication, no court has held that the presence of a reversion in a settlement agreement renders the agreement *per se* unreasonable.  *See McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (approving proposed settlement after commenting that the presence of a reverter clause does not "render the settlement per se unreasonable."); *Montoya v. PNC Bank, N.A.*, No. 14-20474, 2016 WL 1529902, at *18 (S.D. Fla. Apr. 13, 2016) ("Though [a reversion clause] may warrant giving a settlement closer scrutiny, [it does] not compel the court to reject a settlement, like this one, that is otherwise reasonable and not the product of collusion.").  Instead, courts disapprove of settlements containing reversions primarily where there is evidence of collusion between the parties.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) ("*In re Bluetooth*") (remanding class action settlement for further inquiry into the fairness of the settlement); *see also Blessing v. Sirius XM Radio Inc.*, 507 F. App'x 1, 2 (2d Cir. 2012) ("To the extent objectors argue that the clear-sailing and reversionary provisions suggest improper collusion between class counsel and Sirius XM, we note that such provisions, without more, do not provide grounds for vacating the fee.").

Courts in the Third Circuit have routinely approved settlement agreements that include a reversion of funds to the defendant.  *See Landsman & Funk, P.C. v. Skinder-Strauss Associates*, No. 15-2485, 2016 WL 611441, at *3 (3d Cir. Feb. 16, 2016) (affirming district court's approval

of a settlement including a reversion provision after finding "no indicia of self-dealing by counsel" and "counsel has met its responsibility to seek an award that adequately prioritizes direct benefit to the class."); *McDonough*, 80 F. Supp. 3d at 642-43 (approving settlement containing return of any amount of uncashed checks, which would be redistributed to the class in the form of coupons); *Spark v. MBNA Corp.*, 157 F. Supp. 2d 330, 341 (D. Del. 2001) ("The court finds the provision for a reversion to MBNA is fair and reasonable, both in light of the opportunities the parties have given class members to elect to receive a check and in light of the practical problems MBNA would otherwise have in seeing that a check for $3.57 is sent to each class member."); *Meijer, Inc. v. 3M*, No. CIV.A. 04-5871, 2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) (approving settlement with revision to defendant); *Friedman v. Lansdale Parking Auth.*, No. CIV. A. 92-7257, 1995 WL 141467, at *5 (E.D. Pa. Mar. 31, 1995) ("Having weighed the parties' equitable claims, the court concludes that reversion of the settlement fund to the Authority is the appropriate disposition of the surplus."). Courts around the country are in accord. *See*, *e.g.*, *LaGarde v. Support.com, Inc.*, No. C12-0609 JSC, 2013 WL 1283325, at *10 (N.D. Cal. Mar. 26, 2013) (approving a class action settlement including a reversion after finding that there was no evidence of collusion between the parties); *Lemus v. H&R Block Enters. LLC*, No. 09-3179, 2012 WL 3638550, at *5 (N.D. Cal. Aug. 22, 2012) (concluding that a claims-made settlement with a reversionary clause was "fair, reasonable and adequate"); *McKinnie*, 678 F. Supp. 2d at 813 (approving settlement that contained reversionary clause after concluding that "there has been no collusion between the parties.").

The features of the Settlement fund in this case are not evidence of collusion by the parties. Instead, they are some of the many compromises that resulted from the months of arms-length negotiations between the parties, including more than fifteen telephone conferences and

in-person meetings.  *See McDonough*, 80 F. Supp. 3d at 642 (approving a settlement after concluding "this reverter is part of the compromise and does not render the . . . Settlement unfair or unreasonable.").   As described above, these features simply provide a mechanism through which Justice is able to fund at least the portion of the vouchers selected by Class Members either by action or inaction.  Given the numbers cited above, the return of the excess funds is an important, and carefully negotiated, component of the Agreement between the parties.  It is not evidence of collusion, and therefore should be approved.

C.     **Justice Agrees That Any Unawarded Attorneys' Fees May Be Redirected At The Court's Discretion**

Many of the objections are particularly critical of the suggestion that in the event the Court awards less than the $14.1 million that Class Counsel seek for attorneys' fees, the unawarded amount will go to Justice.  This is not correct.  The award of attorneys' fees is a matter committed to the Court's discretion.  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333 (3d Cir. 1998) (noting that the Court of Appeals reviews the district court's award of attorneys' fees for abuse of discretion); *Barel v. Bank of Am.*, 255 F.R.D. 393, 403 (E.D. Pa. 2009) ("Ultimately, we have discretion over the proper amount of attorneys' fees.").  Because up to $14.1 million may be awarded as attorneys' fees, any amounts the Court awards less than that may be used by the Court in its discretion.  *See In re Bluetooth*, 654 F.3d at 949 (noting that where a defendant has agreed to pay a certain amount of attorneys' fees, but the court has awarded less than the full amount, "there is no apparent reason the class should not benefit from the excess allotted for fees.").

