IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CAROL ROUGVIE, et al.              :   CIVIL ACTION
                                   :
            vs.                    :
                                   :   NO.  15-724
ASCENA RETAIL GROUP, INC., et al.  :

KEARNEY, J.                                             July 29, 2016

## OPINION

Eight consumers of "tween" merchandise, on behalf of over 18.4 million consumers, sued the Justice Stores retailer for representing sales at "40% off" when the same price is allegedly always charged.  The consumers sought injunctive relief and damages arguing the "40% off" advertising strategy violated state consumer protection and deceptive trade practices statutes and the common law of contracts in each state.   Liability is unclear with at least one district court twice finding consumers cannot proceed under these theories. Given the uncertainty after pre-suit investigation but before formal discovery, the retailer and eight consumers entered into several rounds of negotiations and then agreed to settle millions of claims through immediate injunctive relief and offering consumers up to $27.8 Million in cash or, if they wished, a voucher to use at Justice Stores.

After notice, 3.3% of the Class chose either cash or a voucher.  The remaining 96.7% of the Class, having not filed a claim, automatically receive a voucher. The parties concede consumers will redeem approximately less than three percent (3%) of these automatic vouchers. The parties ask us to scrutinize the actual benefits to the largely absent settlement class in light of the risks or rewards of a class certification hearing and possible trial and then certify their proposed settlement class, approve their injunctive, cash and voucher settlement which they

value at an as-yet unknown number between an immediate and escrowed Settlement Fund of $50.8 Million and, with voucher redemptions, potentially over $400 Million. Based on the alleged immediate direct benefit of $50.8 Million deposited with the approved Claims Administrator, Class Counsel ask for an award of over $14.1 Million in attorneys' fees and a $6,000 incentive fee for each of the eight (8) consumer plaintiffs.

We scrutinize all class settlements but especially those: reached before extensive formal discovery; seeking to simultaneously certify a settlement class; affording injunctive relief and then offering a choice of differing amounts and types of compensation including cash or vouchers for all known consumers; and, requiring a release from all consumers. The parties offered consumers the choice of cash now with the dollar amount depending on counsels' independent and negotiated valuation of the liability risk and reward based on each state's consumer protections. Given the common questions arising from Justice Stores' admittedly national sales strategy and analyzing each Rule 23 requirement, we certify the Settlement Class. Given the uncertain liability or trial certification, and choice of cash offered to every one of the identified 18.4 million plus consumers, we also find the settlement is fair, adequate and reasonable.

Certifying the settlement class and approving this negotiated settlement as fair, adequate and reasonable does not translate into a rubber stamp for whatever counsel later decides to do with the $50.8 Million deposited in a Cash Settlement Fund. Our issue is whether we should approve attorneys' fees far beyond their demonstrated time mindful of Congress' mandate we carefully review settlements which appear to pay over 95% of the settlement through *de facto* coupons requiring the consumer return to Justice Stores in the next twelve (12) months. Consumers can never transfer or convert the vouchers to cash. They cannot redeem them

anywhere other than Justice Stores which only sells a variety of tween merchandise.   When Class Counsel agrees to settle for a mixture of injunctive relief, cash and vouchers before formal discovery and the vast majority of consumers did not make an affirmative claim, it is prudent to evaluate Class Counsel's decision to settle for almost all vouchers before awarding attorneys' fees at a requested multiplier of over four (4) times the invested time.   We appreciate the contingent nature of Class Counsel's representation and, as in any contingent case, will wait and see the direct benefit before awarding a contingent fee.

We recognize Class Counsel obtained an actual and immediate benefit through a cash choice.   They are entitled to compensation for this actual benefit to the over 600,000 persons who filed affirmative claims choosing between cash and a voucher.   Class Counsel settling "small-damage" innovative consumer class cases should be reasonably rewarded for their efforts in light of the contingent risk. Our award today of $5,311,470.24 recognizes their demonstrated efforts based on their detailed lodestar and reasoned 1.75 multiplier.

We decline to award the full amount of the requested $6,000 incentive award to each Plaintiff based on counsel's belated representations of their varied efforts. We also find Ms. Mansour cannot receive an incentive fee due to her undisclosed familial relationship with Class Counsel and we have no basis for an award to Ms. Sinkler.

We approve the release of administrative costs up to $8 Million with leave for the parties to seek additional reimbursement in connection with a final distribution order.

Any remainder in the escrowed Settlement Fund must be redistributed in an agreed manner approved by this Court.

3

# I.   Background

The consumers claim Ascena Retail Group, Inc. and Tween Brands Inc. d/b/a/ Justice Stores (collectively "Justice Stores") regularly advertised "40% off" sales but the so-called sales were actually regular everyday prices.   Consumers argue this national advertising scheme fraudulently induced consumers to spend money believing they were getting a sale.   The consumers sought injunctive relief and damages claiming Justice Stores violated state consumer protection statutes, administrative regulations and common law contract theories.

Melinda Mehigan and Fonda Kubiak, on behalf of a putative class of New Jersey and New York consumers, sued Justice Stores asserting common law breach of contract claims and violation of consumer protection statutes.   Carol Cowhey filed a similar case individually and on behalf of a putative class of Pennsylvania Justice Stores' consumers asserting common law breach of contract and claims under Pennsylvania's Unfair Trade Practice and Consumer Protection Law.   We consolidated these two matters and later filed cases.[1]

Plaintiffs filed a Third Amended Complaint seeking to certify a nationwide class, excluding only Ohio residents covered by a previously settled class action in *Perez v. Tween Brands, Inc.*, No. 14-1119 (Ct. Comm.Pl. Lake Cty. Ohio).   The putative class is individual purchasers at Justice Stores throughout the United States between January 1, 2012 and February 28, 2015 ("Class Period").   Other consumers later sued Justice Stores in other federal courts.[2] Counsel told us the progress on these other federal court actions await our review of the settlement of this first filed national class action.

At our initial scheduling conference, we directed counsel to proceed on a class certification and trial track while exploring settlement.   We discussed several issues facing the parties in a class certification hearing and possible trial.   Resolving the consumers' claims

4

creates substantial manageability challenges. A class action trial of all claims may likely prove impossible. We could not envision a national class liability trial based on consumer fraud acts which vary from treble damages to no recovery and applying common law contract theories of fifty (50) states with the overlay of fact and reliance issues. While we could possibly address differing damages through a post-trial claim process, the jury would need to address whether frequent purchasers should be treated differently for liability purposes.

Settling a national class consumer claim offers varied challenges as well, but we need not consider trial manageability. The eight (8) consumer plaintiffs, through the vigorous advocacy of their counsel, must protect the interests of over 18.4 million consumers. Justice Stores needs as much finality as possible fearing it could face individual state class actions with possibly widely varying outcomes and the attendant diversion of resources and potential several years of damage to brand identity.

Confident each would "win" something eventually, the parties agreed to meet shortly after our initial pretrial conference to discuss common grounds. Justice Stores agreed early on to stop the challenged conduct. The primary issue then became compensation: how does each party value the strength of the liability claim and what is a fair amount of damages based on the nature of this consumer marketplace. The parties, as now common in consumer cases, would also need to discuss the nature of the compensation recognizing Congress' mandate for courts to scrutinize coupon settlements balanced against Justice Stores' ability to pay tens or hundreds of millions of dollars in cash to persons who never knew of a problem. Even assuming, and only if, the parties could agree on liability and damages, they would need to address notice, opt-out procedures, and lastly attorneys' fees and costs.

A.      **Class settlement issues negotiated and resolved by the parties.**

After significant multiple negotiation sessions and voluntary exchange of data, the parties eventually agreed upon a cash settlement fund of $27.8 million to resolve projected claims. Before getting to this cash settlement fund, the parties spent months in back and forth negotiations, and negotiated and agreed upon several significant terms. The parties analyzed Justice Stores' consumer transaction data guided by expert statistical advice and analysis.

1.    **Defining the Settlement Class and addressing cash purchasers *sans* proof.**

The parties needed to agree upon who would receive value in the settlement in exchange for a release. Consistent with the Complaint, the parties agreed to define the Settlement Class ("Settlement Class") as: all persons throughout the United States who purchased any children's apparel, fashion accessories, or other products at Justice Stores from January 1, 2012 to February 28, 2015 (the "Class Period"). The proposed class excludes individuals within the class settlement in *Perez v. Tween Brands, Inc.* except for *Perez* class members who made purchases from January 1, 2012 to June 30, 2012 or from September 1, 2014 through February 28, 2015.

The Settlement Class includes all persons purchasing product regardless of how they purchased it. The Settlement Class includes persons who cannot prove they purchased products during the Class Period because they did not provide contact information, a receipt or other proof of purchase. Justice Stores estimates this group is 1,700,000 people, or less than 10% of all purchases. These persons received publication notice and could opt-out of the settlement. They are not compelled to release. They elected not to opt-out. Absent some evidence they purchased product, we cannot ascertain their class membership. Unlike a purchase of a continuing service or large ticket item from which we could find independent evidence to ascertain purchase, we cannot rely solely upon the say-so in an affidavit swearing they purchased during the Class

Period especially when these same cash consumers would not provide contact information upon purchase.   These unknown and unascertainable purchasers also received injunctive relief.

### 2.  Calculating the liability risk.

While the consumers sought an all cash settlement, they recognized Justice Stores would not negotiate based on a several hundred million dollar payment for a consumer deceptive practices claim not recognized by any court and riddled with reliance and manageability issues compounded by several different consumer protection regimes in the fifty (50) states.   Class Counsel continued to negotiate and eventually Justice Stores agreed to offer cash to every member of the Settlement Class but not full purchase price.   The parties after strident negotiations agreed the maximum recovery would be forty percent (40%) of a proven purchase. The parties then negotiated the likely damages quotient between what a buyer would have paid, and did pay, at the Justice Stores allegedly based on their reliance upon a "40% off" advertisement. The parties compromised at a thirty-five (35%) chance of consumers winning a 40% off recovery on all purchases for class members. The parties agreed to and negotiated these numbers after independently assessing a likelihood of recovery which Class Counsel estimated high, and Justice Stores' counsel estimated very low.   Thirty-five percent (35%) of the maximum forty percent (40%) recovery equals fourteen percent (14%).   These negotiations, as shown in Class Counsel's billing histories, reflect vigorous representation with no evidence of collusion.

After excluding a statistically significant group of "high volume" consumers to be addressed through a separate calculation and for purposes of determining a meaningful average transaction, the parties agreed the average transaction during the Class Period is $24.   While an objector argued the average transaction should be calculated based on a higher dollar purchase, the parties reasonably agreed to a second option for those frequent or larger dollar consumers.

### 3. Distinguishing between consumers based on purchase activity.

In reviewing customer demographics, the parties eventually agreed Justice Stores' consumers generally fall into three groups: the "average" customer (those making, on average, four (4) purchases during the Class Period); the "frequent" customer (those generally making more than five (5) purchase transactions during the Class Period); and, the "high volume" customer (those spending at least $105 in one (1) or more transactions during the Class Period). The parties agreed to provide meaningful recovery to these distinct groups.

### 4. Varying consumer protection laws.

Acknowledging each state's consumer protection statutes authorize varied recovery, the parties grouped individual state consumers into three (3) categories according to the type of recovery generally permitted under relevant state statutes. The parties specifically addressed the differing damages models similar to a subclass protocol in a contested liability class.

The first group is consumers in states with consumer protection statutes permitting limited or no recovery ("limited recovery states").[3] The second group is consumers in states where consumer protection statutes permit recovery of actual damages ("single recovery states").[4] Consumers in states where consumer statutes permit up to treble damages comprise a third group ("treble recovery states").[5] For each of these three (3) groups, the parties negotiated both a cash and voucher settlement option.

### a. Choice of cash or a voucher.

Justice Stores sell clothing and miscellaneous accessory items primarily appealing to girls aged six (6) to fourteen (14) years. The parties agreed some consumers outgrew Justice Stores and may prefer a cash award rather than a credit or voucher toward a future purchase. The parties agreed to permit every class member a choice of cash or a voucher good toward a future

purchase only at Justice Stores. The dollar amount of each award is determined based on the type of recovery authorized by consumer's home state consumer protection statutes (limited recovery, single recovery or treble damages).

### b. Options for all Settlement Class members.

The parties agreed consumers in the three groups of states may have significantly different recoveries at trial. To account for these differences, the parties agreed upon two claim options and an automatic recovery for all those who do not file a claim but are known purchasers. Option 1 is available to all consumers based on the "average" customer and does not require a proof of purchase for recovery. Option 2 is geared toward "frequent" and "high volume" consumers with proofs of purchase. The consumer must choose between the options. If they do not send in a claim form, they are choosing to automatically receive a voucher.

### 1) Minimum compensation through choice of cash or voucher.

Option 1 is available to all Class Members, but recovery is targeted at the level an "average customer" might receive. Based on these negotiated agreements, the parties calculated consumers in limited recovery states (Group I) could elect a cash option and receive $7; or choose a Justice Stores' voucher for a $10 credit toward a minimum $25 purchase. Class Members in single recovery states (Group II) electing a cash option receive $13; those electing a Justice Stores voucher receive $20 credit toward a minimum $25 purchase. Class members in treble recovery states (Group III) electing a cash option receive $20; those electing the voucher receive a $30 credit toward a future Justice Stores' purchase, with no minimum purchase required. The parties set the voucher amounts at approximately 150% of the cash awards. All vouchers are valid for one year from date of issue.

### 2) More compensation of either cash or voucher for frequent purchasers.

Agreeing the standard $7, $13 or $20 cash award, or alternate voucher offer would not sufficiently compensate Settlement Class Members across all customer groups, the parties created a second option ("Option 2") for Class Members who could provide proof of purchase exceeding $105 in one transaction or who made more than five (5) purchases exceeding $105 during the Class Period. Eligible Class Members electing Option 2 must provide proof of purchase by one of several methods and their award is equal to 14% of total purchases during the Class Period in cash, or 20% of total purchases during the Class Period in the form of a voucher good toward a future Justice Stores purchase.

Based on the Justice Stores' transaction data, the parties estimated 2,500,000 of the 18,422,784 known Class Members were "high frequency" or "high volume Consumers" and eligible to select Option 2. The parties estimated a three percent (3%) participation rate for Option 2 eligible Class Members and a five and one-half percent (5.5%) participation rate for remaining Class Members.

### 3) Automatic vouchers for all others.

Class Members may also elect to not file a claim but still receive value. The parties agreed Class Members who did not file a claim will automatically receive a voucher good toward a future Justice Stores purchase in the amount of $10, $20 or $30. Using the $24 agreed average purchase, the parties agreed to set the automatic voucher depending on their residence state's consumer fraud law. Class Members residing in a limited state receive a $10 voucher good for any purchase at Justice Stores of $25 or more; Class Members residing in a single recovery state receive a $20 voucher for any purchase at Justice Stores of $25 or more; and, Class Members

residing in a treble damages state receive a $30 voucher.  These automatic vouchers are also non-transferable and expire in one year.

### 5.   Establishing a Cash Settlement Fund.

The parties' estimated participation rates, together with their negotiated settlement terms, translated to an estimated cash payment of $15.9 million for Option 1 claimants and $11.9 million for Option 2 claimants, creating a total Cash Settlement Fund of $27.8 million.  The parties did not allocate any part of the settlement consideration to vouchers.

### 6.   Attorneys' Fees and Costs.

The parties negotiated attorneys' fees only after concluding settlement negotiations.[6] Absent any contrary evidence at our Final Fairness Hearing, the parties negotiated a "clear sailing" agreement where Justice Stores would not object to up to $15 million in attorneys' fees and $8 million in administrative expenses after arriving at the initial $27.8 Million Cash Settlement Fund. We heard no evidence of collusion. We still scrutinize the negotiations for an attorneys' fee and incentive award when faced with a settlement before formal discovery.  When combined with the $27.8 Cash Settlement Fund, these calculations generated a total proposed Settlement Fund of $50.8 million.