Here, Justice agrees that in the event the Court determines to award some lesser amount to Class Counsel, the Court may direct the funds that are the difference between the Court's award and the $14.1 million at its discretion.  Those amounts could be distributed pro-rata to all

claimants who sought cash or they could be awarded to other attorneys whom the Court believes to have created value to the Class.  Much of the case law cited by several objectors who contest the so-called "reversion" addresses this point—the fairness of directing unawarded attorneys' fees to the defendant(s).  Given Justice's agreement that the Court may direct these monies in other ways, these objections are moot.

## II.    THE VOUCHERS PROVIDED TO THE CLASS AS PART OF THE SETTLEMENT HAVE SIGNIFICANT VALUE

The Settlement Agreement allows Class Members to elect to receive either cash in an amount that depends upon their state of residence or a voucher with a face value of between 30% and 45% more than the cash value to which they are entitled.  Dkt. No. 78, Ex. A at ¶ 40.  It provides for three levels of recovery based upon the state[5] in which the Class Member resides:

- Class Members who live in limited recovery states—whose laws would not award relief to Class Members—are entitled to receive either $7 in cash or $10 off a purchase of $25 or more;

- Class Members who live in single recovery states—whose laws award only single damages to Class Members—are entitled to receive either $13 in cash or $20 off a purchase of $25 or more; and

- Class Members who live in treble recovery states—whose laws provide for more than single damages to Class Members—are entitled to receive $20 in cash or $30 in vouchers.

*See id.*

Additionally, every identifiable Class Member who does not make a claim will automatically receive a voucher in the amounts described above.  *Id*. at ¶ 40(e).  In total, more than eight million Class Members will receive a voucher for $30, for which there is no minimum

---

[5] Pursuant to 28 U.S.C. § 1715, Justice provided notice of the Settlement to the United States Attorney General, and the Attorney General of each state.  Although certain of the Attorney Generals requested additional information from Justice, none have objected to the Settlement.

purchase required, and more than 425,000 Class Members will receive a cash distribution. *See* Dkt. No. 78, Ex. A at ¶ 40; *see generally* Dkt. No. 137 at ¶¶ 15-18.

Nevertheless, certain objectors disparagingly label the Settlement Agreement a "coupon settlement" and argue that the vouchers do not offer real value. The Court should reject these objections because they rely on inapplicable generalizations and fail to properly account for the facts underlying this Settlement. A proper analysis shows that the terms of the Settlement— including the distribution of vouchers to those claimants who elected to receive them—are fair, reasonable and adequate. *O'Brien v. Brain Research Labs, LLC*, No. CIV.A. 12-204, 2012 WL 3242365, at *15 (D.N.J. Aug. 9, 2012) (approving a settlement agreement that provided either a cash payment of $20 or a voucher for a certain percentage off products sold by defendant).

First, and importantly, Class Members have the option to choose cash—rather than a voucher—and, thus, no Class Member is required to continue to shop at Justice in order to receive the benefit of the Settlement. This aspect of the Settlement alleviates the purported concern—raised by objectors—that Class Members would be required to continue to do business with Justice in order to obtain the benefit of the Settlement. To the extent that a Class Member harbored any objection to receiving a voucher, or simply preferred to receive cash, the Class Member was entitled to elect to receive his or her distribution in cash. Under these circumstances, the Settlement is not a "coupon settlement that requires heightened scrutiny under the Class Action Fairness Act."[6] *See Lee v. Enter. Leasing Co.-W.*, No 3:10-cv-00326, 2015 WL 2345540, at *3 (D. Nev. May 15, 2015) (approving a settlement in which class members could elect to receive cash or a voucher, and holding that it "is not a coupon settlement."); *see also Foos v. Ann, Inc.*, No. 11CV2794 L MDD, 2013 WL 5352969, at *3 (S.D. Cal. Sept. 24, 2013)

---

[6] Under any level of scrutiny, the terms of the Settlement are fair, reasonable and adequate.

("having a coupon option does not necessarily transform a class action settlement into a coupon settlement under CAFA.").

Second, despite having had the option to choose a cash award, approximately 175,000 Class Members elected to receive their distribution in the form of a voucher. *See* Dkt. No. 137 at ¶¶ 15-18. This fact demonstrates that a substantial portion of the Class considers the vouchers to be valuable. The objectors' purported concerns are based on their misunderstanding of Justice's customers, who comprise the proposed Class. Unlike some other retail chains, Justice enjoys many repeat customers. To these individuals, who are likely to shop at Justice stores in the future, the vouchers for savings on Justice's products represent a real and meaningful direct benefit, which is precisely what Third Circuit case law requires. *See In re Baby Prods. Antitrust Litig.*, 708 F.3d at 173 (holding that "direct distributions to the class are preferred over cy pres distributions."). Nor is this a case where the vouchers can only be redeemed for worthless goods. There is no allegation that Justice's products were defective or worthless; rather, the allegations focus on how they were marketed. A number of Class Members who opted-out or objected to the Settlement confirmed that Justice's products were highly regarded. *See, e.g.*, Objection of J. Harmon (Mar. 29, 2016) ("I admit I bought a lot of clothes for my granddaughters there, because they loved the clothes and I knew they would wear them.")

Third, the use of vouchers is particularly appropriate in this case, which is premised on allegations that the Class Members did not receive the benefit of an advertised discount. The voucher provides at least a portion of the discount that Plaintiffs claim they did not receive.