After agreeing to send out supplemental notice after our October 27, 2015 Order approving notice, Class Counsel agreed to reduce the maximum fee recovery to account for one-half of the additional $1.8 Million in administrative expenses associated with the supplemental notices. Again, Justice Stores agreed to a "clear sailing" agreement to not object up to $14,111,455.85 for the combined attorneys' fees and costs.  According to the parties' May 31, 2016 Joint Supplemental Memorandum, Class Counsel's actual fees through our May 20, 2016 Fairness Hearing are $3,035,125.85.

### 7.  Incentive awards to Class Plaintiffs.

The parties also agreed to pay $6,000 in incentive awards to each of the eight (8) class representatives to be paid from the Settlement Fund.  After we challenged these incentive awards without indicia of their activity at the Final Fairness Hearing, Class Counsel filed supplemental lawyer affidavits broadly describing the extent of seven of the eight named Plaintiffs.[7]  The class representatives did not submit affidavits. No class representative quantified the time they invested in the case. Justice Stores did not depose them.  According to Class Counsel, seven (7) Plaintiffs seek an incentive award at a several hundred multiplier of any other Class Member's recovery because she either called a lawyer, or as to Ms. Mansour, she is lucky enough to have a father-in-law and brother-in law be part of Class Counsel.

#### a.  Carol Rougvie

Ms. Rougvie spoke by telephone with Attorney Friesen about her shopping experiences over twelve (12) times, with conversations averaging a half hour each.  In addition to some follow up emails and facsimile correspondence, Ms. Rougvie reviewed the proposed settlement agreement.

#### b.  Tiffany Bolton, Kara Bell

Ms. Bolton and Ms. Bell spoke by telephone with Attorney Friesen on multiple occasions discussing case status and strategy and the proposed settlement terms.   The conversations averaged a half hour. These named plaintiffs also spoke with Attorney Ernest Mansour in Austin, Texas, and Mr. Mansour made three (3) trips to Austin to meet with them during the course of the litigation.  Attorney Mansour's declaration states neither of these plaintiffs live in Austin; Ms. Bolton traveled two hours each way to meet with him and Ms. Bell traveled forty-five minutes each way to meet with him.  During these meetings, these plaintiffs discussed with Mr.

Mansour and local counsel their respective cases, strategy and concerns, and prepared to testify in deposition, hearings or at trial. These individuals also corresponded with Mr. Mansour's partners by telephone and email.

### c.   Carol Cowhey

Mrs. Cowhey met with Attorney Raphael at least three times for at least an hour each, beginning in early February 2015. The conversations covered her Justice Stores' shopping experience, the legal foundation of the case and strategy. Mrs. Cowhey also reviewed and approved the draft Settlement Agreement. Mrs. Cowhey also spoke with Attorney Raphael by telephone on several occasions.

### d.  Melinda Mehigan

Ms. Mehigan had several phone conversations with Attorney Raphael, discussing her shopping patterns at Justice Stores. Ms. Mehigan provided proof of purchase at Justice Stores and reviewed and approved the proposed Settlement Agreement.

### e.  Fonda Kubiak

Ms. Kubiak had several phone conversations with Attorney Raphael, discussing her shopping patterns at Justice Stores, case strategy, settlement negotiations and settlement terms. Ms. Kubiak provided her Justice Stores proof of purchase, and reviewed, approved and executed the draft Settlement Agreement.

### f.   Caroline Mansour

Attorney Ernest Mansour is related to named plaintiff Caroline Mansour; he is her father-in-law. Attorney Robert Mansour is her brother-in-law. We can find no filing disclosing these facts until raised by objectors and then conceded at our Final Fairness Hearing.

Attorney Ernest Mansour states he traveled to Chicago, Illinois to meet with his daughter-in-law, and discussed case facts, strategy, pleadings and initially prepared her to testify at

13

deposition, hearings or at trial. Attorney Mansour swears Ms. Mansour also reviewed the proposed settlement agreement. In addition, Attorney Friesen states generally he corresponded with Ms. Mansour concerning the status of her case.

### g. Marguerite Sinkler Gilder

We have no information regarding Plaintiff Marguerite Sinkler Gilder's efforts.

### 8. Remainder of Settlement Fund after voucher redemption.

The parties agreed and told the Class, "if any funds remained in the Net Settlement fund 180 days following the Effective Date, the remaining funds shall revert to Justice following payment of any outstanding Claims Administration Expenses, Fee Award and Incentive Awards."[8] We are now aware only $10.1 million of the $27.8 million cash has been claimed. Under the Settlement Agreement, some undefined portion of this $17.7 Million delta could revert to Justice to reimburse it for redeemed vouchers. The parties did not preclude our approval of this reverter. To assist the Court on a final distribution, the parties agreed Justice Stores will submit to the Claims Administrator a periodic accounting of redeemed vouchers, and upon our final distribution, these amounts may be credited back to Justice Stores up to a maximum of $8 Million. At the end of the one (1) year voucher redemption period, the parties will revisit options to confer additional benefit to Class members and payout of remaining funds, if any. The precise distribution of any remaining funds in the escrowed interest-bearing Settlement Fund will be determined with the Court's approval after the voucher redemption period expires.

### 9. Release

The Settlement Class agrees to release all present and possible future claims against Justice Stores arising out of or relating to the allegations in the Complaint.[9] Justice Stores voluntarily ended its objectionable sales practices shortly after Plaintiffs filed this lawsuit.[10]

14

### 10. Allowing Class Members to opt-out or object.

The parties agreed on a specific procedure to allow consumers to either object or opt-out of the settlement. The parties agreed a consumer may object to the fairness of the settlement by filing and serving all counsel with a written objection signed by the consumer at least forty-five (45) days before the Final Fairness Hearing.

### 11. Our October 27, 2015 preliminary approval.

After considerable negotiation first on the settlement and then on the attorneys' fees, counsel signed a term sheet on July 2, 2015 with the principal settlement terms. The parties do not dispute the lawsuits resulted in Justice Stores stopping the sales practices.

The preliminary settlement included Justice Stores creating an escrow fund of $50.8 million to pay cash to the class members and to fund costs of administration and attorneys' fees. The parties memorialized these terms in a written Settlement Agreement and on September 24, 2015, counsel filed a Joint Motion for Preliminary Approval of nationwide class action settlement. During an October 19, 2015 hearing on preliminary approval, we addressed several concerns and confirmed Justice Stores' avowal it ceased the sales practices at issue and changed its advertising strategy. During our hearing, we suggested the staggered payment of attorneys' and Claims Administrator's fees and the parties agreed.

After the hearing on preliminary approval, and upon consideration of the parties' joint motion and supplemental filings, we granted Plaintiffs' Motion for Preliminary Approval of the Proposed Settlement and Authorization to Disseminate Notice to Members of the Settlement Class on October 27, 2015. Our October 27, 2015 Order preliminarily approving the Settlement incorporated the attached Settlement Agreement unless we altered the obligations. Having incorporated the attached Settlement Agreement, our October 27, 2015 Order

15

specifically required any objections to be filed by April 4, 2016 and failure to do so would waive any objection to the fairness, adequacy or reasonableness of the proposed Settlement. We further required the parties to file responses to unresolved objections.

### B. Notice is appropriate.

Justice Stores agreed to fund class notice. Plaintiffs initially identified 18,422,784 potential Class Members for whom Justice Stores had a postal route or email address, or who could be identified through reasonable effort, and estimated an additional 1,700,000 potential Class Members for whom Justice Stores had no contact information.[11] The unidentified consumers include those who paid in cash and/or who did not provide contact information for the store database ("Cash Consumers").[12] The parties estimate 5.4% of consumers purchasing during the Class Period paid by cash, did not provide customer contact information at checkout, and did not save receipts. The settlement does not contemplate compensating these Class Members.[13]

Beginning December 1, 2015, Epiq Class Action and Claims Solutions, Inc. ("Epiq")[14] sent email notice to 12,294,258 of the 18,422,784 known potential Class Members in the Justice Stores database with information tailored to possible recovery based on their state of residence.[15] Beginning December 4, 2015, Epiq sent Postcard Notice to 5,979,773 potential Class Members for whom only postal addresses were available.[16] Beginning December 31, 2015, Epiq sent Postcard Notice to 2,301,096 potential Class Members whose email notices were returned as undeliverable, and for whom there was also a postal mailing address on file.[17] After Court approval and beginning February 18, 2016, Epiq sent supplemental Postcard Notice to 6,275,160 potential class Members who were provided email notice, whose email did not get returned, who had not filed a claim or requested exclusion, and for whom Justice provided a postal address.[18]

Of all notices to postal addresses, 999,856 Postcards and 338 Claim packages were initially returned undeliverable.[19]  Epiq updated address files for these Consumers against a current LexisNexis database and re-mailed Notices where applicable.  As of April 29, 2016, 408,166 Postal mailings were ultimately undeliverable, and 1,179,568 email records could not be delivered.[20]  Of the 18,422,784 originally identified potential Class Members, the Claims Administrator reports 1,587,734 individual notices could not be delivered after reasonable effort.

To provide notice to potential Class Members for whom no name or contact information was available in Justice Stores' database, and under the Settlement Agreement, Epiq arranged for national distribution of a Press Release on PR Newswire.[21]  Epiq also arranged additional notice to potential Class Members via publication of class action litigation and settlement in *Parade* and *People* national magazines in January 2016.   Any person who purchased products at Justice Stores could respond to this nationally published notice.

By conservative calculations, an estimated eighty-nine percent (89%) of potential class members received timely notice of this action, giving them fair opportunity to obtain full notice, decide whether to opt out, and/or to file objections to the settlement.[22]   Our approved Notice described the case and specifically directed all Class Members to the docket and publicly available records.  Given the large class size, this percentage is within the range of reasonable response rates. [23]

Notices included a unique access code directing Class Members to a dedicated website and toll-free telephone number where each potential Class Member could enter the access code. The toll-free number provided callers with automated answers to frequently asked questions in both English and Spanish, and provided an opportunity to request a copy of the Detailed Notice and Claim Form by mail or to speak with a live claimant service representative.  The Claims

Administrator provided similar services, with options to file electronic claims, *via* a class action settlement. The Claims Administrator followed up on undeliverable emails and postcard mailings and re-mailed notice to alternate addresses where available.

The written individual notices summarized key settlement terms, informed Class Members of their legal rights, and permitted potential Class Members to submit claims with relative ease.[24] Counsel also complied with the notice requirement of the Class Action Fairness Act.

### C.    Settlement Class Members' response to Notice.

#### 1.  Class Members making a claim.

As of our May 20, 2016 Fairness Hearing, 607,215 Class Members, or 3.3% of the original database of known Class Members, submitted claims:  569,194 Class Members chose Option 1 (requiring no proof of purchase), and 38,042 Class Members selected Option 2 (requiring proof of at least 5 transactions within the claims period, or proof of purchases totaling at least $105). Of the Option 1 claimants, 407,517 elected to receive a cash award, and 161,677 selected vouchers.  Of the Option 2 claimants, 23,261 elected to receive cash award, on average totaling $146.58, and 14,781 Class Members elected a voucher award redeemable toward a future Justice Stores purchase, on average totaling $178.32.[25]

Within each group, the breakdown of claims is:[26]

|              |         | I         | II        | III       | Total      |
|--------------|---------|-----------|-----------|-----------|------------|
| Class Members |        | 1,917,675 | 8,398,780 | 8,106,329 | 18,422,784 |
| *Option 1*   | Cash    | 25,409    | 166,656   | 214,818   | 407,517    |
|              | Voucher | 5,810     | 66,459    | 89,030    | 161,677    |
| *Option 2*   | Cash    | 1,794     | 10,583    | 10,819    | 23,261     |

| Voucher | 971 | 6,719 | 7,026 | 14,781 |
| Undeliverable notice | 165,016 | 724,567 | 698,338 | 1,587,921[27] |
| *Estimated voucher recipients:* | 1,718,675 | 7,423,796 | 7,086,298 | 16,227,627 |

The parties estimate the total value of submitted cash and voucher claims as of May 20, 2016 is $16,718,624.[28] Cash claim awards total $10,036,310.10, with payments to Option 1 cash claimants of $6,640,751[29] and payments to Option 2 cash claimants of $3,395,559.10.[30] Voucher awards claimed by Class Members total $6,682,314.51, with Option 1 voucher claims totaling $4,058,180[31] and Option 2 voucher claims totaling $2,624,134.51.[32] As reported by the Claims Administrator on May 31, 2016, at least 91,122 claims had not yet been processed, including late filed claims and potentially duplicate submissions.[33] Once claims processing is complete, the dollar value of actual claims may be different. The parties have not specifically calculated this number for us as of today. As such, we only review the terms of the settlement and the maximum permitted by the parties' agreement and direct them to supplement upon final distribution.

## 2. 16,247,627 Class Members not responding but entitled to automatic vouchers.

In addition to cash and voucher award payments on affirmative claims up to approximately $16.7 million, Justice Stores will mail automatic vouchers to the remaining 16,247,627 known Class Members who elected not to file affirmative claims. Based on negotiated voucher awards of $10, $20 or $30 in "limited", "single" and "treble" recovery states, the face value of these awards approximates $378 million, including $17,187,050 to limited recovery plaintiffs (1,718,705 x $10), $148,475,920 to single recovery plaintiffs (7,423,796 x

19

$20), and $212,588,940 to treble recovery plaintiffs (7,086,298 x $30).  It is not possible to determine actual outlay for these automatic awards until the one-year redemption period expires.

These vouchers, in the amount of $10, $20 or $30, depending on individual Class Members' state of residence will be sent to an estimated 16,247,627 people.  The face value of these vouchers is $378,315,012, but the parties predict an approximate 2% redemption rate.

### 3.  Opt-outs and objectors

The parties agreed Class Members could file written objections to final settlement and appear at the Final Fairness hearing.  As of April 29, 2016, Epiq received forty-five (45) objections.  The parties agreed Class Members who do not wish to participate in the Settlement may "opt-out" by stating their intention in a written request to the Claims Administrator.  The Claims Administrator reports, as of April 29, 2016, it received 415 requests for exclusion ("Opt-out Plaintiffs") from the Class.[34]  Given the approximately 18,422,784 Class Members, neither the opt-out plaintiffs nor objectors represent a statistically significant percentage of the Class.

## II.    Class certification is appropriate.

In reviewing a motion for class certification, we act as a fiduciary for absent class members and protect the interests of the federal judicial system.[35]  To be certified, a class must satisfy the threshold requirements of Federal Rule of Civil Procedure 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.[36] In addition, the parties seeking certification must show the action is maintainable under Rule 23(b)(1), (2), or (3).[37]

The proposed Settlement Class consists of all persons who purchased items from Justice Stores which were advertised as on sale for at least 40% off, but which were actually sold at regular or everyday price.  Plaintiffs sue under common law contract and state consumer fraud statutes, alleging Justice Stores falsely claimed it offered merchandise at reduced prices.  The

class must be "'currently and readily ascertainable based on objective criteria,' and a trial court must undertake a rigorous analysis of the evidence to determine if the standard is met."[38]

"[T]he proposed class must satisfy at least one of the three requirements listed in Rule 23(b)."[39]  One option, under Rule 23(b)(3), allows a class action to be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

We granted conditional certification of the proposed class for settlement purposes on October 27, 2015, although this does not release the parties from fulfilling the requirements of Rule 23(a) and (b).  Certification continues to be governed by Federal Rule of Civil Procedure 23(a) and (b) and the class may not be finally certified for settlement purposes until it fully satisfies the requirements set forth in these rules.[40]  When a case is to be settled without trial, we must evaluate these requirements with heightened scrutiny.[41]

### A. The Parties satisfy the Rule 23(a) factors.

#### 1. Numerosity

"While there is no minimum number of plaintiffs necessary to maintain a class action lawsuit, generally if the named plaintiffs demonstrate that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."[42]  Purported class members exceed 18.4 million. "The class is so numerous that joinder of all members is impracticable."[43]  Rule 23(a)'s first prong is satisfied as the Settlement Class is sufficiently numerous.