Fourth, the use of vouchers as a component of this claims-made Settlement maximizes efficiency, which has enabled Justice to provide greater value to the Class. For example, distributing the proceeds of the Settlement in the form of vouchers allows Justice to implement

certain fraud-prevention measures, including the prohibition on using the vouchers to purchase gift cards. Such distribution also allows Justice to avoid the complications that accompany distributing checks to a list of Class Members whose contact information may be incomplete or outdated. By sending checks only to those individuals who request them—and for whom Justice has a valid address—Justice avoids sending out checks that will not be cashed, and the resulting potential for loss of those funds through escheat to state governments. These efficiencies result in savings to Justice, which have been passed to the Class in the form of higher value vouchers. Although some objectors complain about the other restrictions placed on use of the vouchers, they are actually minimal and industry-standard rules, such as restricting the combination of vouchers with other offers.

In sum, the objectors' contention that the vouchers in this Settlement do not have real value to the Class is meritless, and the Court should reject it.

## III.   THE CLAIMS-MADE PARTICIPATION RATES HERE ARE IN LINE WITH SETTLEMENTS THAT COURTS REGULARLY APPROVE AND THOSE CLASS MEMBERS WHO DID NOT PARTICIPATE WILL RECEIVE DIRECT BENEFITS

Threaded throughout the objections is the suggestion that too few Class Members reap the benefits of the established $50.8 million settlement fund. As of April 22, 2016, 602,371 Class Members had submitted claims amounting to more than 3.2% of the 18.4 million estimated Class Members. Dkt. No. 137 at ¶ 15. However, some objectors have attacked the rate of participation as insufficient and indicating a defect with the notice program and Settlement. *See, e.g.*, Objection of M. Vullings, Dkt. No. 107 at 3 (contending that the response rate is inadequate as "claims-made settlements have an average claims rate of 1 out of 10"). Such objections lack merit for five reasons.

-11-

First, in analyzing the "reaction of the class" in connection with final approval, courts have recognized that a response rate in the 3% range, or below, is not problematic. *In re Online DVD—Rental Antitrust Litig.*, 779 F.3d 934, 944–45 (9th Cir. 2015) (approving 35 million-member settlement class when only 1.183 million—less than 4%—filed claims and noting that "settlements have been approved where less than five percent of class members file claims"); *Jackson v. Wells Fargo Bank, N.A.*, No. 2:12-CV-01262, 2015 WL 5732090, at *14 (W.D. Pa. Sep. 30, 2015) (finding a response rate of 13% to be "fairly high" in light of authority noting that "response rates in class actions generally range from one to 12 percent"); *Lee v. Ocwen Loan Servicing, LLC*, No. 14-CV-60649, 2015 WL 5449813, at *22 (S.D. Fla. Sept. 14, 2015) ("there is nothing inherently unfair about a single-digit claims rate in a class settlement."); *Rose v. Bank of Am. Corp.*, No. 5:11-CV-02390-EJD, 2014 WL 4273358, at *5 (N.D. Cal. Aug. 29, 2014) (in assessing a 3.25% participation rate, the Court noted "[w]hile low, the participation rate is in line with other settlements of this size."); *Poertner v. Gillette Co.*, No. 6:12-CV-00803, 2014 WL 4162771, at *5 (M.D. Fla. Aug. 21, 2014) (approving a settlement where the claims rate was 0.076%), *aff'd* 618 F. App'x 624 (11th Cir. 2015); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1377 (S.D. Fla. 2007) (approving 10.3 million-member settlement class when less than 119,000—approximately 1.1%—filed claims).  Contrary to the claim by one objector that a response rate below 10% is troublesome, claim rates in consumer class action settlements "rarely" exceed 7%, "even with the most extensive notice campaigns." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (en banc).

Second, it is well-established that the response rate in a class action settlement is not indicative of whether the notice to the class was adequate. *See, e.g., In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 235-36 (S.D.W. Va. 2005) (overruling objection that notice was

-12-

inadequate based on low participation rate and adopting Defendant's expert's assertion that "the adequacy of notice is measured by whether notice reached class members and gave them an opportunity to participate, not by actual participation."); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 550 (N.D. Ga. 1992) ("Whether class members are apprised of their rights is a very different question from whether class members ultimately make a claim."); *cf. In re Processed Egg Prods. Antitrust Litig.*, 302 F.R.D. 339, 357 n.10 (E.D. Pa. 2014) ("Although the response rate to the Notice of Settlement (as measured by the number of Claim Forms returned in relation to number of Notices distributed) is low, the Court does not draw any inferences of some sort of negative class reaction to the settlement from this response rate."). To the contrary, courts have held that individual notice—as used here—is "considered the best practicable notice where . . . the identities of the class members are known or reasonably ascertainable." *See Hall v. Best Buy Co., Inc.*, 274 F.R.D. 154, 168 (E.D. Pa. 2011).