#### 2. Commonality

Named plaintiffs must "share at least one question of fact or law with the grievances of the prospective class."[44]  The purpose of a commonality requirement is to test "whether the

named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."[45] The class members all shopped at Justice Stores and purchased items at "sale" prices. Rule 23(a)(2)'s commonality requirement is satisfied.

### 3. Typicality

Rule 23(a)(3) requires "the claims or defenses of the representative parties be typical of the claims or defenses of the class."[46] "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims."[47] The Settlement Class satisfies the typicality requirement because the Plaintiffs' claims are virtually identical to those of the other class members based on an admitted national advertising strategy. "The heart of this requirement is that the plaintiff[s] and each member of the represented group have an interest in prevailing on similar legal claims."[48]   All Class Members share the identical challenge to Justice Stores' "40% off" sales practices and claim they suffered damages from the deceptive practices.

### 4. Adequacy of Representation

Rule 23(a)(4)'s requirement is met if "the representative parties will fairly and adequately protect the interests of the class."[49] The adequacy inquiry ensures (1) absence of conflicts of interest between named parties and the class they seek to represent, and (2) attorneys for class representatives are experienced and qualified to conduct the litigation.[50]   Where, as here, settlement precedes class certification, "collusion, inadequate prosecution and attorney inexperience are the paramount concerns."[51]   Class Counsel and the eight consumer plaintiffs have no conflict with the Class and counsel is experienced and qualified to conduct this case.

22

Class Counsel is well qualified to handle this matter for the Class. We find no disqualifying conflict between Attorneys Ernest and Robert Mansour and Plaintiff Caroline Mansour; they are in-laws. Given the size of the case and her relative minor role as a fiduciary compared to the role of other Plaintiffs, we have no basis to find inadequacy of representation just because they are family.

Class Counsel are experienced trial counsel; they zealously prosecuted this matter on behalf of all potential Class Members. Other than bald assertions from objectors, there is no evidence of collusion. We have basis to find named representatives have interests contrary to those of absent Class Members.[52]

### B. Rule 23(b) Requirements

Having met Rule 23(a) requirements, Plaintiffs must also satisfy the two prongs of Rule 23(b)(3): (1) questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.[53]

### 1. Commonality/Predominance

The "focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct."[54] Plaintiffs claim Justice Stores misled class members into believing they were purchasing items at a significant discount, when actual retail prices never rose above the represented 40% discount. Each element of the claim need not be susceptible to common proof to satisfy the predominance requirement of Rule 23(b)(3).[55] "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."[56]

23

Justice Stores concedes its national marketing strategy. The same fact issues would need to be resolved focusing on Justice Stores' conduct. These fact issues predominate over any other fact issue. We find the Class' interests are aligned and unified, and common questions predominate. The commonality and predominance requirements are met.

### 2. Superiority

The second element of Rule 23(b)(3) requires us to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."[57] A class action is a superior mechanism for resolving this dispute over individual suits.

Each Class Member has a relatively small claim estimated to be $24 on average, which would likely not be litigated on an individual basis. "Given the relatively small amount recoverable by each potential litigant, it is unlikely that, absent the class action mechanism, any one individual would pursue his claim, or even be able to retain an attorney willing to bring the action."[58] The settlement removes any difficulties in managing a class action, as it is a settlement-only Class. A class action is superior to pursuing thousands or perhaps millions of individual claims.

### C. We overrule the objections to certifying the Settlement Class.

This settlement generated an insignificant number, on a percentage basis, of opt-outs or objections. The objections raise important issues particularly on a case by case basis. The objections as to the settlement are overruled with the exception of our reforming the approval of attorneys' fees, the amount of a reverter and administrative costs following our analysis of redeemed coupons.

Our role is "not to determine whether the settlement is the fairest possible resolution – a

task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated imperfectly."[59]   Rather, we must reflect whether terms of settlement "are fair, reasonable and adequate when considered from the perspective of the class as a whole."[60]

### 1. Notice objections.

Several objectors challenge adequacy of notice.  Objector Michelle Vullings challenges whether the claims administrator used valid mailing or e-mail addresses.[61]  Ms. Vullings also objects to class members' inability to opt-out *via* phone or email, but she fails to support this contention with case law.  We find the parties adequately explained their mailing procedures and follow-up search for updated addresses and we find no merit to these notice objections.[62]

Objector Sheila Ference[63] claims notice is inadequate for failing to identify specific legal issues, class claims or describe how this settlement compared to the previously settled case on behalf of consumers in Ohio, in *Perez v. Tween Brands*.  Rule 23 does not impose such a requirement.  The notice fully described the underlying case and directed the consumers to the docket number and Class Counsel.  Objectors Andrea Kalley and Yanetsy Loor[64] also claim notice procedures are deficient and deny Class Members' due process rights because the notice fails to account for differences in state law and contains an overbroad release. We overrule this objection, as more fully described below.

Objector Deborah Love[65] claims the notice language is misleading insofar as it claims the counsel negotiated the attorneys' fees after the parties reached a class settlement. During the Fairness Hearing, the parties credibly described the order of settlement negotiations, having arrived at a class settlement agreement before negotiating attorneys' fees.  Absent contrary evidence, we find no reason to disbelieve the parties' sworn statements describing the order of

settlement negotiations.

We find no merit in any challenge to adequacy of notice. The notice provided satisfies Rule 23(c)(2) and Rule 23(e) requirements and provided potential Class Members with "the information necessary to make an informed and intelligent decision whether to participate in the class and whether to object to the Proposed Settlement."[66]

Under Rule 23, the approved notice told Class Members of the nature of the litigation and the claims and defenses offered, the terms of settlement and the parties' plan for distribution. Class Members could opt out of the settlement and pursue their own litigation. The notice adequately advised Class Members as to the nature of the pending litigation, general terms of settlement, described where complete information could be obtained, and informed Class Members of their rights to appear and be heard at the fairness hearing.

### 2.  Class Counsel failed to address manageability.

A few Class Members contend Class Counsel failed to address manageability under Rule 23. Following *Amchem Products, Inc. v. Windsor*[67], we apply a more generous standard to the manageability question when certifying a class for purposes of settlement only. In such cases, "variations [in state laws] are irrelevant to certification of a settlement class."[68] Manageability is not a necessary concern when certifying a class for settlement only purposes.[69]

We find the parties promised, and have delivered, on their ability to provide notice and manage distribution of information, including voluntarily supplementing notice and deducting the costs from the attorneys' fees.

### 3.  Class Counsel failed to address commonality/predominance.

Several Class Members object to certifying a single nationwide class because they are eligible for different levels of damages under their state consumer fraud statutes, thereby

destroying commonality and adequacy of representation.[70]   We do not find the differences in

state law damage calculations destroy commonality or adequacy.   With three (3) levels of

statutory regimes and two (2) options allowing more frequent customers to recovery greater

damages, we find the settlement is sensitive to, and adequately reflects, the difference in state

consumer protection laws.[71]   Justice Stores subjected Class Members to common conduct and

common injury, and meet Rule 23's commonality/predominance mandate.   The proposed

settlement differentiates recovery by three (3) distinct types of state consumer protection statutes.

Class Members obtain varied settlement awards predicated on the differing state consumer

protection laws and/or class action rules.   The settlement represents a structure which adequately

considers these different state consumer protection statutes.

### 4,       Objections to adequacy of representation.

Objector Gretchen Carey claims Class Counsel is inadequate to represent the interests of

all Class Members because there is a subclass of Class Members who made small purchases in

cash, did not retain receipts, and have no proof of purchase.   Ms. Carey argues these purchasers

are not adequately represented by Class Counsel because while they are subject to release of

claims, they obtain no benefit for the release.   Ms. Carey relies on a recent Court of Appeals

opinion vacating a class settlement by merchants in an antitrust case against Visa and

MasterCard.[72]   We do not find the facts are analogous to mandate appointment of separate

counsel to represent a subclass of cash purchasers who purchased inexpensive items at Justice

Stores during the Class Period and did not retain their receipts or otherwise have proof of

purchase.   It is patently difficult to award damages to cash purchasers without proof of purchase,

as these claims would be ripe for abuse.[73]   Given a significant potential for fraud in submitting

cash claims by affidavit, we find Class Counsel addressed the subclass of cash purchasers in a

fair manner. We also note in exchange for their release, all Class Members secured the significant benefit of Justice Stores' agreement to stop the criticized sales practices. In addition to the injunctive relief requested, we note these no-proof consumers had an opportunity to opt out of settlement and pursue independent claims, although we recognize the difficulty they would face adducing proof at trial. If they opted out, they could pursue individual claims in small claims court based on their testimony.

During the Final Fairness Hearing, Attorney Goetz challenged adequacy of Class Counsel because their involvement allegedly began with a pre-lawsuit contact from a Justice Stores' whistleblower. Class Counsel confirmed a whistleblower contacted it. There is no evidence the whistleblower did anything wrong. There is no evidence how this contact may undermine the adequacy of the class representation. Attorney Goetz asks to discover if the attorneys invested over $3 Million in time and costs to protect a whistleblower by shifting the blame to Justice Stores. There is no evidence the whistleblower benefited at all by the settlement. Counsel cannot solicit clients and, upon receiving information from a Justice Stores' insider several months before filing suit, it can fairly proceed to investigate the alleged misconduct. We see no merit in rejecting the settlement to allow discovery based on speculation without any evidence.

We address objections relating to Ernest and Robert Mansour's representation below. We have no basis to find, or even infer, any conflict because they are related by marriage to Plaintiff Caroline Mansour. We will not allow her to recover an incentive award due to the non-disclosure of her relationship until well after the preliminary approval. We find no basis to disqualify Kevin Raphael, Esq. because he may have attended law school with Ms. Fubiak. Absent some indicia of self-dealing or failing to protect the Class Members, we find Ms. Fubiak and Class Counsel Raphael are adequate representatives.

Because Class Plaintiffs meet the relevant burdens under Rule 23, we certify the proposed Class for purposes of settlement. Having reviewed objections raised to class certification, we find no objection sufficiently persuasive to challenge our finding the proposed Class meets the requirements of Rule 23. All Class Members advance the same claims. We find Plaintiffs and Class sufficiently similarly situated to certify a class, even if consumers from different states may be entitled to different relief in accordance with prevailing laws in each state and will receive differing damages based on their residence.[74]

## III.    The settlement is fair, reasonable and adequate.

### A.    This Court's role and presumption of fairness.

Our approval of a proposed class action settlement as "fair, reasonable and adequate" is required under Federal Rule of Civil Procedure 23(e) for all class action settlements to protect "unnamed class members from unjust or unfair settlements affecting their rights."[75] The decision whether to approve a proposed settlement is left to our sound discretion.[76]

Our Court of Appeals requires heightened scrutiny in cases, like this, reaching settlement before the class has been formally certified.[77] Our duty is to protect absent class members by assuring the settlement represents adequate compensation for release of class claims, a duty which some courts have described as a "fiduciary responsibility."[78]

> The role of a district court is not to determine whether the settlement is the fairest possible resolution – a task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated imperfectly. The court must determine whether the compromises reflected in the settlement – including those terms relating to the allocation of settlement funds – are fair, reasonable and adequate when considered from the perspective of the class as a whole.[79]

"Because class actions are rife with potential conflicts of interest between Class Counsel and class members," however, "district judges presiding over such actions are expected to give

careful scrutiny to the terms of proposed settlement in order to make sure that Class Counsel are behaving as honest fiduciaries for the class as a whole."[80]

The law favors settlement in class actions where substantial judicial resources can be conserved by avoiding formal litigation.[81]   A presumption of fairness is established if we find: (1) negotiations occurred at arm's length; (2) sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."[82]

Class Counsel submitted affidavits showing the settlement resulted from intensive arm's length negotiations between counsel.  Class Counsel describe the sufficient informal discovery before filing the Complaint including reliance upon a whistleblower and months of investigation. While the case is difficult to manage to a class-wide trial, the liability discovery would focus on Justice Stores' conduct and knowledge.   Based on the confidential settlement meetings, Justice Stores came to understand the Plaintiffs possessed specific information. Within a month of filing the Complaint, Class Counsel engaged Justice Stores in describing the pertinent information gained through the whistleblower investigation to initiate the settlement dialogue.[83]   Class Counsel are experienced in this type of complex class action litigation, and a very small fraction of the more than 18.4 million Class Members objected to their efforts.   We find an initial presumption the settlement is fair.

In evaluating whether the settlement is fair, reasonable and adequate under Rule 23(e), we conduct an independent analysis guided by the nine factors in *Girsh v. Jepson,*[84]   and additional considerations in *In re Prudential* and *In re Baby Products Litigation.*[85]

### B.    Evaluation of *Girsh* factors strongly favors approval.

### 1. Complexity, expense and likely duration of litigation.

"This factor captures 'the probable costs, in both time and money, of continued

litigation."[86]   Settlement is particularly favored in a complex class action such as a national consumer protection and breach of contract claim possibly involving, at some point, fifty (50) subclasses or trials over the next few years.  Considering the expense of a complex, protracted trial and associated risks inherent in all trials, compared to the immediate and guaranteed benefits of settlement, we find settlement is in the best interest of the Class.  This factor strongly supports settlement.

### 2. Class reaction.

"This factor attempts to gauge whether members of the class support the settlement," although the court needs to be careful not to infer too much from a small number of objectors to a sophisticated settlement.[87]   On a percentage basis, very few class members object to the proposed settlement. The Claims Administrator received approximately forty-five (45) largely duplicative objections to the proposed settlement, and only 415 potential class members opted out of the settlement, a negligible percentage of the 18,422,724 Class Members.  This factor favors settlement.

### 3. Stage of proceedings and discovery completed.

We review the type of and extent of discovery to ensure a proposed settlement is the product of informed negotiations.[88]   During the fairness hearing, counsel described informal discovery which began before filing a complaint. While Plaintiffs prepared for testimony and Class Counsel prepared initial written discovery, the case did not proceed to deposition and formal document production. Before settlement discussions, Justice Stores produced business records describing customer transactions, which became a starting point for productive negotiation. We find counsel were well positioned to evaluate strengths and weaknesses of their cases and conducted significant arms-length settlement negotiations.[89]   We cannot find early

31

settlement based on whistleblower data and investigation absent any other indicia constitutes collusion.   Otherwise, Class Counsel is incentivized to ignore early settlement efforts when the retailer is willing to discuss settlement solely to drive up their demand in a case which may never survive a motion to dismiss or the manageability mandate to certify a class for trial.

Class Counsel coordinated efforts with other plaintiffs' counsel in related state and federal actions and the parties reached a settlement in principle after arm's length negotiations. We find counsel had an adequate appreciation of the merits of the case before negotiating and the proposed settlement is the product of informed discussions and negotiations. This factor strongly favors approval of the settlement.

### 4. Risks of establishing liability.

We consider the potential risks or rewards if Class Counsel decided to litigate rather than settle.[90]   Plaintiffs advanced several theories of liability under state consumer protection laws, and state common law but recent decisions confirm Plaintiffs bear significant risk in establishing liability.