Third, the benefit provided to the Class cannot be measured by simple reference to the rate of responsiveness. Unlike the run-of-the-mill claims-made settlement, where class members recover only if they submit a claim, ***Class Members here recover automatically without the need to submit a claim***. See Dkt. No. 78, Ex. A at ¶ 40(e). Accordingly, the number of claims submitted is an incomplete metric by which to measure the proportion of Class Members benefitting from the Settlement and likely significantly understates the interest in the Settlement and claims rate that would have occurred if identified Class Members were not assured that they would receive a voucher even without submitting a claim. In fact, the automatic-voucher mechanism ensures that the volume of Class Members benefitting from this Settlement compares favorably against the settlements discussed above.

-13-

Fourth, it is possible—if not likely—that the low participation rate is due, to some extent, to the fact that Class Members do not believe that they were misled or defrauded by Justice's alleged actions.  This assumption is supported by many of the objections and opt-outs.  *See*, *e.g.*, Objection of R. & L. Johnson (Dec. 22, 2015) ("Consumers decide what they believe is a fair price to pay for an item.  If the mark down price is too high we should be smart enough to decide not to buy it."); Objection of C. Jacobs (Jan. 9, 2016) ("The customers of Justice knew the prices for the garments they were purchasing and willingly purchased them at the offered price.  It is disingenuous for those individuals to now claim they were deceived."); Objection of L. Kaplan (Jan. 9, 2016) ("Justice's pricing model was never deceptive; what they were doing was evident and any customer could have realized.").

Fifth, the number of objections and opt-outs may also be considered as part of the "reaction of the class" element of considering settlement approval.  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d at 318 (affirming district court's decision finding that the reaction of the 8 million person class was positive where only approximately 19,000 opted out, and approximately 300 objected, and noting that the "most vociferous objectors to the Proposed Settlement are a handful of litigants represented by counsel in cases that compete with or overlap the claims asserted in the Second Amended Complaint.").  Here, the overall reaction of the Class cannot possibly be viewed as a negative.  Of 18.4 million identifiable Class Members, only 398 opted out and 41 objected.  *See generally* Dkt. No. 137 at ¶¶ 15-18 (describing overall participation rate).  That is an opt out rate of 0.002% and objection rate of 0.0002%.

For each of these five reasons, these objections are devoid of merit.

IV.     **THE NOTICE PROGRAM IS THE BEST NOTICE PRACTICABLE**

Certain objectors contend that class notice was "inadequate," taking issue with various details and logistical concerns, such as details about Class Counsel's fee motion, the method for reaching Class Members whose initial mailing addresses and/or email addresses were incorrect, among other things.  *See*, *e.g.*, Objection of S. Ference (Apr. 14, 2016), Dkt. No. 105 at 5; Objection of M. Hipshire (Apr. 15, 2016), Dkt. No. 110 at 8-9.  But the law does not require perfection—Class Members must simply be provided with the "best notice practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B).  Here, the Court already determined that the notice program met this standard and approved it as part of the Order for Preliminary Approval (*See* Dkt. No. 78); none of the objections provide any compelling reason to change that determination now.

Indeed, the notice program was comprehensive, by any measure.  The Court and parties prioritized direct notice, which is the gold standard for class notice and presumptively meets the legal requirements.  *See*, *e.g.*, *Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90–91 (3d Cir. 1985) (noting that first class mail and publication have "regularly been deemed adequate under the stricter notice requirements" and that Third Circuit cases establishing "maximum notice" policy in class actions "requir[e] only first-class mail and publication").  Where "extensive individual notice [is] combined with widespread published notice," the "best notice practicable" requirements of Rule 23 and due process have been satisfied.  *Esslinger v. HSBC Bank Nevada, N.A.*, No. 10-3212, 2012 WL 5866074, at *5-6 (E.D. Pa. Nov. 20, 2012); *see also Wallace v. Powell*, No. 3:09-cv-286, et al., 2015 WL 9268445, at *11-12 (M.D. Pa. Dec. 21, 2015) (finding that the dissemination of notice "through a variety of means, including direct mailings, a toll-free call center, publication in newspapers, and a website" satisfied Rule 23 and due process).

Here, the parties leveraged the customer information from Justice to provide contact information for approximately 93.6% of the Class.  *See* Dkt. No. 78, Ex. 9.  Between December 1, 2015 and March 11, 2016, the Settlement Administrator sent direct notice by email to 12,294,258 potential Class Members and notice by first-class mail to 14,981,463 potential Class Members—over 27 million direct communications in total.  See Dkt. No. 98, Ex. 1.  In addition to direct notice, publication notice was made with ads in the national editions of Parade and People magazines.  *Id.*; *see In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 482 (E.D. Pa. 2010) (endorsing the use of publication of notice on the internet and in various publications, including Parade Magazine, as "demographically relevant" for the cross-section of the population that would appreciate being informed of a consumer class action).  A press release was issued that resulted in at least 275 news stories, including many with national coverage and local media in every region of the country.  See Dkt. No. 98, Ex. 1.  The Settlement Administrator maintained a toll-free number that received 85,731 calls, received 14,284 communications sent to its Post Office and email addresses designated for the Settlement, and maintained the Settlement website since November 30, 2014, which received over 4 million hits. *Id.*

Furthermore, the notice program appropriately informed Class Members of Class Counsel's fee motion pursuant to Rule 23(h).  The direct notice specifically identified Class Counsel's fee request of up to $15 million, and specified that the Court would address that request on May 20, 2016.  Dkt. No. 98, at Ex. 6.  This notice meets the strictures of Rule 23(h). *Wilson v. Airborne, Inc.*, No. EDCV 07-770, 2008 WL 3854963, at *5 (C.D. Cal. Aug. 13, 2008) (overruling objection that the settlement class did not receive adequate notice of the fee motion where print media advertisements generally informed potential class members about the

-16-

projected range of attorneys' fees requested).  Notice was sufficient and objections related to notice issues should be overruled.