Plaintiffs' novel claim did not have much legal support when filed.   Class Counsel conceded the difficulty of showing liability at our Final Fairness Hearing.   At least one federal district court dismissed lawsuits brought on similar legal theories where, under a similar factual scenario plaintiffs' complaint did not allege a legally cognizable injury.[91]      In *Shaulis v. Nordstrom, Inc.*, plaintiff alleged defendant enticed her to purchase items by a price tag noting higher "compare at" prices, making her believe she was obtaining a "deal."   Like the class plaintiffs in this case, plaintiff claimed the defendant store misrepresented the existence, nature and amount of price discounts on its products, causing her to purchase items she otherwise may not have purchased. The court granted defendant's motion to dismiss, holding plaintiff failed to

allege a "legally cognizable injury" sufficient to state a claim under Massachusetts' consumer protection statutes.[92]

> [P]laintiff's subjective belief that she did not receive a good value, without more, is not enough to establish the existence of a Chapter 93A injury. That is true even though the complaint alleges that a specific and material misrepresentation (indeed, one that was specifically prohibited by regulation) directly caused her to purchase an item that she otherwise would not have purchased. And it is true even though that purchase can be remedied with a fair exchange that does not provide plaintiff with a windfall, but simply restores the status quo ante. The law requires more than misrepresentation, causation and potential remedy: it requires a legally cognizable 'injury.' There does not appear to be such an injury here. It therefore appears that the complaint does not state a claim within the meaning of Chapter 93A.[93]

Class Plaintiffs similarly allege deceptive advertising. As in *Shaulis*, no one alleges the purchased merchandise is worth less than what they paid. The alleged 'injury' is the deception—the belief each got a bargain. But there may be no recognized injury based entirely on a consumer's subjective belief about the value she received. "Such a ruling would likely expand the category of injuries that are cognizable under [consumer protection statutes] to a considerable extent."[94]

In both *Shaulis* and *Mulder,* the court also dismissed plaintiffs' breach of contract, breach of implied covenant of good faith and fair dealing and unjust enrichment claims, which Class Plaintiffs also raise. "The implied covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship."[95] "The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of the performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance."[96] Like the plaintiff in *Shaulis,* Plaintiffs only generally allege Justice Stores made representations which materially induced consumers to effectuate the sale, and consumers relied on the representations. Plaintiffs

do not allege they suffered any detriment as a result; there is no allegation they did not obtain the benefit of the bargain as promised. "By charging this agreed price in exchange for ownership of the clothing, [defendant] gave the plaintiff the benefit of [the] bargain."[97]

Similarly, to prevail on an unjust enrichment claim, a plaintiff must generally show a benefit conferred; knowledge by defendants of the benefit; acceptance of the benefit under circumstances which would render it inequitable to retain without payment.[98]  It is unlikely, as *Shaulis* held, Plaintiffs would be able to show Justice Stores was unjustly enriched by obtaining revenues and profits it would not otherwise have obtained absent its false, misleading and deceptive conduct. Plaintiffs do not claim they paid more than the items were worth; only Justice Stores deceived them in their purchase.   This is not enough to state a claim for unjust enrichment.[99]

These factors favor settlement.  Plaintiffs bear significant risk proving at trial Justice Stores deceived consumers and caused them harm.  Because of the uncertainty of a trial, and the difficulty of obtaining class certification, settlement at this time affords substantial benefits compared to zero recovery, again favoring settlement.

### 5. Risks of establishing damages.

"This inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time."[100]  We look at the potential damage award if the case were taken to trial, against the benefits of immediate settlement.[101]  As outlined, Plaintiffs bear significant risk in establishing liability and damages at trial. This factor strongly favors settlement at this time.

### 6. Risks of maintaining class status through trial.

Rule 23(a) permits us to decertify or modify a class at any time during the litigation if it

proves to be unmanageable.[102] There is significant risk of decertification when managing a nationwide class action under multiple state laws. Other courts, including our Court of Appeals, have raised concerns about maintaining nationwide class actions under multiple state laws.[103] Even if the Class were maintained through the liability portion of a trial, it is likely the Class would need to be divided into subclasses for the damages portion of a trial. This factor strongly favors settlement.

### 7. Ability to withstand greater judgment.

This factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the Settlement."[104] There is no evidence of Justice Stores' ability to pay or whether this factored into the settlement negotiations. We note, however, Justice Stores voluntarily ceased all objectionable practices relating to their promoting items as "40% off." Having stopped Justice Stores' practices, Plaintiffs' settlement is adequate compared to the best possible recovery.[105] This factor is neutral.

### 8. Range of reasonableness of settlement in light of best possible recovery and all attendant litigation risks.

The eighth and ninth *Girsh* factors ask "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial."[106] Our Court of Appeals counsels, "in cases primarily seeking monetary relief, the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement."[107]

The parties estimate the maximum potential damages recovery is approximately $775 million.[108] This estimate considers 18,422,784 Consumers during the Class Period, times the average number of transactions (4.4), times 40% on the purchase price of transactions, times the average spend per transaction ($24) (18,422,784 x 4.4 x .40 x 24 = $778,178,396.16). Justice

Stores would have challenged this damages figure at trial; it contends damages are $0.

We find the final two *Girsh* factors, together with the other *Girsh* factors, support approving the settlement. We conclude the settlement amount and its terms are reasonable in light of the strengths and weaknesses of Plaintiffs' case.[109]   All Class Members had the opportunity to opt out of the settlement and preserve their right to independently seek full recovery of their alleged damages if they believed they could achieve better results. Very few did so.

### C. *Prudential* considerations.

In *In re Prudential Insurance Co. America Sales Practice Litigation*, our Court of Appeals expanded the *Girsh* factors to include additional considerations, where appropriate, which courts now refer to as the *Prudential* considerations.[110] These factors illustrate permissive inquiries which may be useful to a thorough analysis of settlement terms.[111]

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.[112]

These factors are permissive inquiries which may be useful when analyzing fairness of a settlement. Our Court of Appeals directs us to conduct "a thorough analysis of settlement terms" to determine "the degree of direct benefit provided to the class," including whether "the number of individual awards compared to both the number of claims and the estimated number of class

members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards."[113]

We note several objectors express concern over the use of a percentage to pay attorneys' fees, which we address below.  We are directed to no other *Prudential* factor negatively impacting fairness of settlement.

### D. *Baby Products* considerations

In *Baby Products*, our Court of Appeals added factors to consider in analyzing proposed class action settlements:

> We add today that one of the additional inquiries for a thorough analysis of settlement terms is the *degree of direct benefit provided to the class*. In making this determination, a district court may consider, among other things, [1] the number of individual awards compared to both the number of claims and the estimated number of class members, [2] the size of the individual awards compared to claimants' estimated damages, and [3] the claims process used to determine individual awards. . . .
>
> . . . Making these findings may also require a court to *withhold final approval of a settlement until the actual distribution of funds can be estimated with reasonable accuracy.* Alternatively, a court may urge the parties to implement a settlement structure that attempts to maintain an appropriate balance between payments to the class and *cy pres* awards. For instance, it could condition approval of a settlement on the inclusion of a mechanism for additional payouts to individual class members if the number of claimants turns out to be insufficient to deplete a significant portion of the total settlement fund.[114]

The $27.8 Million Cash Settlement Fund is fair.  As shown below, we are specifically calculating the degree of direct benefit to the Class and withholding final approval on the portion of the Settlement Fund representing all of attorneys' fees beyond the lodestar and reasonable 1.75 multiplier warranted by the direct benefit we can calculate today.  This structure allows the parties to address a fee beyond counsel's investment based on the direct benefit to the class.

The parties contemplate immediate distribution of cash and the requested vouchers from

the $50.8 million Cash Settlement Fund, followed by issuing automatic vouchers. The parties
agree to return to the Court and revisit ways to further provide direct benefit to Class Members
using escrow funds in the Settlement Fund remaining after we learn how many vouchers are
redeemed.

### E.    We overrule the filed objections to the settlement.

#### 1.  The consideration is not enough.

One group of objectors contends the maximum total damages estimate is too low. During
our Fairness Hearing, one objector[115] maintained the maximum potential damages number is
closer to $2.5 billion, calculated by multiplying potential class members (18,422,784) times 4.4
average transactions, times a $48 average transaction amount, times 40%.   (18,422,784 x 4.4 x
$48 x .40). While the maximum potential recovery may be calculated differently, this offers
little to suggest the overall settlement is unfair. In reaching this decision, we are mindful of the
equally likely scenario recovery may be $0.[116]   We have no basis to challenge the average
transaction, average number of transactions, or the liability risk/benefit analysis of a 35% chance
of victory for the Class.

Additional objectors contend the damages estimate should have taken into account the
potential for treble damages under consumer fraud statutes. Recovery of such damages is purely
speculative, however, and need not be taken into account when calculating the reasonable range
of recovery.[117] The settlement also addresses the higher awards for residents of states with treble
damage regimes.

To the extent objectors argue the settlement is not high enough because it does not allow
100% recovery of consumers' alleged loss, we find these objections without merit. The
settlement offers every consumer a choice of cash or, if they wish to purchase additional tween

merchandise, a voucher exercisable for one year.   Keena Jones objects because the consideration does not account for the profits she claims Justice Stores made on her interest on the credit card purchases.   This objection lacks merit as a third party bank finances and services the credit card.

We also overrule Paul Lawless' claim the settlement is not large enough to deter Justice Stores.   We have no basis for this finding.   Absent evidence, we have no reason to believe a $50.8 Million Settlement Fund with potential liability of over $400 Million should deter Justice Stores and retailers from this advertising strategy.

The settlement represents a compromise between the maximum possible recovery and the inherent risk of litigation, including a difficult burden to show liability and certify a trial class. "The test is whether the settlement is adequate and reasonable and not whether a better settlement is conceivable."[118]   We appreciate more discovery may find a basis for a greater damages number, but we find it more likely given the exchange of financial and customer data, not to be so.   It is much more likely the parties would engage in extended discovery and greatly reduce the amount of funds available for distribution to the Class.

### 2.  Terms of the release.

Manda Hipshire contends the release is overbroad and impermissibly extends beyond the scope of the plead claims.  Ms. Hipshire claims Tennessee's common law fraud theories may warrant punitive damages, even though no such claims are plead in the complaint, and as the Release covers all claims "brought or could have been brought…" it surrenders the possibility Tennessee plaintiffs could recover under Tennessee's fraud statute.   Ms. Hipshire also objects on grounds the settlement does not fairly consider relief to plaintiffs in states which do not permit class actions under state consumer protection laws.  To the contrary, the record reflects the parties fairly considered these issues during settlement negotiations, and arrived at a fair

compromise to these class members.   For example, the settlement provides varied recoveries to address differing states' consumer fraud regimes.   If Tennessee consumers thought they could do better, they had the choice to opt out.   Given the case law to date, they could have just as easily found a choice of cash or a voucher to be better than losing a motion to dismiss.

One objector is concerned because the release is broader than the class period and does not align with the improper conduct.[119]   Objectors speculate the challenged "40% sales" practices may have continued into March 2015, despite the Court's injunction, and there may be individuals who release claims without any corresponding compensation. We find this pure speculation insufficient to undermine the otherwise fair and reasonable settlement.

Ms. Carey additionally contends the Settlement Agreement fails to consider state laws addressing minimum consumer recoveries; some state statutes provide *minimum* statutory recovery for violations of consumer protection laws and the Settlement Agreement greatly undervalues the award to plaintiffs in these states.   As detailed during the Fairness Hearing, the parties specifically considered recovery in all states including minimum recovery states.

### 3.  Coupons are not proper under 28 U.S.C. §1712.

Several class members object because the voucher award is essentially a "coupon" settlement which does not comply with the Class Action Fairness Act, 28 U.S.C. §1712 *et seq.* ("Act").   In particular, over 70% of affirmative claimants selected a cash award settlement, and rejected vouchers.

We disagree with objectors' suggestion some consumers' preference for cash awards, rather than vouchers, renders the voucher offers "not meaningful compensation."   Because Justice Stores' target market is pre-teens aged 6-14, it is reasonable to expect at least some portion of Justice Stores' consumers between 2012-2015 outgrew Justice Stores' products and

prefer cash awards. More than a *de minimus* number of consumers selected a voucher award, affirming they do confer value to some Class Members. We do not find the voucher awards improper.

Class Members received notice and the opportunity to choose a cash award in lieu of a voucher award. No one is forced to accept a voucher. We find the Claims Administrator made a substantial effort and then supplemented notice to educate the Class Members resulting in reaching over 16 million individuals who made purchases at Justice Stores during the Class Period.

To the extent the objectors challenge the award of attorneys' fees, we address those issues below in framing the approval of attorneys' fees in two stages.

### 4. Administrative costs are not capped.

Several objectors contend there is no limit to administrative costs. The Settlement Agreement provides if administrative costs exceed $8 million, the excess is taken from the Class Members' recovery. Class Counsel acknowledge the agreement but claim "the reality is that is not going to happen" because there will be remaining funds to cover all administrative fees."[120] Class Counsel is correct. No administrative cost will affect the agreed cash recovery to any Class Member. At most, the additional administrative fees will affect the amount available as a reversion to Justice Stores or for attorneys' fees. All Class Members are guaranteed up to $27.8 Million in cash. The present cash award is less than $10.1 Million. Further, while we approve the noticed administrative costs up to $8 million, all other reimbursements will be addressed in the final distribution. Objectors also contend the cost of Supplemental Notice should not have been borne by the Class. We disagree. Class Counsel appropriately evaluated the need for supplemental notice to protect the Class and these additional expenses, shared *pari passu* with

Class Counsel, allow us to confirm notice upon the great majority of the Class.[121]

### 5. The attorneys' fees are too high.

Several objectors challenge the allocation of approximately $14.1 Million from the $50.8 Million Cash Settlement Fund to pay attorneys for services valued, by the attorneys, at approximately $3 Million on a lodestar basis.   We addressed these issues at the Final Fairness Hearing and counsel agreed our resolution of the attorneys' fees in a manner different than the Settlement Agreement would not affect the remaining distributions.   With this agreement and as described below, we are awarding attorneys' fees in two steps: first on the lodestar with a 1.75 multiplier for the actual benefit provided to date and without considering the amount of redeemed vouchers and then possibly awarding fees based on redeemed vouchers.

### 6. Justice Stores will receive money back from the Cash Settlement Fund.

The parties agreed some portion of the Cash Settlement Fund not distributed to Class Members may revert back to Justice Stores up to a cap of $8 Million.  Objector Susan House claims this agreement rewards bad behavior.  We disagree.  This settlement provides a reverter only from portions of the $27.8 Million not claimed by Class Members.  The parties did not guaranty a reverter. As shown, we have "no indicia of self-dealing by counsel" and the reverter only applies if we approve the final reverter number capped at $8 Million based on the demonstrated lack of interest in a cash payment.[122]  Had the Class Members elected cash to the cap of the $27.8 Million Cash Settlement Fund, we would have no reverter but Justice Stores would still have tens of millions of dollars in contingent voucher liability.  The reverter does not reward Justice Stores' behavior; rather, it recognizes the voucher would become, by inaction, the principal settlement consideration. To avoid concerns with validity, we will review the voucher redemptions before allowing any distribution of funds up to $8 Million from the Cash Settlement

Fund to be paid to Justice Stores.

### 7.  Frequent purchasers must produce proof of purchase.

Several objectors contend the claims process unfairly requires frequent purchasers to produce proof of purchase to qualify.  This objection misunderstands the Settlement Agreement. Consumers are given three choices:  (1) elect a cash award (ranging from $7 to $20); (2) elect a voucher, to be used toward a future Justice Stores purchase (ranging from $10 to $30); or (3) if consumers are frequent and/or high dollar purchasers, (greater than 5 transactions in the settlement period or greater than $105 in a single transaction), after producing evidence of purchases, they may elect to receive *either* 14% of total dollars spent as a cash reimbursement award *or* 20% of the transaction dollars as a voucher to be used toward future Justice Stores' purchases.

Numerous methods of proving frequent purchases are acceptable.  Class members who find this method too burdensome may elect to receive the standard cash award or voucher without producing any proof of purchase. The options presented are fair.

### 8.  Individuals who paid in cash are fairly treated.

Consumers who provide contact information at the time of checkout and who pay in cash are recorded in Justice Stores' customer data and are included in the Class even if they do not have proof of purchase. A small group of consumers who did not provide contact information at checkout or retain receipts now object.  We realize the settlement may not include every possible cash consumer at Justice Stores and some persons may have paid in cash, not disclosed their contact information at the register and not kept a receipt.  We could expect a consumer who elects not to disclose her contact information at purchase may also not want to file an affidavit specifically describing the date and amount of purchase and now disclose her contact

43

information solely to get cash or a voucher. Following our Court of Appeals' guidance including *In Re Baby Products,* our role is to review the settlement "when considered from the perspective of the class as a whole."[123]  We are "not to determine whether the settlement is the fairest possible resolution – a task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated imperfectly."[124]  The parties agreed to settle after several arm's length negotiations which further support fairness of the overall allocation and distribution of the settlement fund.