## V.   THE OVERALL VALUE TO THE CLASS IS FAIR, ADEQUATE AND REASONABLE

In light of the scattershot approach taken by objectors in raising their purported concerns, it is notable that, by and large, they do not object to the overall value of the Settlement to the Class.  Nor could they.  The value of the Settlement—both in the aggregate and to each Member of the Class—is fair, adequate and reasonable in light of the numerous risks that Plaintiffs would have encountered had they chosen to pursue this case to trial, including the risks that they would not be able to establish liability or damages, or to maintain the Class through the conclusion of trial.[7]  *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (holding that, in determining whether a settlement is fair, reasonable and adequate, courts must consider the risks of, inter alia: (1) establishing liability; (2) establishing damages; and (3) maintaining the class action through the trial).

First, Plaintiffs would likely be unable to establish that Justice's sales practices violated state consumer protection laws as alleged in the complaint.  Multiple recent cases have dismissed similar claims by plaintiffs arguing that they were harmed by misleading price advertising, holding that consumers in these situations did not actually suffer any harm due to the alleged wrongful practices.  *See*, *e.g.*, *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740 (7th Cir. 2014) (affirming dismissal of complaint under Illinois Consumer Fraud Act alleging misleading price advertising because plaintiff had not "sufficiently pleaded that he paid more than the actual value of the merchandise he received."); *Mulder v. Kohl's Dept. Stores, Inc.*, No. 15-11377, 2016 WL 393215, at *5-6 (D. Mass. Feb. 1, 2016) (dismissing claim under the

---

[7] Justice incorporates by reference the arguments it made in its Memorandum of Law in Support of its Joint Motion for Final Approval of Settlement.  Dkt. No. 100.

Massachusetts Consumer Protection Act because there was no allegation that the plaintiff had actually been harmed as a result of misleading comparative price ads); *Shaulis v. Nordstrom, Inc.*, 120 F. Supp. 3d 40, 50-52 (D. Mass. 2015) (holding that a plaintiff who purchased a product with allegedly false advertised savings of 77% could not allege any damages since she "got exactly what she paid for, no more and no less").

Second, Plaintiffs would have encountered intractable management problems in attempting to prove at trial their claims under the laws of 50 states and the District of Columbia. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). Courts in this circuit have properly refused to certify such classes. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004); *Powers v. Lycoming Engines*, 272 F.R.D. 414, 427 (E.D. Pa. 2011) (denying motion to certify proposed litigation class, and holding "[a] single nationwide class action is unmanageable when the law of many different jurisdictions must be applied.").

The practical difficulties with succeeding at trial on these claims were only underscored by the claims process. During that period, many Class Members wrote to Counsel for the parties and to the Court to express their frustration with this lawsuit. For example, one Class Member wrote:

> This settlement is contrary to public policy in that the claims are so ridiculous they make a mockery of our legal system. This Settlement rewards people for not using reasonable diligence in conducting their daily transactions. A reasonable person knows or should know the price of the T-shirt and jeans they are buying and whether the price represents a 40% savings over the prevailing market price. The customers of Justice knew the prices for the garments they were purchasing and willingly purchased them at the offered price. It is disingenuous for those individuals to now claim they were deceived. The court should not allow this abuse.

Objection of C. Jacobs (Jan. 9, 2016). Another Class Member wrote "I believe that the Action is absurd. . . . Justice's pricing model was never deceptive; what they were doing was evident and

-18-

any customer could have realized."  Objection of L. Kaplan (Jan. 9, 2016).  Finally, a third Class Member noted "[a]nyone with half a brain can see that the 40% off promotion is nothing more than a sales gimmick . . . .  Who was harmed?"  Objection of D. Kupstas (Mar. 29, 2016).

Had this case not settled, counsel for Justice would have deposed each of these potential Class Members—and the many others like them—in order to further develop evidence that Justice shoppers were not confused—much less defrauded—as a result Justice's sales techniques. These putative Class Members would likely have made compelling witnesses at trial.

In sum, the value to the Class offered by this Settlement is significant particularly given that Class Members would likely have received no recovery at trial.  *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 117 (E.D. Pa. 2005) (approving settlement that did not include a monetary award to plaintiffs where "class members could not rightfully expect to receive large individual monetary damages and because the court must discount for the risk of not prevailing.").

## VI.   REQUIRING RECEIPTS FOR INCREASED CASH PAYOUTS WAS APPROPRIATE

A handful of objectors contend that the "proof-of-purchase" requirement set forth in this Settlement Agreement is unduly prejudicial and inappropriate.  *See*, *e.g.*, Objection of V. Mager and M. Schultz (Apr. 12, 2016); Objection of C. Russo (Mar. 11, 2016); Objection of M. Vullings (Apr. 15, 2016).  These objections should be overruled.