### D. Balancing the factors results in a fairness finding.

Analysis of all fairness factors weighs in favor of approving Settlement.  We are persuaded the parties reached a settlement after several rounds of informed negotiations, careful consideration of risks of litigation, work of experienced counsel and a settlement fund reflecting meaningful recovery to the Settlement Class.  We approve the Settlement as fair.

## IV.   We grant in part, and deny in part, Class Counsel's Motion for attorneys' fees and expense reimbursement.

Class Counsel moves for an aggregate attorneys' fee award equal to twenty-eight percent (28%) of the $50.8 Million Cash Settlement Fund, including their expenses.  In their most recent request, they suggested a twenty-five percent (25%) fee award.[125]  We deny the breadth of this request.  We find the Act applies to this settlement requiring, as Class Counsel contemplated in the settlement negotiations, over 95% of the Class Members receive consideration through a non-transferable voucher requiring them to shop again at Justice Stores within the next year.  The Act requires a two-step approach to the direct benefit with a lodestar and 1.75 multiplier for the actual benefit now and allow Class Counsel to later seek fees after we learn the direct benefit based on redeemed automatic vouchers.

Exercising our discretion,[126] we are required to conduct a "thorough judicial review" to determine the amount of any award to counsel.[127] "Judicial deference to the results of private negotiations is undoubtedly appropriate for many settlements, but not for class action settlements, including their attorney fee terms. 'That the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class in the agreement does not detract from the need carefully to scrutinize the fee award.'"[128] In a common-fund class action, our Court of Appeals generally favors awarding fees applying a percentage-of-the-recovery method.[129] Cases involving statutory fee awards like this one usually apply the lodestar approach. Settlements partially based on coupons are reviewed under the Act requiring we apply a lodestar with multiplier to the non-coupon recovery and a percentage of the common fund paid based on the value of the redeemed coupons.

### A. Our focus must be on the direct benefit to the class.

While addressing the fairness of attorneys' fees, we are guided by our Court of Appeals' lessons three years ago in *In re Baby Products Antitrust Litigation*: "courts need to consider the level of direct benefit to the class in calculating attorneys' fees."[130] We approach this analysis on a case by case basis.[131] We "begin by determining with reasonable accuracy the distribution or funds that will result from the claims process."[132] This may require us, as we do today, "to delay a final assessment of the fee award to withhold all or a substantial part of the fee until the distribution process is complete."[133]

Justice Stores agreed to set aside a defined Cash Settlement Amount of $50.8 Million plus vouchers. Of this amount, the parties originally agreed to set aside $27.8 Million to pay Class Members in cash. Contrary to their present position, the parties referenced a Cash Settlement Amount as distinct from vouchers. If the Class did not choose cash up to $27.8

Million, Class Counsel decided any unused portion of the Cash Settlement Amount allocated to Class Members could revert to Justice Stores to cover voucher charges following payment of any approved outstanding administration costs, approved fee award and approved incentive award. If the Class elected more than $27.8 Million, the Class Members would reduce their cash awards *pro rata.* The parties also agreed the Cash Settlement Amount included up to $8 Million for reasonable administrative and notice costs for this 18.4 million person class and any costs proven in excess of $8 Million are deducted from the balance of the Cash Settlement Amount. The parties also agreed Class Counsel could apply for up to $15 Million as attorneys' fees and costs.

Following ample notice, the cash award is $10,036,310.10. This response leaves a delta of over $17.7 Million in cash.

We must also consider the direct benefit for Class Members who chose the voucher over the cash payment. These Class Members presumably view the voucher as equal to cash, or they would not have selected the voucher.[134] We need to value the voucher as of now but realize, as both parties confirmed, many of the voucher recipients may not use their vouchers even though they chose the voucher consideration over cash. The voucher has immediate value upon receipt, although unlike cash or a gift card, the Class Member must use the voucher in Justice Stores and purchase additional tween merchandise to get the discount. Absent empirical evidence of the voucher value, we can conservatively value the voucher chosen by a Class Member at the cash value for the same Class Member. Under this rubric, the value of the vouchers affirmatively chosen by the Class Members is $2,902,848.[135] We add this value as an immediate direct benefit to the Class.

At the May 20, 2016 Fairness Hearing, Class Counsel projected $11.9 Million for administrative charges based on the mailing of vouchers, a $2.5 Million increase from their

Claims Administrator's May 13, 2016 sworn declaration.[136]  Absent later proof, we cannot rely on Class Counsel's oral representation of a $2.5 Million increase over their Claims Administrator's presumably careful estimate filed a week earlier.[137]  As such, subject to our later evaluation of the actual benefits but not presently questioning the Claims Administrator's estimate of at least $8 Million in expenses, we will rely on the Claims Administrator's estimate of $8 Million.

We also calculate the present award of attorneys' fees as a present actual benefit. We can fairly value the attorney's fees at $3,035,125.85 as described by Class Counsel in sworn detailed monthly certifications filed after the Fairness Hearing.  While paying attorney's fees to Class Counsel and paying notice and administrative expenses is a benefit to the Class, it is presently difficult to accurately value the benefits to the Class from counsel's effort beyond these certain numbers.   We do not see any actual benefit to the Class in the $8 Million possibly reverting to Justice Stores until we can quantify this reversion after the one year voucher exercise period.

We value the actual benefit to the Class now at $23,974,283.95 ($10,036,310.10 + $2,902,848 + $8,000,000 + $3,035,125.85).

**B. Congress, through the Class Action Fairness Act, requires we value redeemed vouchers in setting a portion of the attorneys' fee award.**

When a proposed settlement provides an award of coupons and injunctive relief, Congress mandates we award attorneys' fees attributable to the award of coupons based on the value of the class members of the redeemed coupons.[138]  We may apply a contingent fee to any portion of the class action settlement attributable to redeemed coupons.   If the requested attorneys' fees are not based on a portion of the redeemed coupons, we calculate the attorneys' fees through a lodestar with a multiplier method.  As our Court of Appeals guided in *In re Baby*

*Products*, our analysis and two-step fee award "further supports the proposition that the actual benefit provided to the class is an important consideration when determining attorneys' fees."[139]

Unlike cases where the settlement provides for a coupon solely to ensure final distribution or as ancillary relief, the benefit to the Class is now overwhelmingly based on the ability of over 16 million of the over 18.4 million class members to obtain a Justice Stores' merchandise through a voucher they did not ask for at Justice Stores for one year.

The Act specifically addresses attorney awards calculated on a mixed settlement, with a specific reference to the injunctive relief awarded to the consumers. The only consistent reading of the Act is Congress intended to address mixed settlements, such as ones where counsel contemplate offering 5% in cash and 95% in coupons.[140]  Congress did not define "coupon" in the Act.  Its legislative history, including from the Senate Judiciary Committee, confirm a concern when "class members receive nothing more than promotional coupons to purchase more products from the defendants."[141]   The Act, by any reading, seeks to address "in-kind compensation" which may act as marketing tool for defendant retailers.[142]  Further, reading the Act to exclude this case would render the Act meaningless when over 95% of the settlement is paid in vouchers which are required to be redeemed at Justice Stores in one year or less.

Justice Stores' vouchers, as with Southwest Airlines' "vouchers" found by a court of appeals to be coupons, have modest value "...when the coupons expire soon, are not transferable, and/or cannot be aggregated."[143]  Incentivizing a former consumer to return to purchase more of its tween merchandise requires, like a coupon, "forced future business" with Justice Stores regardless of whether the parties call it a voucher.[144] As Judge Young recently analyzed under First Circuit guidance (which, like our Court of Appeals, has not defined a "coupon" under the Act), a non-cash voucher with no value to class members unless they

transact additional business with Michael's (a niche arts and craft retailer) is a coupon under the Act. [145]   As we do now, Judge Young found the Act precluded a percentage of the recovery award based on the face value of the coupon awarded to class members but allows us to grant either a percentage of the recovery award or a multiplier on a lodestar based on the percentage of coupons redeemed by class members.[146]

Class Counsel argue we are not reviewing a "coupon" settlement. They argue all Class Members have a choice of cash, albeit at a dollar value lower than the voucher. They argue it is unfair to wait for their attorneys' fees because the vast majority of Class Members chose, by inaction, to accept a voucher.   They argue this settlement should not be considered a coupon settlement because they negotiated a choice of cash or a voucher. Class Counsel argues they do not require Class Members to accept a coupon settlement and their voucher is more akin to a gift card than a coupon.

Their argument is facially attractive. But it ignores the reality of their negotiations and requires blinders on the fiduciary obligations when negotiating the settlement. Under Class Counsel's argument, they satisfy fiduciary obligations and can recover a percentage contingent fee simply by providing a choice after agreeing with their adversary the choice will not meaningfully and actually benefit the Class.

Class Counsel's reliance upon *O'Brien v. Brain Research Labs[147]* to argue a "choice" between cash and a voucher eliminates the Act's mandate in a mixed settlement is misplaced. In *O'Brien,* the court did not evaluate the Act in light of 89% of the class choosing cash in a much smaller class. We face over 95% of the Class receiving vouchers. We cannot read *O'Brien* as precedent precluding the Act's mandate when the court did not address the Act and the cash nature of the direct benefit. We also cannot read the inapposite decision in *In re Easy Saver*

*Rewards Litigation[148]* and the unpublished non-precedential decision in *CLRB Hanson Indus., LLC v. Weiss & Assocs., P.C.*[149], to alter Congress' mandate on settlements where the vast majority (over 95% here) of the settlement is paid through a voucher only redeemable at Justice Stores, as Class Counsel anticipated when it agreed to these terms.

We find Class Counsel's characterizations of the automatic vouchers as equal to cash ignore their central role in negotiating this settlement.        Rather than require cash for all consumers, or allow consumers to redeem coupons for cash at a later stage, they agreed to a voucher program which requires the consumer to return to Justice Stores to obtain the value of their negotiated settlement. Class Counsel cannot claim surprise. Justice Stores from day one negotiated for the voucher believing, as it candidly conceded at our Final Fairness Hearing, between 2% to 3% of the consumer Class will redeem the automatic voucher.   The most optimistic cash outlay estimate involved approximately 5% of the value. Class Counsel knew, under its fiduciary duty, an agreement to settle would result in the vast majority of the negotiated consideration paid in voucher.

Our observation as to coupons does not diminish the reasonableness of the settlement. The vouchers, as all concede, have a face value exceeding $380 million. But even wearing their rosiest glasses when signing the Settlement Agreement, Class Counsel expected a maximum cash payment of $27.8 Million or less than seven percent (7%) of the potential direct benefit. As shown, only approximately 2.5% of the settlement is paid in cash.   Offering a choice to all Class Members militates in favor of finding the settlement is fair, adequate and reasonable. But Class Counsel cannot realistically argue they expected more than a small percentage of the Class Members to elect cash and an even smaller percentage to redeem vouchers.

Class Counsel also knew the 18.4 Million Class Members would not select the cash option; if all Class Members did select cash, they would receive less than $2 cash from a capped $27.8 Million Cash Settlement Fund. Based on their present admissions, the parties could not argue $2 cash is fair consideration. We approved the settlement as fair based on the detailed choice between cash and a higher face value in the voucher when all counsel rationally anticipated the vast majority of consideration would be paid by voucher.

We also cannot ignore the automatic vouchers act like a coupon. Over 16 Million Class Members will receive a voucher requiring them to purchase more product from Justice Stores. The voucher expires, like a coupon, on a date certain. Justice Stores focuses on a niche market of pre-teen merchandise. Its customer quickly grows up and, unlike other retailers, Justice Stores does not sell merchandise for the older consumer. As described earlier, we found the parties' considered decision to offer the Class Member a choice of cash instead of a voucher materially supports our fairness finding. But we cannot blindly mischaracterize this voucher as cash-like. Unlike a gift card redeemable at any retailer, which may be closer to cash, Class Counsel agreed to a twelve (12) month voucher which can only be redeemed at Justice Stores. Class Members need to buy more product at Justice Stores to get the discount. We are not suggesting there is no value to this voucher, but it is not cash and not a gift card. Unlike a freely transferable Wal-Mart gift card with no expiration date as in *In re Online DVD-Rental Antitrust Litigation*[150] or the Victoria's Secret $67.50 freely transferable gift card with no expiration in *Fernandez v. Victoria Secret Stores, LLC*[151], this voucher expires in one year and cannot be sold to someone else.

In sum, this fair recovery is more similar to a very good sale for the vast majority of consumers who we know purchased tween merchandise from Justice Stores between January 1, 2012 and February 28, 2015. The parties recognized this distinction in the Settlement

Agreement providing Hawaiian and Alaskan consumers with a "gift card" "instead of a voucher".[152] To equate them now belies counsels' understanding in their extensively negotiated Settlement Agreement.

Class Counsel asserts an actual benefit of $50.8 Million based on their negotiation skill in setting their Cash Settlement Fund at $27.8 Million. The problem is the reality, not the capped speculation. If the actual benefit were all cash at $27.8 Million, as in their cited authorities, they may have a fair argument based on the low response rate from Class Members. Class Counsel's cited comparator cases, with one exception, involved exclusively cash payments to the class. The court in those cases could easily set the present value of cash as an actual benefit. In the one exception, the court awarded a 30% contingency when defendant agreed to redistribute unclaimed funds through coupon benefits and the court found the coupon as a means of redistribution "is not a primary or substantial part of the bargain."[153]

We value the actual benefit as the cash and the cash value of the vouchers chosen by the Class Members. But the vast majority of potential benefit is provided by a voucher. A fair contrast is presented in *Weiss v. Mercedes-Benz*[154], where the district court found Class Counsel's request for a fifteen percent (15%) contingency appropriate in reviewing an immediate $100 million benefit through a coupon, but after three (3) years the class members could redeem the coupon for 50% value in cash. The court valued the coupon in three (3) years, considered the present value of the coupons and valued the settlement at $75 million. The district court accepted counsel's request for a 15% fee but, given the coupon component as a primary or substantial part of the bargain, reset the present value of the settlement at a lower number admitting precise calculations of present value "are not possible."[155]

Class Counsel admits the currently calculable benefit now is approximately $12.9 Million including cash and actual benefit of the chosen vouchers.   We are not aware of a person who would pay a contingent fee based on a $27.8 Million recovery when she is only getting $12.9 Million now. We don't view counsel as being penalized; they hired financial experts, consulted records and estimated a compromise.  Their estimate is way off today but they expect the actual benefit through redeemed vouchers will increase over time.   Moving forward, Class Counsel and Justice Stores have differing hopes as to the number of redeemed vouchers; true to their fiduciary duty, Class Counsel will now recover on a percentage of the redeemed vouchers they negotiated for the Class Members and Justice Stores will be required to honor the vouchers up to the maximum amount of approximately $400 Million.

Applying the Act, we will award a lodestar with a multiplier to the actual benefit now. The Act "forecloses using the value of all of the coupons *made available* to the class as a basis for the percentage award, insisting instead upon a percentage of the coupons *claimed by the class*..."[156] An approximate $24 Million benefit is a significant recovery for the 604,623 persons filing an affirmative claim.   We will then apply the percentage-of-recovery method to the recovery based on redeemed coupons after their exercise and deducting the present actual benefit of $2,902,848 we presently ascribe to the affirmative claim voucher.  At the end, Class Counsel will not be awarded more than the agreed $14.1 Million.   Under this approach, we will closely follow the actual benefit analysis and provide the benefit of percentage of recovery when we can fairly evaluate the recovery.[157]

### C. Fees under a lodestar analysis with a multiplier.

After examining the reasonableness of the billed hours and hourly rate, and as contemplated by the Act, we can set a multiplier on the lodestar to, among other things, "reflect

the risks of nonrecovery facing counsel ... as an incentive for counsel to undertake socially beneficial litigation, or ... reward counsel for an extraordinary result."[158]    We recognize, as did Judge Shwartz in *O'Brien,* "[t]he multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work."[159] While factors applied to review a percentage of recovery award do not directly apply to our need to calculate, explain or justify a multiplier, the *Gunter* factors help guide our analysis.[160]

### 1. Reasonableness of billed hours and rates.

Three law firms represent the consumers.[161]    After review of their May 31, 2016 detailed summaries of time and expense through our May 20, 2016 Fairness Hearing, we do not find duplicative efforts.    Counsel provided an extensive narrative of their monthly progress from first contact to the Final Fairness Hearing.    As of our May 20, 2016 Fairness Hearing, each counsel reported their invested time since they began representing consumers:

Pietragallo Gordon Alfano Bosick & Raspanti, LLP: 2,720.5 hours with a blended rate of $537 per hour, resulting in a lodestar of $1,432,456.25;

Mansour Gavin and Robert Mansour:  2,507 hours with a blended rate of $532.80 per hour, resulting in a lodestar of $1,335,729.60;

Edward J. Westlow, Esq.:  444.9 hours at his standard $600 hourly rate, resulting in a lodestar of $266,940.