First, the requirement for additional documentation only applies to a limited set of Class Members for whom there are good reasons to require proof of purchase.  For the vast majority of the Class—including the approximately 18.4 million people for whom Justice had contact information—relief is available without providing any receipts or other information at all.  Thus, proof of purchase is not a significant barrier to recovery under the Settlement.

-19-

Second, the requirement is entirely reasonable and necessary for the limited group of Class Members for whom it was required.  The Settlement required proof of purchase for: (a) Class Members who did not receive direct notice with a code confirming that Justice had a record of their status as a current or former customer; and (b) Class Members choosing "Option Two" relief by establishing that he/she made more than five purchases, or spent $105 or more during the relevant period.  Dkt. No. 78, Ex. A at ¶ 40.  In each of these instances, the requirement of receipts or credit card statements is entirely reasonable and necessary to determine Class Membership and to prevent fraud by those seeking to obtain a higher cash award without proof of their entitlement.  *See Tait v. BSH Home Appliances Co.*, No. SACV 10-0711, 2015 WL 4537463, at *3 (C.D. Cal. July 27, 2015) (overruling objections and granting motion for final approval of a claims-made settlement where certain class members were required to submit proof of ownership of a washing machine by providing a receipt, invoice, credit card statement, or picture of the machine's serial number); *In re Comcast Corp. Set-Top Cable Tel. Box Antitrust Litig.*, 311 F.R.D. 145, 152 (E.D. Pa. 2015) (refusing to certify the Settlement Class where the settlement allows "a sworn statement, without objective records . . . to establish membership in the Settlement Class," as relying on the equivalent of "affidavits alone" is not a "reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition").

Third, the Settlement also allowed for submission of other documentation, such as credit or debit card statements.  The vast majority of purchases at retail clothing stores like Justice are made using cards, and these statements are easily accessible, even after the original statements have been discarded.  *See, e.g.*, JPMorgan Chase & Co., "Paperless Statements,"

https://www.chase.com/online/digital/paperless-statements.html (last visited Apr. 25, 2016) (stating that credit card holders can access up to 7 years of account statements online).

Finally, not only do these objections overstate the burden associated with submitting supporting documentation, but these objections also overlook the fact that—as to those seeking to take advantage of Option Two—requiring documentation is the only way that Justice could allow Class Members to obtain recovery for the full number and amount of their purchases. Although Justice does keep some customer information, and was able to provide contact information for the vast majority of potential Class Members, it would be impossible as a practical matter for Justice to accurately account for every sale made by the Class Members. In reality, Class Members who have taken advantage of the benefits of Option Two are better protected by shouldering the burden to substantiate their own actions as they know whether they purchased goods from Justice; Justice does not know—and cannot reasonably know—each and every person who made a purchase, including the number and value of those purchases, during the relevant time period.

## VII.  **ATTORNEYS' FEES**

Some objectors quarrel with the fact that Justice agreed not to object to the request from Class Counsel for attorneys' fees in the amount of $15 million (now, $14.1 million) or less. Contrary to these objections, however, there is nothing improper or objectionable about this approach.

First, the negotiation related to attorneys' fees was entirely appropriate and such agreement did not in any way depend on relief to the Class. Justice and Plaintiffs' Counsel negotiated the relief to the Class first and provided for separate amounts designated for the Class before agreeing that Justice would not oppose a request for fees up to $15 million. As accurately described in the Long Form Notice, attorneys' fees were "separately negotiated" only "[a]fter

-21-

reaching the core terms of the Settlement on behalf of Plaintiffs and the Class Members." Dkt. No. 71-1, Ex. 4 at 7. This is apparent in the Term Sheet, which was executed on the same day— July 2, 2015—that the parties agreed to a settlement in principle and specifically indicated that Justice committed an estimated $27.8 million to pay affirmative claims by Class Members, separate from the $15 million that might go toward Class Counsel's fees. Although the total (including $8 million for administration) added up to the $50.8 million that Justice agreed to place in escrow, the amounts were separate and in no way dependent or contingent on one another. Dkt. No. 112, at Ex. B.

Second, "class action settlements frequently provide that the defendants will not object to the plaintiff's request for attorneys' fees and costs. Such a provision is neither unconscionable nor unfair because Class Members are free to challenge any fee award." *Cohorst v. BRE Properties, Inc.*, No. 10CV2666, 2012 WL 153754, at *3 (S.D. Cal. Jan. 18, 2012); *In re Bluetooth*, 654 F.3d at 948 (a "clear sailing" provision simply requires that the court "peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class.").

Third, where the court determines that a fee award should be reduced, the appropriate course is not to invalidate the settlement as a whole, but "for the court to decrease the fee award." *In re Baby Prods. Antitrust Litig.*, 708 F.3d at 179; *see also In re Bluetooth*, 654 F.3d at 949 (noting that where a defendant has agreed to pay a certain amount of attorneys' fees, but the court has awarded less than the full amount, the appropriate action is not to invalidate the agreement but to direct the amount to the class); Fed. R. Civ. P. 23(h) ("In a certified class action, the court **may** award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement.") (emphasis added).