Counsel has offered only blended hourly rates more appropriate for a percentage of the recovery award which does not require mathematical precision.[162]    Counsel must provide specific support for its hours.  No one objects to the hourly rates and we have no reason to doubt Class Counsel's calculations, but we must fulfill our obligation to the Class and require a supplemental affidavit with comparator reasonableness affidavit in our accompanying Order.

We expect Class Counsel's sworn affidavit will be consistent with their May 31, 2016 sworn declarations, but if we find disparities, we will adjust our attorneys' fee award before distribution of any fees from the Settlement Fund.[163]

We can review a billing rate of all attorneys in light of rates charged in this District, nature of services provided and Class Counsel's experience necessary to represent the Class.[164] While these hourly rates account for a substantial amount of time spent by more senior attorneys, we recognize this case largely involved negotiations in over fifteen (15) meetings, review of significant research from fifty states and a thoughtfully crafted settlement to provide value to all ascertainable consumers. We expect the research performed by attorneys with hourly rates much lower than $500.

We cannot find these hourly rates reasonable in all contexts since we do not have fee comparator affidavits. While Michael J. Boni, Esquire opines the aggregate $14.1 Million requested fee is within the range of reasonable awards, Class Counsel does not adduce an opinion as to the reasonableness of their blended hourly rates. Attorney Boni may be correct and we will review his opinion, and any contrary views, when measuring the actual benefit after the vouchers are redeemed.[165]

This case is different than a lengthy litigated case where lower hourly rate attorneys may bill hundreds of hours in addressing several motions, discovery concerns, depositions, written discovery and the wide variety of legal work occasioned by a fifty (50) state class action on common law theories with differing consumer fraud regimes.

Class Counsel described 5,672.4 hours invested on the consumers' behalf. While counsel has not yet submitted comparator affidavits as to the reasonableness of their hourly rates in consumer class actions, for purposes of this initial review, we calculate the lodestar as

$3,035,125.85.

We find, based on Class Counsel's detailed month-by-month description, their effort is reasonable given the work to resolve these claims.  We also find, subject to review of the fee affidavits required in the accompanying Order, the blended rates are fair and reasonable for this quality of work particularly given the complex negotiations but, given the lack of a comparator affidavit on the reasonableness of the blended fees in this District or detailed billings, we cannot ascribe any value beyond the billed rates based on this factor.

### 2.  Size of the Settlement Fund created and number of persons benefitted.

After extensive negotiations, Class Counsel obtained an actual immediate benefit of $23,974,283.95 on behalf of 604,623 customers who elected to file a claim out of the over 18.4 million Class members receiving some remedy, including automatic voucher recovery for all class members potentially in excess of $400 Million.

"The degree of success obtained" is considered the "most critical factor" weighed in both a multiplier to a lodestar and percentage of the recovery analysis.[166]  The consumers' claims cannot be considered, by any means, to be a sure winner.  Two district courts previously rejected this theory.  In *Spokeo,* the Supreme Court addressed statutory recoveries absent actual and concrete damage.  Despite several obstacles detailed earlier, we continue to cite the right of every Class member to a cash payment or, if they wished, a voucher to use at Justice Stores.  As in *O'Brien,* we can fairly find the class members immediately choosing the voucher believe it has a value at least equal to the cash.  Justice Stores decided not to cap the number of vouchers, thus presumably valuing the voucher at less than the cash.  As did our Court of Appeals thirty years ago in *In re General Motors* and Judge Shwartz did in *O'Brien,* we find the voucher program will result in additional sales for Justice Stores.[167]

The degree of success must also be measured by other consumer cases awarding full or multiples of purchase price upon confirming a purchase.[168]   While we recognize the value of an early informed settlement based on insider and possible whistleblower data, the existing case law and differing consumer fraud regimes, we also could find Class Counsel may have been more successful after discovery and potential court rulings upholding some, but possibly not all, claims depending on each state's regime.  On balance, this factor weighs in favor of awarding attorney's fees but not at an extraordinary multiplier of the lodestar.

### 3. The presence or absence of substantial objections by Class Members.

We reviewed forty-two (42) filed objections to the settlement.  Three (3) persons objected to the lawsuit.   In total, forty-five (45) consumers out of 18,422,784 consumers, object to the terms. This is a minuscule percentage.   Mere objections do not suffice.  Rather, there must be a substantial objection by class members.[169]

While they were limited, several objections required the parties to address the concerns. The objections as to the use of any excess reversionary fund resulted in Justice Stores agreeing at the Final Fairness Hearing to cap their reverter and allow any reimbursement to be reviewed by the Court after periodic accountings in a final distribution.   We are now ordering Class Counsel to detail the time and hourly rate for each professional and allowing Objectors who previously raised questions concerning the amount of attorneys' fees to supplement their objection to the calculation of the lodestar.

The objections to attorneys' fees to be paid because the parties reached a settlement earlier in the process lack merit given the difficult burden on plaintiffs to win class certification and then a liability trial.  We carefully reviewed the objections relating to the use of vouchers in a consumer settlement and attorneys' fees.  While the "clear sailing" agreement on attorneys'

fees properly raises questions, we find no valid basis to challenge the fees or settlement when the only evidence is the parties negotiated the fees after reaching terms on the settlement.[170]

We find these objections do not create sufficient grounds to find the settlement for over 18.4 Million persons is not fair, reasonable or adequate. We found no objection rose to the level of finding the settlement unfair.

### 4. Class Counsel's skill and efficiency.

Class Counsel is well-qualified to litigate this complex class action, and they showed their effectiveness through the favorable settlement with both injunctive relief and compensation for all known consumers of Justice Stores' merchandise during the Class Period.[171] A careful review of their specific month-by-month description of services provided confirms a focused effort to address a resolution.

We cannot discount Class Counsel's effort because they learned of the facts from an insider or whistleblower. Every lawyer needs a client to proceed. Often, a disgruntled employee or insider provides information concerning the internal corporate decisions and actions. Under *Twombly*, we may look for more specificity and could not expect a consumer claim would last very long if based entirely on "information and belief" of lawyers after walking around a suburban mall.[172] As shown in the attorney certifications, Class Counsel focused their initial discovery upon the insider's disclosures. We should expect experienced counsel to do so, rather than issue wide ranging discovery to address issues not conducive to resolving the case before trial.

We recognize the settlement contained no guarantee of 100% compensation for Class Members. We reviewed objections seeking more money which would, according to an objector, be available after discovery. We have no basis to credibly find a higher damages number. A

settlement needs to provide the fullest possible compensation. While it would have been much easier to file a single state class, particularly one with treble damages, counsel should not be penalized for seeking a national class. Class Counsel strived to eliminate duplicative or prolonged issues. We specifically directed counsel at our Rule 16 conference to begin settlement discussions. Class Counsel followed our direction and engaged in multiple meetings before reaching a July 2, 2015 agreement in principle. The test is skill and efficiency, not whether a lawyer who has not taken the risk or fully understands the subtleties of dozens of consumer protection regimes could possibly have persuaded Justice Stores to pay more. Class Counsel demonstrated skill and efficiency and their extraordinary effort warrants a fair multiplier.

### 5. The complexity and duration of the litigation.

We now consider, among other things, "the complexity of both the factual and legal issues, the amount of discovery and depositions conducted, the length of the litigation, the amount and quality of work produced, and attempts to negotiate and settle."[173]

Class Counsel decided to pursue the biggest case they could possibly sustain: a national class action based on varying state consumer fraud laws relating to a consumer's reliance on Justice Stores' advertising "40% off". This decision invoked numerous manageability issues. Counsel described substantial hours in evaluating the varying consumer fraud regimes and manageability issues. Plaintiffs benefitted by allegedly having insider information from a former employee, but counsel may not have met their Rule 11 obligation based solely on one disgruntled employee say-so.

The fact pattern is not overly complex. The consumers allege Justice Stores' uniform national advertising included the "40% off". The legal issues surrounding reliance in a national

state law claims are complex.   The law is not established.   Two cases from the District of Massachusetts, as well as similar manageability cases, would lead many attorneys to avoid a $3 Million investment of time.

The settlement of these varied consumer issues, as described in affidavits and during our Fairness Hearing, also involved complex negotiations. Class Counsel described numerous contested meetings.   Class Counsel reviewed the rapidly developing case law and framed a settlement with a choice of cash and voucher in amounts depending upon the consumer fraud regime for each state. Every consumer showing some evidence of purchase receives both an injunctive and damages benefit.   Undoubtedly, Class Counsel wanted more money and viewed their chance of winning at a higher percentage than Justice Stores.

The parties reached an initial settlement fairly early in this case.   We recognize the litigation ended within months of filing. The case began in Spring 2014 through a meeting with a whistleblower.  The parties did not enter formal discovery but the submitted time entries confirm substantial preparation for discovery.

Even if Class Counsel could have certified a liability class and demonstrated some way for us to manage these varied fraud statutes and then recover a larger judgment at trial, any recovery would be postponed for years. Alternatively, the settlement secures payment for every member of the Class now, rather than the speculative promise of a larger payment years from now.   This factor weighs in favor of a fair multiplier on attorneys' fees.

### 6. The risk of nonpayment.

Class Counsel worked on a contingency fee basis since inception, undertaking significant risk of non-payment.[174] Class Counsel obtained a recovery where victory at trial may have been, at best, "remote and uncertain."[175] The most direct way to recover attorneys' fees when the

individual claims are relatively minor is through a class action.   The amount of individual recovery, even if every consumer won at trial, is minor.     While most states may allow fee shifting, Class Counsel would need to work through several small class actions to obtain a partial fee.[176]   The manageability issues at trial create a significant roadblock to any class treatment. Even assuming the consumers should show liability, they would need to structure a damages equation for small recoveries to try to recover the invested attorneys' fees.     Should Class Counsel win on all issues at trial in one or more (up to fifty) trials, this corporate defendant may no longer exist or have assets to satisfy multiple judgments.     This factor favors an award of a multiplier.

### 7.  Time devoted to the case.

We specifically described Class Counsel's investment of their stock-in-trade, i.e. time, above.  This investment is appropriate for a fifty (50) state class action particularly when the parties were on a trial track and beginning to prepare discovery at the same time they were attempting to negotiate a multi-faceted settlement.

### 8.  Fee awards in other class action settlements.

Class Counsel faced considerable contingent risk in pursuing this national consumer class action. Counsel committed substantial time and resources to this litigation on a purely contingent basis, expending over 5,672 hours of work and investing over $3 Million (not including hours incurred after May 31, 2016) without compensation and without any guarantee of receiving compensation.

Ignoring the possibility we would follow the Act and apply the lodestar to the actual benefit today and a percentage of the fund to the voucher redemption, Class Counsel offered no guidance on a multiplier to a lodestar.   As a cross check on a percentage recovery, our Court of

Appeals has suggested a multiplier of 3 is an appropriate ceiling for a fee award.[177]

We find Class Counsel reached a fair settlement in a national class action which faced long odds at liability certification due to trial manageability and in defeating the reasoning already applied by judges. They used the national leverage and substantial risk to Justice Stores to reach this settlement. Supported by pre-suit diligence and research, experienced counsel realized a settlement may be in all parties' interest. The parties did not specifically value the injunctive relief leaving us unable to ascribe a dollar value, but we find the agreed ending of the alleged misleading advertising shortly after this case began has value if only to put an end to the continuing claims.

Class Counsel cite authorities for a multiplier ranging from 4.3 to 15.6. All of their cited authorities, with the exception of *Weiss v. Mercedes-Benz* addressed above,[178] involve exclusively cash settlements. *Weiss* involved a coupon which turned into 50% cash in three years. These multiplier ranges should not apply to reward, contrary to the Act, a settlement consisting of over 95% in vouchers.

We find no basis to award a multiplier above 2. Class Counsel engaged in extraordinary work to reach a complex settlement structure in a fifty (50) state consumer action in which they had some, but not great, hope of success of recovery on a national class basis. They took the risk of investing the time of largely their most experienced litigators to resolve the thicket of fairness issues. Their work, particularly their ground work in negotiations, offers a lesson to class action counsel seeking early common ground under Fed.R.Civ.P. 1. But given the limited time involvement and relatively straightforward facts compounded by the advantage of having possible insider information reducing a need for extensive fact finding, we find no basis for a higher multiplier. Under the Act, Class Counsel may also recover under a percentage of the

recovery based on the redeemed vouchers less the $2,902,848 we ascribe to the present value of the voucher affirmatively chosen by the Class.

On balance, we find a substantial basis to find an extraordinary effort warranting a 1.75 multiplier on the lodestar and allow Class Counsel to later seek a percentage of the recovery award based on the redeemed vouchers net of the value we presently ascribe to the vouchers chosen by the Class.[179] Under this 1.75 multiplier, we award Class Counsel $5,311,470.24 in attorneys' fees in the accompanying Order subject to any challenge to the calculation of the lodestar based on Class Counsel's imminent affidavits.

### C. Class Counsel is entitled to cost reimbursement, but have not shown a basis.

The three Class Counsel law firms seek $82,436.27, $71,917.72 and $5,399.21 respectively for reimbursement of costs.[180] Each Class Counsel represents their percentage fee recovery includes these expenses. They have not shown support for these expenses. They are entitled to be reimbursed for reasonable costs, but must offer us a basis to evaluate the reasonableness. As they have not done so, we will honor their request and defer this evaluation until we review further awards following the consumers' response to the vouchers.

## IV.   Six of the eight Plaintiffs are entitled to a reduced incentive award.

Class Counsel seeks an award of $6,000 for each of the eight (8) plaintiffs.   This award would be, based on the calculations supporting the fairness of the settlement and lacking contrary facts, a several hundred timed multiplier on their recovery as a class member.   After our inquiry during the Fairness Hearing, Class Counsel submitted affidavits describing the efforts of each Plaintiff other than Ms. Sinkler.

Our Court of Appeals recognizes incentive awards are not uncommon in class action

litigation.[181]  When, as here, the incentive award is deducted from the Cash Settlement Fund, we must "carefully review" the request for fairness to other class members.[182]  We consider:

> [T]he risk to the plaintiff in commencing suit, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit.[183]

"A rubber-stamped approval by the Court of any unjustified incentive award is fodder for abuse... because '[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.'"[184]

In applying these factors, we find no basis for a $6,000 incentive fee to any Plaintiff.  We have no evidence of financial or social risk as they are eight (8) of over 18.4 million consumers with no ongoing relationship at risk.  They expressed no personal notoriety. No Plaintiff submitted proof of investing time or costs.  Their efforts can generously be described as "monitoring" the progress by reviewing the settlement terms and talking to their lawyers.  We cannot approve incentive awards based on run-of-the-mill assistance.  We require more extensive involvement.[185]  No one describes how they came to learn of the potential harm.  While they did subject themselves to possible depositions and participated in reviewing settlement terms, they did not get deposed because their counsel resolved the case before their extensive involvement. They were involved in the case for a limited time of several months, but not years. While they provided some services, we find no reason to distribute an incentive award at a multiplier of hundreds over the Class Members.[186]  We find, based upon Class Counsel's sworn statements, six (6) Plaintiffs are entitled to an incentive fee in the range of $2,000 to $3,000 but not higher. Two (2) Plaintiffs are not entitled to an incentive fee.