Finally, contrary to the suggestion of some objectors, Justice did not conduct a "reverse auction" with respect to the Settlement.  There are certainly examples of this behavior in the context of class action settlements.  *See*, *e.g.*, *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277 (7th Cir. 2002) (three lawyers, none of whom had pending suits or even clients, lunched with defense counsel, discussed settlement and apparently made a tentative agreement as to the monetary value of such a settlement, before "buying" a client from another lawyer, bringing suit against defendants, and settling for the agreed-upon figure).  None of those facts—or any other facts— suggesting a "reverse auction" or other collusion exist here.  Rather, the Settlement was the result of a contentious and adversarial negotiation that took place over several months. Rather than conduct any "auction" with respect to the Settlement, Justice negotiated and settled with the first group of Plaintiffs who filed a multi-state lawsuit.  *See*, *e.g.*, Dkt. No. 47 (Motion for MDL Consolidation attaching a schedule of related cases).  Although multiple "copycat" class actions were filed around the country, Justice never made any offers to "auction off" the Settlement to the group of plaintiffs who offered the "best deal."

## VIII.   THE SETTLEMENT COMPARES FAVORABLY TO THE OHIO SETTLEMENT

Counsel involved in the prior settlement in Ohio in the case of *Perez v. Tween Brands, Inc.*, No. 14CV001119 (Ct. Comm. Pl. Lake Cty. Ohio) (the "*Perez* Settlement"), have filed an objection on behalf of named plaintiffs in some of the later-filed cases (the "Gallagher Objection").  Dkt. No. 112.  The Gallagher Objection repeats many of the objections addressed above and contains some additional arguments.  Most notably, the Gallagher Objection, and others, suggest that the *Perez* Settlement was more favorable to Ohio class members than this one.  Dkt. No. 112 at 8.  That is demonstrably false.  In fact, this Settlement is significantly better for Class Members than the *Perez* Settlement.

First, the basic recovery amounts are superior.   Under the *Perez* Settlement, the basic recovery available for Class Members who made a claim but did not submit receipts was $12 or a voucher for 40% off Justice Products.  Dkt. No. 112-5 at ¶ 5.  Here, Class Members in Ohio identified through Justice records can, without providing receipts, claim either a check for $20 or a voucher for $30 with no minimum purchase.  Dkt. No. 78, Ex. A at ¶ 40.  Moreover, the *Perez* Settlement was entirely claims made, meaning that ***class members only recovered if they filed a claim***.  Dkt. No. 112-5 at ¶ 5.  In stark contrast, all Class Members for whom Justice has accurate contact information will receive relief (in the form of a $30 voucher in Ohio) even if they do not submit a claim.  Dkt. No. 78, Ex. A at ¶ 40(e).  Thus, for the vast majority of Class Members in Ohio, this Settlement will offer significantly more benefit than the *Perez* Settlement.[8]

Second, the claims rate in the *Perez* Settlement was similar or less than the claims rate here.  In *Perez*, the parties identified 588,474 Class Members through Justice records and the administrator received 16,262 claims, amounting to a rate of 2.8%.  See Dkt. No. 112-4, Ex. 1 at ¶¶ 3 & 8.  Here, as of April 22, 2016, Justice received 602,371 claims against 18.4 million Class Members identified by Justice, which is a claims rate of 3.3%.  *See* Dkt. No. 137 at ¶ 15. Calculated against the estimated 19.5 million people in the Class, the claims rate is 3.08%.  Thus, under either analysis, the claims rate in this case is higher than what class counsel secured in *Perez*.

Third, the actual payment to the class in the *Perez* Settlement was limited compared to the *cy pres* payment and attorneys' fees award.  Justice ultimately paid $3 million in settlement relief, with approximately $643,066 going to the class and a *cy pres* payment of about $2.3

---

[8] For those Class Members who submit receipts documenting their purchases, the settlements provide similar relief. Perez offered 20% of purchases; this Settlement gives Class Members with qualifying volume or dollar amount of purchase the choice of a check for 12% of their purchases or a voucher for 20% of purchase.

million going to charity.[9]   Against those amounts, the plaintiffs' attorneys in *Perez* (who now object to this Settlement) extracted ***$3 million*** in attorneys' fees.  Dkt. No. 112-5 at ¶ 14.  Such an arrangement would likely raise concerns in this Court.  *See In re Baby Prods. Antitrust Litig.*, 708 F.3d at 173 (holding that "direct distributions to the class are preferred over *cy pres* distributions").  In short, the notion that the *Perez* Settlement provided superior value to ***Class Members*** is pure fiction.  And rather than suggesting any critique of this Settlement, the *Perez* Settlement highlights some of the important ways in which the Settlement is eminently fair and reasonable.