## 1. Awards to six representative Plaintiffs.

Ms. Rougvie began speaking with Class Counsel in February 2015 and had twelve (12) conversations with her lawyers for an average of thirty minutes. She discussed the facts of her case, reviewed pleadings, described her concerns for her privacy in filing in a public forum, and initially prepared for depositions. She is the named lead counsel for all proceedings since June 2015. She also reviewed aspects of the settlement. We find she provided services and is entitled to a $2,500 incentive fee.

Ms. Bolton and Ms. Bell spoke with their lawyers on multiple occasions beginning in February 2015 from five minutes to an hour to discuss status of the case, strategy and proposed settlement. They described their experiences at Justice Stores during the Class Period. They met with Class Counsel in Austin, Texas, requiring both Plaintiffs to travel. They discussed a concern with privacy in a public forum. They began preparing for testimony in deposition or trial. We find Ms. Bolton and Ms. Bell provided services and are each entitled to a $2,000 incentive fee.

Mrs. Cowhey began talking to Class Counsel in February 2015 about her experiences shopping at Justice Stores during the Class Period. She believed Justice Stores deceived her. She described her understanding of the "40% off," her shopping patterns, purchases and provided documents and samples of the purchased tween merchandise. She also addressed the legal foundation for the claims, legal strategy, potential defenses and settlement discussions. She agreed to be the named plaintiff for the Pennsylvania class leading to our retaining venue. She met with Class Counsel at least three times for at least an hour each time. Mrs. Cowhey also spoke to Class Counsel several times on the phone. As Mrs. Cowhey provided both factual and legal input and, for a period of time, served as the named Plaintiff in this District, we find Mrs. Cowhey is entitled to a $3,000 incentive fee.

Ms. Mehigan spoke with Class Counsel several times concerning her shopping patterns, the case status and strategy and proposed settlement terms. She provided proof of purchase. She reviewed and approved the settlement. She agreed to be named as the lead plaintiff and this case remained captioned under her name for many months.   We find Ms. Mehigan provided services and is entitled to a $2,500 incentive fee.

Ms. Fubiak spoke with Class Counsel several times concerning her shopping patterns, the effect of the sale advertising, status of the case, strategy and proposed settlement terms.   She provided proof of purchase and later reviewed and approved the settlement.     We find Ms. Fubiak provided services and is entitled to a $2,000 incentive fee.

### 2.  We decline to award an incentive fee to Ms. Mansour and Ms. Sinkler.

The request for Caroline Mansour raises a different question.   Ms. Mansour is the daughter-in-law of one member of the Class Counsel and sister-in-law of another Class Counsel. Her father-in-law swears she provided effort.   She would have been subject to discovery particularly into her appropriateness as a class representative given her family's role as Class Counsel. She discussed the facts of the case, strategy, reviewed pleadings, and raised concerns about her privacy in a public forum.

Notwithstanding her efforts, we cannot abandon our obligation to find she does not satisfy the adequacy inquiry under Rule 23(a)(4).   The relationship casts doubt on Ms. Mansour's ability to "place the interests of the class above that of Class Counsel."[187] Neither Class Counsel nor Ms. Mansour disclosed her familial relationship and the potential conflict until the Final Fairness Hearing.   The conflict should have been disclosed: "[o[ur message to the class action bar is short and simple; when in doubt, disclose."[188] There are potential conflicts of interest which, had they been disclosed, we would have fully reviewed before preliminary approval.   We

find, similar to the Court of Appeals last year, the failure to disclose is an important failure in protecting the Class and we decline to award an incentive fee to Ms. Mansour.[189]

We have no information on services provided by Ms. Sinkler and decline an incentive fee for her.

## V.    Conclusion

As first conceived decades ago by creative lawyers, many from this District, class action treatment of an alleged national deceptive practice inflicting relatively small losses upon millions of consumers is warranted upon fully satisfying Rule 23 and particularly protecting the interests of absent class members.  Eight consumers and their experienced counsel filed an innovative lawsuit against Justice Stores looking for class action resolution of these relatively smaller damage claims for over 18.4 million consumers.  By any measure, they faced an uphill battle in certifying a liability class and proving damages.  To their credit, they obtained pre-suit material information and, with our urging, opened settlement discussions early in the litigation arc. Experienced courtroom lawyers fairly valuing the potential liability and manageability issues based on extensive data vigorously disputed settlement terms.    After several rounds of negotiations over months, they reached a settlement despite the case law on liability and manageability entitling the over 18.4 million consumers to choose between cash or, if they wished to shop at Justice Stores again, a voucher.  We find substantial grounds to certify the Settlement Class and opine the settlement is fair, reasonable and adequate. This settlement is more than reasonable.  Less than fifty (50) persons objected with similar arguments.  The parties addressed and cured meritorious objections and the remaining objections are overruled. The settlement is not perfect, but none are.  Knowing the precise values, we can fairly evaluate the settlement consideration.

Awarding attorneys' fees for this effort is a different question. Facing the intersection of our Court of Appeals' guidance on reviewing the direct benefit and Congress' mandate in the Class Action Fairness Act, we must evaluate the actual benefit to the Class both for the approximate 3.3% of Class Members who chose a remedy, and for the 96.7 % who receive an automatic non-transferable voucher for a purchase of tween merchandise at Justice Stores within one (1) year. Having valued the direct benefit to the 3.3% of the Class now, we award Class Counsel's proffered lodestar with a 1.75 multiplier and award a limited incentive fee to six (6) plaintiffs.   We allow the parties to return for additional distributions from the $50.8 Million Cash Settlement Fund detailed in their Settlement Agreement under a percentage of recovery method based on the redeemed vouchers. In the interim, we expect quarterly accountings on the progress of their agreed voucher program and ongoing administrative costs. After the vouchers expire and we review the actual benefits to the remaining Class Members, we will distribute the balance of the Cash Settlement Fund.

---

[1] Plaintiffs Carol Rougvie, Marguerite Sinkler Gilder, Caroline Mansour, Kara Bell and Tiffany Bolton joined Mehigan's and Kubiak's Amended Complaint adding claims under analogous consumer protection statutes in California, Florida, Illinois and Texas. Our June 18, 2015 Order consolidated this case with these later filed matters. (ECF Doc. No. 49).

[2] Additional plaintiffs in *Joiner v. Tween Brands, Inc.,* No. 15-1590 (D. Md.); *Legendre v. Tween Brands, inc.*, No. 15-4088 (D.N.J.); *Gallagher v. Tween Brands, Inc.*, No. 15-833 (E.D. Mo); *Kallay v. Tween Brands, Inc.*, No. 15-2238 (S.D. Ohio); *Metoyer v. Tween Brands, Inc.,* No. 15-1007 (C.D. Cal.); *Loor v. Tween Brands,* No. 15-953 (M.D. Fla.); and *Traynor-Lufkin v. Tween Brands, Inc.*, No. 15-2712 (E.D. Pa.) filed similar lawsuits in May and June 2015.

[3] The parties represent these states include Alabama, Georgia, Louisiana, Mississippi, Montana, South Carolina and Tennessee. These states either do not allow class actions, or do not permit class actions under consumer protection laws.

[4] These states include Alaska, Arkansas, Arizona, California, Connecticut, Delaware, Iowa, Illinois, Florida, Kansas, Kentucky, Maryland, Maine, Michigan, Minnesota, Missouri, North Dakota, Nebraska, Oklahoma, Oregon, Rhode Island, South Dakota, Utah, Vermont, West Virginia and Wyoming.

[5] States with consumer protection statutes permitting up to treble damages include Colorado, Hawaii, Idaho, Indiana, Massachusetts, New Hampshire, New Mexico, New Jersey, New York, Nevada, North Carolina, Ohio, Pennsylvania, Texas, Virginia, Washington, Wisconsin and the District of Columbia.

[6] N.T. Fairness Hearing, pp. 10, 21-22.

[7] ECF Doc. No. 167, Ex. 3.

[8] ECF Doc. No. 71-1, Settlement Agreement at ¶41.

[9] "'Released Claims' means any case, claim, cause of action, … of every kind and description that the Releasing Parties had or has, … against any of the Released parties *arising out of or relating to the allegations in the Complaint*, prior to the Effective Date of the Settlement, …. including but not limited to all claims that were brought or could have been brought in the Action or the Related Actions." ECF Doc. No. 71-1 at p. 13-14.

[10] ECF Doc. No. 136, p. 20.

[11] ECF Doc. No. 71-1 at p.20.

[12] During the Fairness Hearing, Justice Stores' counsel estimated having identification information for approximately 94.6% of all customers who shopped at Justice Stores between January 1, 2012 and February 28, 2015. N.T. May 20, 2016, p. 178.

[13] Class Members who purchased with cash, did not provide contact information but who saved their receipts were able to file claims under Option 2. As Justice Stores did not have a record of these customers in its database, the only way to confirm their Class membership is through proof of purchase.

[14] We appointed McGladrey LLP (renamed "RSM") to serve as Claims Administrator. ECF Doc. No. 78. RSM retained Epiq to assist with notice to potential Class Members.

[15] ECF Doc. No. 98, Schultz Decl. at ¶6. Where Epiq could not identify a particular state of residence, customers were given notice of the range of possible awards.

[16] *Id.* ¶7

[17] *Id.* ¶8.

[18] *Id.* ¶9.

[19] *Id.*¶10.

[20] ECF Doc. No. 153, Azari Decl., Exh. A. ¶8.

[21] ECF Doc. No. 98, Shultz Decl. at ¶13, Ex. A;  Epiq identified 275 stories in broad ranging media including national newspapers, business publications, television, radio and the internet.

[22] ECF Doc. No. 153, Azari Decl. at ¶5.

[23] *In re Nat'l Football League Players' Concussion Injury Litig.,* 301 F.R.D. 191, 202-03 (E.D. Pa.)*, petition dismissed sub nom. In re Nat. Football League Players Concussion Injury Litig.,* 775 F.3d 570 (3d Cir. 2014) (citing *In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litig.,* 851 F.Supp.2d 1040, 1061 (S.D.Tex.2012) (notice plan that expert estimated would reach 81.4% of class was sufficient); *Alberton v. Commonwealth Land Title Ins. Co.,* No. 06–3755, 2008 WL 1849774, at *3 (E.D.Pa. Apr. 25, 2008) (direct notice projected to reach 70% of class plus publication in newspapers and Internet was sufficient); *Grunewald v. Kasperbauer,* 235 F.R.D. 599, 609 (E.D.Pa. 2006) (direct mail to 55% of class and publication in three newspapers and Internet was sufficient)).

[24] *In re Prudential Ins. Co. of America,* 962 F. Supp. 450, 496, 527 (D.N.J.1997) (citing 2 H. Newberg, *Newberg on Class Actions* § 8.32 at 8–103.)

[25] ECF Doc. No. 167.  The parties represent there is a slight variance in numbers based on some Class Members submitting invalid multiple claims.  The parties anticipate claims processing and final review will be complete sometime this month. Ex. 1A, p. 16, ¶12.

[26] ECF Doc. No. 167, Marr Decl., Ex. 1A, p. 12-16.

[27] These numbers include undeliverable emails and postal addresses, as represented by Declaration of Richard Zayas and the parties' Slide 13 presented during our May 20, 2016 Fairness Hearing.

[28] ECF Doc. No. 167, p.2.

[29] *Id.*, ¶6.

[30] *Id.,* ¶8.

[31] *Id.*, ¶7.

[32] *Id.*, ¶9.

[33] *Id.*, ¶12

[34] 5/10/16 Azari Decl., ECF Doc. No. 153, Exh. 1-A at ¶20.

[35] *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 5 F.3d 768, 784 (3d Cir.) *cert denied*, 516 U.S. 824 (1995).

[36] *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 613 (1997).

[37] *Id.* at 614; *In re Gen. Motors Corp. Pick-Up Truck Ruel Tank Prods. Liab. Litig.*, 55 F.3d 768, 792-97 (3d Cir. 1995). ("[C]lass actions created for the purpose of settlement are recognized under the general scheme of Federal Rule of Civil Procedure 23, provided that the class meets the certification requirements under the rule.")

[38] *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).

[39] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

[40] *In re Prudential Ins. Co. America Sales Practice Litigation*, 148 F.3d 283, 308 (3d Cir. 1998).

[41] *Amchem Prods.*, 521 U.S. at 621.

[42] *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001); *see Vista Healthplan, Inc. v. Cephalon, Inc*, No. 06-1833, 2015 WL 3623005, at *13 (E.D. Pa. June 10, 2015).

[43] Fed. R. Civ. P. 23(a)(1).

[44] *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)).

[45] *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

[46] Fed. R.Civ.P. 23(a)(3).

[47] *Baby Neal*, 43 F.3d at 58 (citation omitted).

[48] *Seidman v. American Mobile Systems, Inc.*, 157 F.R.D. 354, 360 (E.D. Pa. 1994).

[49] Fed. R. Civ. P. 23(a)(4).

[50] *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006); *Hawk Valley, Inc. v. Taylor*, 301 F.R.D. 169, 183 (E.D.Pa. 2014).

[51] *Gen. Motors,* 55 F.3d at 795.

[52] *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004).

[53] Fed.R.Civ.P. 23(b)(3).

[54] *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 240, 266 (3d Cir. 2009).

[55] *See Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1197 (2013).

[56] *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

[57] *In re Prudential*, 148 F.3d at 316 (internal quotations omitted).

[58] *Lake v. First Nationwide Bank*, 156 F.R.D. 615, 626 (E.D. Pa. 1994); *In re Prudential*, 148 F.3d at 316.

[59] *In re Baby Products Antitrust Litigation*, 708 F.3d 163, 175 (3d Cir. 2013).

[60] *Id.*

[61] ECF Doc. No. 107.

[62] ECF Doc. No. 98, Schultz Decl., Ex.1A.

[63] ECF Doc. No. 105.

[64] ECF Doc. No. 113, 132.

[65] ECF Doc. No. 157.

[66] *In re Prudential,* 962 F.Supp. at 526.

[67] 521 U.S. 591 (1997).

[68] *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 303 (*citing In re Warfarin Sodium Antitrust* Litigation, 391 F.3d 516, 529 (3d Cir. 2004)); *In re Nat'l. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 370-71 (E.D. Pa. 2015), *aff'd* 821 F.3d 410 (3d Cir. 2016).

[69] *Id.*

[70] ECF Doc. No. 105.

[71] *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 327 (3d Cir. 2011).

[72] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 12-4671, 2016 WL 3563719 (2d Cir. June 30, 2016).    In this long-pending antitrust lawsuit by merchants challenging Visa and MasterCard fees, the diverse classes sought distinct relief, one for monetary relief, and one for prospective injunctive relief. "Structural defects in this class action created a fundamental conflict between the (b)(3) and (b)(2) classes and sapped class counsel of the incentive to zealously represent the latter." *Id.* at *29.

[73] Fraud in the claims process is a legitimate concern.   As the Claims Administrator noted when reviewing Option 2 claims, several class members submitted claims contending they made purchases totaling one million dollars during the Class Period, which are unlikely to be justified with the required proof. ECF Doc. No. 167, Ex.1A, ¶8.

[74] *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 (3d Cir. 2012).

[75] *Amchem Products, Inc.*, 521 U.S. at 623; *In re Prudential*, 148 F.3d at 316 (quoting *In re G.M. Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir.1995)).

[76] *In re Prudential*, 148 F.3d at 299 (citing *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975).

[77] *In re General Motors,* 55 F.3d at 805.

[78] *Id.*

[79] *In re Baby Products,* 708 F.3d at 173-74.

[80] *Mirfasihi,* 356 F.3d at 785 (collecting cases); *In re Baby Products*, 708 F.3d at 175; *In re Gen. Motors,* 55 F.3d at 785;

[81] *In re General Motors*, 55 F.3d at 784.

[82] *In re Cendant,* 264 F.3d 201, 232 n. 18 (3d Cir.2001) (citing *In re General Motors,* 55 F.3d at 785).