Finally, the Gallagher Objectors suggest that Justice admits that it has misled consumers and broken the law.  Dkt. No. 112 at 3.  That is also untrue.  Justice consistently has denied any liability or wrongdoing.  *See*, *e.g.*, Dkt. No. 78, Ex. A at ¶ 15 ("Defendant expressly disclaims any liability or any wrongdoing of any kind whatsoever."); *id.*, Ex. 3 (Direct Notice) ("Justice denies all of the claims and says that it did nothing wrong.").  The Gallagher Objection also suggests that the Settlement is not a sufficient deterrent.  Dkt. No. 112 at 3 & 5-6.  The idea that payment by Justice of $50.8 million will not deter the company is laughable.  Moreover, Justice has already committed in the Settlement to make changes to its sales practices and follow the law.  Dkt. No. 78, Ex. A at ¶ 33).  Indeed, the Court's Preliminary Approval Order states that Justice has "ceased the persistent forty percent (40%) off everything sales, had changed its business model to reprice merchandise and agrees to abide by all applicable laws with respect to price comparison and sale advertising."  Dkt. No 78, Ex. A at ¶ 1.

---

[9] Justice expects to supplement its brief with a report from the settlement administrator in the *Perez* matter prior to the Final Approval Hearing.

IX.      **THE SCOPE OF SETTLEMENT PERIOD IS NOT A VALID CONCERN**

This Settlement includes all individuals throughout the United States who purchased products from Justice from January 1, 2012 until February 28, 2015 (the "Claims Period"). Dkt. No. 78, Ex. A at ¶ HH. Contending that Justice's "40% off" promotion began in February 2009, objectors argue that the Settlement improperly excludes individuals who purchased products from Justice in the window between February 2009 and January 2012. *See* Objection of T. Metoyer (Oct. 19, 2015) at 3.[10] Objectors have also complained about limiting the Settlement to exclude purchases after February 28, 2015. *See*, *e.g.*, Objection of G. Carey (Apr. 15, 2016) at 4.

Justice shoppers who made purchases outside the Claims Period fall into one of two camps: (1) those individuals whose *only* purchases at Justice occurred before or after the Claims Period; or (2) those individuals whose purchases occurred before *and* during the Claims Period. Without having made a purchase within the Claims Period, individuals who fall into the first camp are not Class Members. Those individuals have nothing to gain or lose in these proceedings; they do not have standing to object to this Settlement and cannot be prejudiced by its ultimate resolution. *See Esslinger*, 2012 WL 5866074, at *7 (stating that non-class members "do not have standing to object to the settlement").

The second group of Justice customers are already Class Members by virtue of their purchase within the Claims Period and are able to take part in this litigation, even if they also purchased products prior to or after the Claims Period. Those Class Members who believe they are somehow negatively impacted by the Settlement are able to opt out and pursue claims individually. As a Class Member possesses the right to opt out and pursue an individual claim, he or she is not prejudiced by the limitations on the scope of the Claims Period; after opting out,

---

[10] Theresa Metoyer's counsel sent this objection to the parties immediately before the Court's October 19, 2015 Preliminary Approval Hearing. On November 4, 2015, Ms. Metoyer's objection was filed as an attachment to her "Notice of Receipt of Pleadings." Dkt. No. 79.

that former Class Member may pursue relief for purchases made before, during, and after the Claims Period.

## X.   TENNESSEE CLASS MEMBERS ARE ABLE TO RECOVER UNDER THE SETTLEMENT

Objector Manda Hipshire contends that Class Counsel "unnecessarily and unreasonably" restricted the benefits due [to] Tennessee Class members" by "omitting a viable claim under the TCPA [Tennessee Consumer Protection Act]."  Objection of M. Hipshire (Apr. 14, 2016) at 8. According to Ms. Hipshire, Class Counsel inappropriately elected not to advance a claim under Tennessee's Consumer Protection Act on behalf of Tennessee Class Members, instead favoring Class Members in other states.  *Id*. at 6.  However, even though the TCPA does not permit class actions, residents of Tennessee are included in the Class and entitled to relief in the Limited Recovery category, allowing them (along with residents of six other states) to choose $7 in cash or $10 in the form of a voucher.  *See* Dkt. No. 78, Ex. A at ¶ 40.  Of course, if Ms. Hipshire or other residents of Tennessee believe that they can obtain a more favorable recovery by pursuing their own claim, they were free to opt-out.  *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 258 (D.Del. 2002), *aff'd* 391 F.3d 516 (3d Cir. 2004) (overruling class settlement objections, noting that a settlement represents a compromise of varying interests, and those Class members who believe that they are entitled to more substantial relief may do so by opting out).

## XI.   CONCLUSION

Based on the foregoing responses to the objections, along with Justice's Memorandum of Law in Support of it Joint Motion for Final Approval of Settlement, Justice requests that the Court grant final approval of the Class Settlement.

DATE:  April 29, 2016                Respectfully submitted,

s/ Gregory T. Parks
MORGAN, LEWIS & BOCKIUS, LLP
Gregory T. Parks
gparks@morganlewis.com
Ezra D. Church
echurch@morganlewis.com
Christopher J. Mannion
cmannion@morganlewis.com
1701 Market Street
Philadelphia, PA 19103
Telephone: 215-963-5000
Facsimile: 215-963-5001

*Counsel for Ascena Retail Group, Inc. and
Tween Brands, Inc.*