[83] ECF Doc. No. 167, p. 25 of 101.

[84] 521 F.2d 153, 157 (3d Cir.1975).

[85] 708 F.3d at 177, 178; *In re Cendant,* 264 F.3d at 231.

[86] *In re Cendant,* 264 F.3d at 233 (quoting *In re General Motors*, 55 F.3d at 812).

[87] *In re Prudential,* 148 F.3d at 318.

[88] *Id.* at 319.

[89] *In re Cendant,* 264 F.3d at 235.

[90] *Id.* at 237.

[91] *Shaulis v. Nordstrom, Inc.*, 120 F.Supp.3d 40 (D. Mass. 2015) (appeal pending); *Mulder v. Kohl's Department Stores, Inc.*, No. 15-11377, 2016 WL 393215 (D.Mass. February 1, 2016) (appeal pending).

[92] *Shaulis,* 120 F.Supp.3d at 42. Class Plaintiffs raise identical statutory claims under Massachusetts law as raised in *Shaulis*.

[93] *Id.* at 53.

[94] Class Plaintiffs raise identical statutory claims under Illinois law as raised in *Canasta*. *Id.* at 52; *Mulder,* at *6 (dismissing plaintiff's' complaint for failure to allege a legally cognizable

injury even noting "it is superficially appealing to conclude that plaintiff has suffered a cognizable injury under the law"); *see Camasta v. Jos A Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014) (affirming district court's dismissal of action where consumer failed to allege facts showing he suffered actual damages under Illinois consumer Fraud and Deceptive Business Practices Act, based on practice of advertising normal retail prices as temporary price reductions); *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (element of actual damages "requires the plaintiff suffer actual pecuniary loss."); *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1196 (Ill. Sup. Ct. 2008);  We also cannot ignore the Supreme Court's recent review of statutory claims requiring concrete injury-in-fact and resulting arguments challenging recovery for consumer fraud absent actual pecuniary loss; *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540 (2016).

[95] *Shaulis*, 120 F.Supp.3d at 55 (internal citiations omitted).

[96] *Id.* (quoting *Speakman v. Allmerica Fin. Life Ins.*, 367 F.Supp.2d 122, 132 (D.Mass. 2005)).

[97] *Mulder,* 2016 WL 3932315 at *8.

[98] *See e.g. Shaulis,* 120 F.Supp.3d at 55.

[99] *Id.; Mulder,* 2016 WL 393215 at *8 (dismissing unjust enrichment claim).

[100] *In re Cendant,* 264 F.3d at 238.

[101] *In re Prudential,* 148 F.3d at 319.

[102] *Id.* at 321.

[103] *See In re LifeUSA Holding, Inc.,* 242 F.3d 136 147 (3d Cir. 2001); *Tylka v. Gerber Products, Co.,* 178 F.R.D. 493, 498 (N.D.Ill. 1998) (application of fifty states' consumer fraud statutes would be unmanageable).

[104] *In re Cendant,* 264 F.3d at 240.

[105] *See e.g. Hanrahan v. Britt*, 174 F.R.D. 356 (E.D. Pa. 1997).

[106] *In re Prudential,* 148 F.3d at 322.

[107] *In re General Motors,* 55 F.3d at 806 (quoting *Manual for Complex Litigation 2d* § 30.44).

[108] N.T. May 20, 2016 Fairness Hearing at p. 32.

[109] *In re Union Carbide Sec. Lit.,* 718 F.Supp. 1099, 1103 (S.D.N.Y.   1989). ("Dollar amounts are judged not in comparison with possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.")

[110] *Id.,* 708 F.3d at 174-75.

[111] *In re Baby Products,* 708 F.3d at 174 (citing *In re Pet Food Antitrust Litigation*, 629 F.3d at

350).

[112] *Prudential*, 148 F.3d at 323.

[113] *In re Baby Products*, 708 F.3d at 174.

[114] *Id.* (emphasis added).

[115] Attorney Goetz appeared at the Fairness Hearing on behalf of Objectors Katie Traynor-Lufkin, Terry Holcomb, Emily Mohr and Dorlene Goldman.  *See* N.T. May 20, 2016 Fairness Hearing, pp. 132.

[116] *Shaulis, supra; Mulder, supra.*

[117] *See Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 376 (D.D.C.2002) ("[T]he standard for evaluating settlement involves a comparison of the settlement amount with the estimated single damages," not treble damages.)

[118] *In re Vitamins Antitrust Litig.,* 2000 WL 1737867, at *2 (D.D.C. Mar.31, 2000) (internal citation omitted); *See also Baby Products, supra.*

[119] Counsel for Objector Gretchen Carey spoke of this concern during the Fairness Hearing.

[120] ECF Doc. No. 136 at p. 13.

[121] The parties agreed to equally share the cost of supplemental notice including by reducing from the fund earmarked for attorneys' fees and the amount available for cash distribution ($928,662 each).

[122] *Landsman & Funk, P.C. v. Skinder-Strauss Associates*, 639 Fed.Appx. 880 (3d Cir. 2016).

[123] *In re Baby Products*, 708 F.3d at 175.

[124] *Id.*

[125] ECF Doc. No. 166.

[126] *In re General Motors*, 55 F.3d at 821.

[127] *Prudential*, 148 F.3d at 333; *GMC*, 55 F.3d at 819.

[128] *In re Southwest Airlines Voucher Litigation*, 799 F.3d 701, 713 (7th Cir. 2015) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003).

[129] *Sullivan*, 667 F.3d at 330;  *See In re Cendant,* 243 F.3d at 734; *In re Prudential,* 148 F.3d at 333–34.

[130] *In re Baby Products*, 708 F.3d at 170.

[131] *Id.* at 178.

[132] *Id.* at 179.

[133] *Id.* (citing *Manual for Complex Litigation*, § 21.71 (4th ed. 2008)).

[134] *O'Brien v. Brain Research Labs, LLC,* No. 12-204, 2012 WL 3242365 at *23-24 (D.N.J. Aug. 9, 2012).

[135] We can calculate the specific response to each voucher option multiplied by the cash value to equal $2,902,848:

Option One  (any purchaser)
- Limited Recovery: 5786 persons  x.  $7
- Single Recovery: 66,123 persons  x.  $13
- Treble Recovery: 88,642 persons  x.  $20

Option Two (frequent purchasers with proof of purchase):
- Limited Recovery: 956 persons  x.  $7
- Single Recovery: 6,576 persons  x. $13
- Treble Recovery: 6,886 persons  x.  $20

[136] ECF Doc. No. 153, p.10-11.

[137] ECF Doc. No. 153.

[138] 28 U.S.C. § 1712(a).

[139] *In re Baby Products*, 708 F.3d at 179 n.13.

[140] *Yates v. United States,* 135 S.Ct. 1074, 1081-82 (2015) ("[w]hether a statutory term is unambiguous,  however, does not turn solely on dictionary definitions of its component words..."); *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a [statutory] word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform that analysis"); *Exxon Mobil Corp. Allapattah Servs., Inc.*, 545 U.S. 546, 567 (2005) (noting that where a statute is ambiguous, a court "should look to other interpretive tools" including legislative history); *In re HP Inkjet Printer Litig.,* 716 F.3d 1173, 1175 (9th Cir. 2013) ('If the legislative history of CAFA clarifies one thing, it is this: the attorneys' fees provisions of § 1712 are intended to put an end to to the 'inequities' that arise when class counsel receive attorneys' fees that are grossly disproportionate the actual value of the coupon relief obtained for the class").

[141]  *In re Online DVD-Rental Antitrust Litig.*, 7790 F.3d 934, 950 (9th Cir. 2015)(quoting S.Rep. No. 109-14, at 15 (2005), 2005 U.S.C.C.A.N. 3, 16).

[142]  Ten years before the Act, our Court of Appeals similarly criticized a settlement with General Motors as a marketing technique. *In re General Motors, supra.*

[143] *In re Southwest Airlines Voucher Litig.,* 799 F.3d at 706 (citing *In re HP Inkjet Printer Litig.,* 716 F.3d 1173, 1177-79 (9th Cir. 2013), *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006), Christopher R. Leslie, *The Need to Study Coupon Settlements in Class Action Litigation,* 18 Geo.J. Legal Ethics 1395, 1396-97 (2005).

[144] *Martina v. L.A. Fitness Intern., LLC,* No. 12-2063, 2013 WL 5567157,  at *5 (D.N.J. Oct. 8, 2013)(quoting *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 654 (7th Cir. 2006)).

[145] *Tyler v. Michaels Stores, Inc.,* No. 11-10920, 2015 WL 8484421, *1 (D.Mass. Dec. 9, 2015); Judge William G. Young also enjoyed the benefit of knowing consumers used approximately $138,000 out of the voucher's $418,000 face value on vouchers expiring in ninety (90) days to be used only at Michael's stores when he awarded the lodestar fees because the percentage of the recovery would reduce the attorneys' fee award below their investment of time.

[146] *Id.*

[147] No. 12-204, 2012 WL 3242365 (D.N.J. Aug. 9, 2012).

[148] 921 F.Supp.2d 1040, 1048 (S.D.Cal. 2013)(class members receive both cash and a $20 credit).

[149] 465 Fed.Appx. 617, 619 (9th Cir. 2012) (unclear as to the basis for the settlement).

[150] 779 F.3d 934, 951 (9th Cir. 2015) (finding the choice between a freely transferable Walmart gift card with no expiration and the cash equivalent of a gift card is not a coupon under the Act: "Instead of merely offering class members the chance to receive a percentage discount on a purchase of a specific item or set of items at Walmart, the settlement gives class members $12 to spend on any item carried on the website of a giant, low-cost retailer.  The class member need not spend any of his or her own money and can choose from a large number of potential items to purchase. Even in the gift card is only worth $12, it gives class members considerably more flexibility than any of the coupon settlements listed in the [United States] Senate report.")

[151] No. 06-04149, 2008 WL 8150856 (C.D. Cal. July 21, 2008).

[152] ECF Doc. No. 71-1, p. 54 ("For Claimants who reside in Hawaii or Alaska, instead of a Voucher, Claimants will receive directly from Justice, via first class mail, a gift card...").

[153] *McDonough v. Toys R Us, Inc.,* 80 F.Supp.2d 626 (E.D.Pa. 2015).

[154] 899 F.Supp. 1297, 1299-1304 (D.N.J. 1995).

[155] *Id.* at 1304.

[156] Newberg on Class Actions §15.71 (5th ed.).

[157] *In re Prudential,* 148 F.3d at 292.

[158] *Id* .at 340.

[159] *O'Brien,* at *29 (quoting *In re AT&T* Corp, 455 F.3d at 164 n. 4).

[160] *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000).

[161] Billings from the Mansour Gavin firm include non-firm member Robert Mansour.

[162] *In re Rite Aid Securities Litigation,* 362 F.Supp.2d, 587, 589 n.1.

[163] ECF Doc. No. 167.   We expect Class Counsel to provide us with the hours billed by each attorney with the hourly rates normally charged in commercial litigation consistent with their sworn declarations.

[164] *In re AT&T Corp.,* 455 F.3d at 164 n.3.

[165] We agree with Judge Posner's analysis, albeit in a securities case, the market should define a contingent fee in the common fund portion of a recovery: "[t]he judicial task might be simplified if the judge and the lawyers bent their efforts on finding out what the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character.   This was a contingent fee suit that yielded a recovery for the 'clients' (the class members)... The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client." *In the Matter of Continental Illinois Securities Litigation*, 962 F.2d 566, 572 (7th Cir. 1992).

[166] *Hensley v. Eckerhart*, 461 U.S. at 436.

[167] *See In re Gen. Motors,* 55 F.3d at 808 (coupon settlement is a "sophisticated GM marketing program").

[168] *See Kelly v. Phiten USA,* 277 F.R.D. 564, 567-68 (S.D.Iowa 2011).

[169] *In re Rite Aid*, 396 F.3d at 301.

[170] *In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 374 (E.D.Pa. 2015) *aff'd,* 821 F.3d 410 (3d Cir. 2016).

[171] *See Cullen v. Whitman Medical Corp.,* 197 F.R.D. 136, 149 (E.D.Pa.2000) ("The single clearest factor reflecting the quality of class counsels' services to the class are the results obtained.").

[172] *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).

[173] *O'Brien*, at * 26 (quoting *In re Rite Aid*, 396 F.3d at 305).

[174] *See Muchnick v. First Federal Savings*, No. 86-1104, 1986 WL 10791, *1, *3 (E.D.Pa. 1986) (awarding a upward adjustment in the lodestar attorneys' fees in a statutory fee case raising

several "significant and novel legal issues" based on "remarkable" settlement in light of the "unlikelihood of such a result at the outset of the litigation.")

[175] *In re Rite Aid*, 362 F.Supp.2d at 599.

[176] Consumers entitled to mandatory fee shifting reside in: Alaska, California, Georgia, Hawaii, Idaho, Louisiana, Massachusetts, Maryland, Maine, North Dakota, New Hampshire, New Jersey, New Mexico, Nevada, South Carolina, Texas and Wyoming. Consumers may ask the court to award fees in: Alabama, Arkansas, Colorado, Connecticut, District of Columbia, Delaware, Florida, Illinois, Indiana, Kansas, Kentucky, Michigan, Minnesota, Missouri, Montana, North Carolina, Nebraska, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Tennessee, Utah, Virginia, Vermont, Washington, Wisconsin and West Virginia. Only consumers in Arizona, Iowa and South Dakota are not entitled to mandatory or discretionary attorneys' fees under their consumer protection statutes.

[177] *In re Cendant,* 243 F.3d at 742.

[178] 899 F.Supp. 1297 (D.N.J. 1995).

[179] If we found the Act did not require us to initially compensate on the lodestar basis with an allowed multiplier, Class Counsel most recently requested a 25% fee based on the actual direct benefit. We calculate the direct benefit at $23,974,284, but this calculation includes the over $2.9 Million we ascribed to the present value of vouchers chosen by Class Members. Class Counsel's request for a 25% contingency based on the higher actual direct benefit would result in an attorneys' fee of $5,993,579 but if we apply the requested 25% contingency to the actual benefit not including the chosen vouchers, we would award attorneys' fee of $5,267,859. Even assuming we are not reviewing a mixed settlement under the Act and applied the requested percentage of the actual benefit claimed today, this lodestar recovery with the reasoned multiplier falls within the range of attorneys' fees sought by Class Counsel. We are not agreeing 25% is the fair percentage either now or upon final distribution but only note Class Counsel now seeks 25%.

[180] ECF Doc. No. 167.

[181] *Sullivan,* 667 F.3d at 333 n. 65.

[182] *Altnor v. Preferred Freezer Services, Inc.*, No. 14-7043, 2016 WL 3878161, at *17 (E.D.Pa. July 18, 2016)(quoting *Varacallo v. Mass. Mut.Life.Ins.Co.*, 226 F.R.D. 207, 257 (D.N.J. 2005)).

[183] *Reibstein v. Rite Aid Corp.,* 761 F. Supp. 2d 241, 257 (E.D. Pa. 2011) (quoting *Perry v. FleetBoston Fin. Corp.,* 229 F.R.D. 105, 118 (E.D. Pa. 2005)).

[184] *Altnor,* at *19 (quoting *Weseley v. Spear, Leeds & Kellogg,* 711 F.Supp. 713, 720 (E.D.N.Y. 1989)).

[185] *Id.,* at *18 (citing *Creed v. Benco Dental Supply Co.,* No. 12-1571, 2013 WL 5276109, at *7 (M.D.Pa. Sept. 17, 2013)).

[186] Newberg on Class Actions, § 17.18 (5th ed.)

[187] *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir. 2003).

[188] *In re Southwest Airlines Voucher Litig.*, 799 F.3d at 715.

[189] We do not view this failure to disclose as adversely affecting Class Counsel Mansour's share of the attorneys' fee.  We have no basis to find the relationship between the Mansours adversely affected the global settlement which offered every Class Member a choice between cash and a voucher.  Absent this overarching relief for every Class Member, we would consider disallowing a fee to the Mansour firm.