## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CAROL ROUGVIE,** *et al.* | **:  CIVIL ACTION** |
| | **:** |
| **vs.** | **:  NO.  15-724** |
| | **:** |
| **ASCENA RETAIL GROUP, INC.,** *et al.*  **:** | |

## MEMORANDUM

**KEARNEY, J.**                                                              **February 12, 2019**

Lawyers creatively settled this deceptive sales practices action against Justice Stores on behalf of 18.4 million consumers in exchange for stopping an allegedly deceptive marketing strategy, up to $402 Million in vouchers to use at the retailer's stores for those who wanted a voucher, and up to $50.8 Million immediately deposited in a Settlement Fund allocated to pay up to $27.8 Million in cash to consumers requesting cash, $8 Million for claims administration, up to $14.1 Million in attorney's fees, and an unlimited amount of the remaining funds reverting to Justice Stores to cover voucher exposure. After carefully considering several objections to the unlimited reverter, we approved an arms-length settlement capping Justice Stores' reverter at $8 Million and awarded attorney's fees to Class Counsel based on hours worked. Six objectors appealed, and Class Counsel then paid them $467,000 out-of-pocket (with a small contribution from Justice Stores) in mid-2017 to dismiss the appeals. After a year of monitoring the consumers redeeming approximately $30 Million in vouchers and cashing approximately $10 Million in checks, we must now distribute the unanticipated millions of dollars left in the Settlement Fund. Everyone agrees to a supplemental distribution to Class Members who filed claims. But how do we distribute this unanticipated large balance in the Settlement Fund?

In accompanying Orders, we approve supplemental cash distributions to approximately 607,000 Class Members after costs and paying fees based on today's Class benefit but must, consistent with our fiduciary role, reject paying: the Claims Administrator's unsupported or unbudgeted reimbursements; Justice Stores's request for an increased reverter; over $1.2 Million in fees to an objector group who, along with eleven others, objected to the unlimited reverter; excessive costs to Class Counsel; and, incentive fees to objectors absent evidence of their specific efforts providing a benefit to the Class. While deeply skeptical of handsomely paying off objector appeals to move class action settlements to earlier distribution, we must also deny a request from one objector group to order five objector-appellants disgorge the hundreds of thousands of dollars Class Counsel paid them in 2017 to withdraw their 2016 appeals as there is no present basis under our inherent power to find unjust enrichment or otherwise apply the December 1, 2018 amendment to Federal Rule 23(e)(5) now requiring court approval of these payoffs agreed to settle appeals.

## I.  Background

Eight consumers of pre-teen merchandise alleged Ascena Retail Group, Inc., and Tween Brands, Inc.—doing business collectively as "Justice Stores"—deceptively labeled their "tween" retail merchandise as "40% off," when the "allegedly reduced price was, in fact, [the] *regular* price."[1]  The eight consumers alleged various state law causes of action against Justice Stores. Unlike an earlier suit in Ohio limited to Ohio consumers, they decided to bring the big fight by seeking to proceed with a national class of over 18.4 million consumers.  As described in our July 29, 2016 Memorandum, the Class Counsel took on a difficult legal mountain.  Judges had already denied this consumers' theory of deceptive sales practices.  Management of a national class based on common questions of law presented with a wide variety of state law deceptive trade practice statutes and common fact issues from store to store around the country would be difficult.    But

2

Justice Stores may have faced several lawsuits on a state-by-state march to exponential attorney's fees. This ambitious putative national class action could resolve all these issues.

Within four months of filing and after two amended complaints, we held our first case management conference and, after setting a trial date, we urged experienced counsel to expand their good faith initial settlement overtures. It would take creative and well-prepared lawyers and thoughtful negotiating in a class action environment where competing lawyers find other consumer class members and then seek fees for sitting back, objecting to a settlement term and then, if unsuccessful in getting bought out in exchange for withdrawing their objection at the trial level, appeal our order denying their objections to the court of appeals with the resulting leverage of unknown delay and costs of appeal diminishing the class recovery. A well-known disreputable form of payoffs all too common in large class actions – especially when there is a likely large balance in the settlement funds after initial distribution. Objections are important when class counsel may lose sight of a fair resolution to seek a quicker payday but pursuing appeals when trial judges deny meritless objections may be cynically viewed as seeking to be paid far beyond the settlement terms reached by counsel who lived with the case and presumably acted in their client's best interests – especially class counsel who seeks to maximize the benefit to the proposed class and presumably obtain a larger percentage fee based on a larger benefit to the class. This conduct – albeit discouraged by skilled counsel - should be expected by experienced class counsel and their claims administrator including expecting these issues will be more vigorously disputed in an 18.4 Million national consumer class. After various rounds of intensive negotiations, the parties reached a pre-certification settlement agreement requiring Justice Stores stop this marketing strategy and offering settlement class members either a cash payment or a voucher redeemable at Justice Stores.

3

Presumably mindful of this class action environment and after Justice Stores agreed to stop its challenged marketing strategy, the lawyers originally agreed to offer the nationwide class a choice of cash now or a voucher up to $30 which could be used to purchase more products at Justice Stores. The parties agreed Justice Stores would deposit $50.8 Million into a Settlement Fund managed by Claims Administrator RSM US LLP and Justice Stores would issue vouchers based on their confidential consumer database with a maximum value of $402 Million. The parties initially agreed to allocate $27.8 Million of the Settlement Fund to pay cash claims, $8 Million towards administrative costs including mailings to this large a class, a cap of $15 Million for Class Counsel fees and costs, and a reverter of unclaimed cash in the Settlement Fund to Justice Stores.

On October 27, 2015, we preliminarily approved the settlement and certified a class including "[a]ll persons throughout the United States who purchased any children's apparel, fashion accessories, or other products from Justice during the period from January 1, 2012 to February 28, 2015."[2] After preliminary approval, we studied objections from several class members to a wide variety of concerns with the voucher value, differing treatment under state laws, the undefined and possibly substantial reversion to Justice Stores, and intended use of money left in the Settlement Fund.

Facing our skepticism informed by at least twelve objections to the unlimited reverter, the parties proposed a different settlement in the initial hours of our May 20, 2016 final approval hearing, which benefited the Class by capping the reverter to Justice Stores at $8 Million but only if it could justify this "insurance" on its vouchers through redeemed vouchers before the final distribution. On July 29, 2016, we found the revised settlement to be fair and reasonable. We found a present Class benefit based on the affirmative claims from 607,215 Class Members seeking cash or a voucher as of our hearing. Under our Court of Appeals' guidance, we could not define

4

the benefit beyond this recovery in the mixed cash and voucher settlement. Upon finding a benefit to the Class of $23,974,283.95 based on the 607,215 affirmative claims and administrative costs incurred to date, we awarded Class Counsel fees of $4,831,846.25 based on our review of their demonstrated detailed lodestar plus a 1.75 multiplier.[3] We also approved the $8 Million for demonstrated administrative charges specifically declining to add $2.5 Million in administrative fees in addition to the Claims Administrator's sworn declaration a week earlier. We deferred an award of further distributions until we could measure the benefit to the other approximately 17.8 million members of the Class based on the $402 Million in possible voucher redemptions.

Twenty members of the 18.4 million Class Members timely appealed our July 29, 2016 Orders. They challenged our findings on the voucher value, the fairness of treating residents of different states in a similar manner, the amount of cash offered to the Class Members, and the amount of funds available to be paid to Class Counsel. Our Court of Appeals assigned these multiple appeals to the court's mediation program and Chief Mediator Joseph A. Torregrossa held an initial session on November 30, 2016. This first effort failed. The parties returned to litigating the amount of the appeal bond, preparing extensive appendices and filing the appellants' opening briefs. Our Court of Appeals' Chief Mediator Torregrossa reconvened mediation in April 2017. The second effort succeeded. Class Counsel agreed to pay $467,000 from their pocket – funds we awarded them to be paid over three installments at the same time they paid the cash to the Class members requesting cash– to the objector-appellants to withdraw their appeals. The objector-appellants agreed to release their claims and not petition for further attorney's fees, costs or compensation. Class Counsel did not spend money not already awarded to them to satisfy the settlement terms with the objector-appellants.

5

Following dismissal of the appeals, the parties began moving forward on the voucher redemption portion of the settlement. Two non-appealing objectors, Barbara Comlish and Kathryn Artlip ("Comlish Objectors") then moved to intervene seeking to disclose and disgorge the cash payments made to the objector-appellants. We denied their motion without prejudice to raise objections to final distribution. As confirmed in their time records now shown to us as part of their request for fees, the Comlish Objectors researched the issue and decided not to appeal our denial of their motion.

The parties proceeded on issuing the checks and vouchers. Due to unanticipated personnel decisions by Justice Stores, the Claims Administrator needed to create and format the vouchers. The parties filed regular status reports describing the incremental successes in the voucher redemptions. Through October 31, 2018, Justice Stores processed $30,250,183.24 in vouchers – far below the outside possibility of $402 Million the parties described in seeking our approval of the fairness of the settlement – from 1,121,505 consumers. This redemption includes approximately $2.9 Million in vouchers included in our July 29, 2016 benefit analysis.

By the time of our December 13, 2018 hearing on this distribution, the Class had cashed $9,618,058.92 of checks distributed under our July 29, 2016 Order, leaving 19,656 checks worth $327,429.52 not cashed and remaining in the Settlement Fund. With 8.4% of the Class either cashing checks or redeeming vouchers, and all Class members receiving injunctive relief in Justice Stores agreeing to stop their practices, this settlement represents work well done by all counsel and their clients. But this is only the starting point of evaluating the next distributions from the Settlement Fund.

## II.  Analysis

We must now scrutinize requests for further disbursements from the Settlement Fund. The Settlement Fund is much larger than anyone anticipated at our May 20, 2016 fairness hearing and analyzed in our July 29, 2016 Orders and Memorandum. Millions of dollars left in the Settlement Fund engenders the disputes now before us.     Recognizing the large balance in the Settlement Fund, the parties now agree to issue checks pro rata to the approximately 607,000 persons who filed affirmative claims before July 29, 2016 as a further distribution from the balance in the Settlement Fund. The issue is:  what is the balance? The professionals all want more, even though we only reserved reimbursement of additional costs incurred by the Claims Administrator and Class Counsel's right to seek an additional fee based on the benefit to Class Members who did not seek affirmative relief but who may redeem the voucher. The Claims Administrator seeks a 79% premium on its budgeted $8 Million cap in administrative fees which we approved as fair in July 2016; Justice Stores now wants an additional $1.1 Million reverter (above the approved $8 Million) because it issued more $30 vouchers than it expected but still honored only approximately $30 Million out of possible $402 Million in vouchers;  two sets of objectors want to be paid for increasing the benefits to the Class through objections to the reverter and fee payments, along with their lawyers; and, Class Counsel moves for an additional 25% of this added benefit (voucher redemptions, additional administration costs, and money left in the Settlement Fund) as attorney's fees along with costs reimbursement.   One objector group also wants us to order Class Members who long ago dismissed their appeals of our July 29, 2016 Orders to disgorge the money Class Counsel paid out of pocket to them in exchange for dismissing those appeals.

Some of these requests are not challenged.     But our role is different in reviewing distribution from a Settlement Fund designed to benefit millions of consumers not in court. This

7

is not the lawyers's or accountants's money. It is not Justice Stores's money. When we approved the fairness of the settlement, this original \$50.8 Million Settlement Fund became our responsibility to monitor for the over eighteen million absent Class Members. Federal Rule of Civil Procedure 23(e) "sets out the basic charter for a court's analysis of the fairness of a class action settlement."[4] "The purpose of Rule 23(e) is to protect the unnamed members of the class."[5] To effectuate this purpose, we must act "as a fiduciary guarding the rights of absent class members and must determine that the proffered settlement is fair, reasonable, and adequate."[6]

In a series of accompanying Orders, we recognize the value of Class Counsel's and the objector counsel's efforts to benefit the Class, decline to sweeten the negotiated reverter for Justice Stores, award some but not all of the Claims Administrator's ever-expanding and apparently loosely supervised billing requests, and deny ordering objector-appellants to disgorge funds paid by Class Counsel from their own pocket – not Class funds – in exchange for dismissing appeals of our July 29, 2016 Orders denying their objections. We also require the parties to promptly return with a specific accounting of the money left in the Settlement Fund after today's Orders identifying the specific distribution amount in each check to be promptly sent to each of the approximately 607,000 Class Members who filed affirmative claims. Once we know this final number, including the amount of uncashed checks, we can then determine whether to issue one last distribution to the Class, a possible cy pres award, or other feasible relief.

But we all have much work to do before then. And our work includes making sure "then" will be as soon as practicable.

8

## A. The Class must partially pay demonstrated Class Administrator expenses, with leave to seek additional expenses for ongoing efforts.

Class Counsel requests we approve a total of $14,303,521.19 in expenses to be paid from the Settlement Fund to the Claims Administrator RSM US LLP. This request marks a third request for an increase over anticipated costs when we approved the settlement as fair to the Class with an $8 Million cap in October 2015. In February 2016, we approved an $1,800,000 increase in administrative costs so the Class Members initially receiving notice by e-mail would also receive first class mail.[7] In exchange, Class Counsel agreed to reduce the $15 Million cap on its fees by $900,000. By May 2016, within days of our final approval hearing, Mr. Barkan swore the Class could only be responsible for the Claims Administrator's total anticipated expenses of $8,469,718.[8] Class Counsel still argued for an additional $2.5 Million in postage costs at our May 20, 2016 final approval hearing. We found the settlement fair and reasonable on July 29, 2016 but capped the benefit to the Class from the Claims Administrator's total services at $8 Million. We then expressed our concern with the Claims Administrator's calculations as we denied Class Counsel's request – at this stage – to increase costs by $2.5 Million after the Claims Administrator swore a few days earlier it expected total costs paid by the Class to be less than $8.47 Million.

Almost a year later and having already incurred in excess of $7,300,000 in costs before distributing a dime, Class Counsel returned again with a request to increase the cost cap for the claims administration by $190,000 for costs incurred during the almost nine months of the appeals,[9] $950,400 for total costs increase to distribute automatic vouchers by first class mail to those Class Members who the Claims Administrator and Class Counsel originally proposed would receive bulk mail rate, and $3,200,000 to print and mail automatic vouchers to those Class Members the Claims Administrator and Class Counsel originally proposed would receive their vouchers by email. We granted the joint motion for the first-class mail with increased postage

9

rate and $3,200,000 to print and mail automatic vouchers including to those we thought were getting notice by email. We did not approve the $190,000 represented to be part of costs in an appeal period subject to our review upon distribution as we then expressed concern with how the Claims Administrator could have viewed these costs as unanticipated. Class Counsel now represents the $190,000 is held in escrow.

To date, we approved payment of $12,523,326 from the Settlement Fund allocated to Class Members. As Class Counsel paid $928,662 to ensure timely notice and distribution, the Claims Administrator has already been paid $13,250,110.95. It now asks for the Class to pay $530,472.39 plus release the $190,000 in escrow to cover unanticipated expenses from December 1, 2017 until July 31, 2018.

No one objects. But to fulfill our fiduciary obligation, we must first discover why the parties who initially agreed to cap administrative expenses at $8 Million are now asking us to approve over $6.6 million dollars more – almost 79% more than they first thought fair. We approved most of this increase based on good reasons such an ensuring notice by first class mail, vouchers by first class mail, and increased costs of postage. These are the type of unanticipated costs consistent with our understanding of the fairness of the settlement. But now we are reviewing final distributions.

Class Counsel hires a claims administrator to perform services as its subcontractor. Several class action firms may provide this administration in-house. We do not question Class Counsel's decision to hire an outside firm but the Claims Administrator, like an attorney hired on a contract basis to help Class Counsel, must perform diligently with a fiduciary duty to the Class as the Class Counsel's agent.

RSM's Senior Director Frank Barkan testified at our December 13, 2018 distribution hearing. He came back and testified at our January 22, 2019 show cause hearing on the Comlish Objectors' request to disgorge payments. He appeared confused and contradicted himself. He did not have information with him and admitted not reviewing subcontractor invoices before asking the Class to pay him. He admitted holding months of accounts receivable from Class Counsel but not billing yet. He could not explain several aspects of the increased expense to our satisfaction. We equate this Claims Administrator to a general contractor who, when called to explain his final bill, could not confirm how he arrived at a final bill. We do not question his credibility as he admitted lacking enough data. He did not appear to be lying; he just did not know. We question the assigned professionals' ability employed by the Claims Administrator to manage this national class settlement with responsibility for tens of millions of dollars. Missing the budget by almost 79% - after swearing as to the veracity of its budget – raises concerns not only for us but should also do so for the lawyers in the case tasked with ensuring their settlement remains fair. Class Counsel performed less than we would expect in this supervision. We appreciate its lawyer efforts to arrive at a fair settlement by July 2016 but then it appears Class Counsel did not fully appreciate its continuing supervisory obligations over the Claims Administrator. Class Counsel retains a claims administrator to help fulfill its fiduciary role to the Class. We appreciate most counsel do not have the in-house capacity to manage this claims process. But Class Counsel must vigilantly ensure the Class funds are budgeted and managed.

We examine these requested reimbursements - a 79% premium billing above the $8 Million cap - to ensure we arrive at the right numbers to explain this premium.

11

## 1. We disallow the requested $190,000 for costs during appeal and otherwise not specified.

The Claims Administrator initially swore it incurred $190,000 in costs during the time the objector-appellants sought review of our July 29, 2016 Orders in our Court of Appeals. It asked for $190,000 – Justice Stores did not object – without showing Class Counsel or this Court a basis for this request. Appearing extraordinary at the time, we denied this $190,000 request subject to placing these funds in escrow and reviewing at a distribution hearing. At the December 13, 2018 distribution hearing, we questioned why an experienced claims administrator would not anticipate an appeal in this large of a settlement with over eighteen million potential claimants and several experienced litigious objectors. But for Class Counsel paying out of pocket to resolve the appeals months before its likely resolution by the court, these costs would have increased. Class Counsel and the Claims Administrator should have known, based on RSM's touted experience, most appeals of nationwide class settlements require at least a year of briefing and study.

The Claims Administrator now concedes its error in seeking $190,000 for costs due to the appeals. It now claims the cost directly attributable to the appeal is $44,667.84 based on fixed costs – such as website maintenance and telephone charges – incurred for an additional seven months. In other words, the Claims Administrator apparently guessed on the $8 Million cap when its client (Class Counsel) swore to the fairness of the settlement based on the Claims Administrator's experience of how long a district judge would take in resolving these difficult issues but somehow forgot to consider an appeal time. This is the Claims Administrator's error and we will not require the Class to pay for its error. We deduct $44,667.84 from the reimbursement.

12

But what about the approximate $145,332 balance of this represented $190,000 in appeal costs? Mr. Barkan's supplemental affidavit does not offer specificity other than directing us to an assortment of invoices.[10] We cannot determine how much of this balance currently held in escrow is represented by these bills. Having once sworn to $190,000 in appeal costs and still not offering us a basis to find this escrowed amount tied to a service but instead lump billed, we cannot award the $190,000 in part. The entire $190,000 once represented for appeal costs and now held in escrow shall be returned to the Settlement Fund with interest.

### 2. We allow increased administrative fees of $146,100 for voucher development but not for additional telephone or claims review.

Class Counsel asserts the Claims Administrator incurred additional fees and expenses beyond its sworn estimates submitted for our reliance in May 2016. They now seek payment of an additional: $146,100 for voucher development and training from July through September 2017; additional telephone costs of $121,118; and, unanticipated time on claims review and emails of $219,584.

On May 13, 2016, presumably knowing we would be relying on his affidavit in determining the fairness of the settlement, Senior Director Mr. Barkan swore total costs of $525,667 for telephone support and now seeks a 23% premium because the Claims Administrator did not expect the number of live agent minutes necessary to respond to phone calls. Mr. Barkan also swore claims processing and administration costs of $481,480 and now seeks a 45% premium because approximately 14% of the claims required more attention than he originally estimated. Mr. Barkan did not provide an estimate of costs for voucher development. He now credibly swears Class Counsel and he anticipated Justice Stores would design and produce the electronic versions of the voucher. For undisclosed reasons, Justice Stores terminated the employees producing these

vouchers leaving this crucial obligation to the Class Counsel. We cannot fault Class Counsel and the Claims Administrator for incurring this expense necessary to meet the terms of the settlement. Justice Stores' failure in this effort to produce vouchers which would bring return customers remains unexplained.

While we allow the reimbursement of $146,100 for voucher development and testing from July through September 2017, we will not tax the Class for the Claims Administrator's inability to accurately budget for its work. These are anticipated risks in contracting for claims administration. We relied upon specific estimates in finding fairness. We do not approve paying the requested additional telephone costs of $121,118 and the requested additional claims review and emails of $219,584 from the Settlement Fund. To the extent those amounts have already been paid from the Settlement Fund, the Claims Administrator will refund these unauthorized costs into the Settlement Fund.

Class Counsel and the Claims Administrator have not sufficiently explained – or maybe we just cannot follow despite our extensive analysis – how they reconcile the requested administrative expenses of $530,472.39 plus releasing the $190,000 with the presently outstanding requests.

### 3. We allow Class Counsel to file an affidavit of the Claims Administrator's efforts from August 2018 through final distribution.

Class Counsel and the Claims Administrator still have much to do. The Claims Administrator seeks $35,000 a month for fees through May 2019. It may incur out of pocket expenses consistent with its budget over the next few months until final distribution. We want the Claims Administrator to complete its crucial role. It must do so with monthly billings sent to Class Counsel identifying the underlying costs of subcontractors.

14

Class Counsel will need to apply for final distribution. It may elect to include the Claim Administrator's affidavit with attached detailed billings should it seek reimbursement for authorized services in completing its crucial role. We expect Class Counsel, mindful of its fiduciary role, will ensure the Claims Administrator's continued diligence. We have no reason to doubt the Claims Administrator is performing its crucial function for the Class and the Court in a professionally prudent manner; our concern is with the past billing and inconsistent explanations on costs. It is already being paid approximately much more than it expected when hired; we appreciate it has done more work, but this is the nature of professional services. We designated RSM as Claims Administrator based on its sworn understanding of this obligation and its national reputation as a financial services and accounting firm.[11] We designated Class Counsel based on their ability to manage this type of settlement. In this limited regard, both have much more work to do.

## B. We deny Defendants' Motion to increase their reverter to $9.1 million.

Justice Stores requests we direct the Claims Administrator to distribute $9.1 million to it to fund purchases made using the vouchers.[12] Justice Stores now informs us of "[o]f the 17,937,886 vouchers that were distributed," class members redeemed 1,121,241 vouchers, a redemption rate of 6.25%.[13] This is a tribute to experienced lawyering and prudent business decisions. But it does not justify a greater reverter. Justice Stores made the deal knowing of $402 Million in potential redemptions on the street. Just because it thought the redemption rates would be lower does not justify another award of $1.1 Million. It made a guess too low for its consumer base. Justice Stores's expectations are left to the next case. It performed its role in part – except for not producing a voucher exemplar – and customers returned to its stores. How is this not a good thing?

15

We scrutinized this unique reverter at our May 20, 2016 final fairness hearing concerned with this potential reverter. The parties reduced the cap on the reverter to address our concerns – and concerns raised by twelve objectors. But possibly under the adage, "those who don't ask, don't get", Justice Stores now wants more money back. This was not the agreement, as its lawyer confirmed during our May 20, 2016 fairness hearing where we – and several objectors – raised concerns on the agreed "reverter":

```
10            The Court: The only way Justice gets
11    some of that back, is how? Is there some calculation
12    that is going to show us after the vouchers expire a
13    year from approval, that show us that we did not incur
14    voucher expenses of that number? How do you get your
15    money back?
16            Mr. Parks: The only way Justice gets any
17    amount of money back from that is if less than or about
18    2 percent of the vouchers are used.
5             So if -- that $8.1 million number is
6     about 2 percent of $378 million. So if only 2 percent
7     of the automatically distributed vouchers are used, then
8     that amount will be totally used up and that will be it.
9     If the amount of vouchers is like 30 percent that are
10    actually redeemed, then Justice is out of pocket an
11    additional approximately 120, $130 million.
```

Consistent with Justice Stores's counsel's representations, our July 29, 2016 Order provides, "[w]ithin forty-five (45) days after the last expiration date for a voucher distributed under the approved settlement . . . Defendants are granted leave to move for distribution of proceeds from the 50.8 million Cash Settlement fund, with supporting affidavits describing the face value of vouchers actually redeemed, up to a cap of $8 million."[14]

Notwithstanding this agreement and representation to us on May 20, 2016, Class Counsel later agreed Justice Stores could "request an increase in the voucher reimbursement cap of $8 million to $9.1 million."[15]

We deny Justice Stores' motion. This is Class money. As with the Claims Administrator, the parties reached this $8 million cap aware of the risk entailed in their good-faith estimate. The settlement agreement unambiguously capped Justice Stores's reverter at $8 million. Their efforts, as we intended, resulted in more redemptions.     Well done. We cannot both find the parties did less than everything possible to maximize the Class benefit and then find the parties did not expect these results when they represented a potential voucher exposure of $402 Million. Justice Stores's counsel admitted his client knew of this exposure during the May 20, 2016 fairness hearing. Justice Stores and Class Counsel then agreed to raise the voucher value to $30 but the undeniable fact remains Justice Stores agreed to this $8 Million cap knowing of a $402 Million exposure. It may not get both more customers in its stores using the vouchers and an even greater reverter when it swore its possible exposure exceeded $400 Million and the actual redemption after July 29, 2016 is less than $29 Million.

### C. We award Class Counsel reimbursement of demonstrated costs and 25% of the increased benefit to the Class based on vouchers redeemed by non-claimants but not from the additional distribution.

Class Counsel's efforts resulted in both a cash and immediate voucher benefit and now vouchers worth approximately $30 Million to the Class. Class Counsel's time sheets evidence diligence and, in at least two instances, put their own money into the case to move it along: they reduced their possible fee recovery by almost $900,000 to pay the Claims Administrator to allow more fulsome notice and then paid almost $467,000 out-of-pocket to resolve appeals and mitigate the delay for over one million Class members. Their efforts arguably resulted in a much larger Settlement Fund than necessary based on Class response. With the benefit of hindsight, they may have calculated larger initial payments to Class Members but they did not settle this case in a vacuum. Justice Stores, as represented by experienced counsel, set the dollar numbers for the

17

vouchers and cash payments mindful of its potential liability.     Class Counsel performed admirably at each step with the only possible question arising from managing the Claims Administrator.     But, as it affected the Class directly, we will not second guess their steps to maximize the Class benefit.

### *The Class benefit from the voucher redemption is $30,043,835, 24.*

Our first obligation in determining the proper fee is to understand the benefit to the Class. Unlike our July 29, 2016 Order, we are today are focused only on the value of the voucher redemption and the administrative costs relating to this redemption.

The members of the Class who did not affirmatively seek relief redeemed $27,347,335.24 in vouchers. This starting point is not disputed.

Class Counsel asks we add administrative expenses to the present Class benefit. We agree to an extent shown as relating to the voucher redemption since July 29, 2016. We today approve $4,669,426 in additional administrative expenses. But not all those additional administrative expenses approved today affected the voucher redemption.     A sizable portion of these administrative expenses directly affected the amount of redemptions. The Claims Administrator described why it would incur an additional $3.2 Million to print and mail automatic vouchers and an additional $950,400 in postage expenses relating to the automatic vouchers.[16]  The Claims Administrator admits budgeting 50% of these print/mail expenses in the initial $8 Million budget with the doubling due to the parties preferring to mail the vouchers rather than email.   We also awarded $146,100 for voucher development and testing from July through September 2017.   As we found earlier, we will not count the Claims Administrator's time for answering emails and phone calls relating to the voucher when they fairly included (or should include) these costs in its $8 Million initial approved budget.   The Claims Administrator should have always anticipated

18

those costs as the voucher always presented the much larger contact with the 18.4 million Class Members. Lacking further specificity, we are presently unable to reconstruct the balance of the additional administrative expenses as they relate to the voucher redemption. For purposes of the Class benefit today, we set the administrative expenses not already accounted for in the $8 Million budget (and thus already counted towards the class benefit in July 2016) at $2,696,500 representing 50% of the approved printing, the full amount of the postage increase to mail the vouchers, and the $146,100 in voucher development after Justice Stores did not meet its obligation.

This calculation represents a present $30,043,835.24 benefit to the Class from the voucher redemption.

Class Counsel also seeks a percentage of the funds remaining in the Settlement Fund. We decline this request. There is no present benefit to the Class in these withheld funds. There may be more benefits to the Class moving forward. Class Counsel will need to effectively manage the Claims Administrator. The next steps will require more administrative expenses. We can address those benefits in awarding a third distribution to Class Counsel. But we do not presently award fees based on the money left in the Settlement Fund. These remaining funds will be distributed under today's Orders later when Class Counsel may seek recovery based on a lodestar basis as this is a cash award to affirmative claimants like the initial July 2016 analysis. This supplemental payment is only available to those approximately 607,000 Class Members who filed affirmative claims before our July 29, 2016 Order. In reviewing this relief in July 2016, we awarded fees based on a lodestar with 1.75 multiplier which accounted for the present benefit to the affirmative claimants and stopping the marketing practice for all consumers.

Class Counsel may seek another award of attorney's fees on a lodestar basis for the services moving forward after this Order to be paid from the Settlement Fund. We are not today finding

19

whether Class Counsel is entitled to a multiplier on its fees for its representation since November 2018.

### *We award a 25% contingency fee under Gunter.*

Arguing its clients already agreed to a 27.8% contingency fee and courts find 22-33% of the benefit is a fair payment in a common fund recovery, Class Counsel moves for a fee award of 25% of the present $30,043,835.24 Class benefit. Class Counsel invested 2473 hours in this case since the Summer 2016 when we awarded fees based on the recovery for approximately 607,000 Class Members who made claims.[17] Its lodestar when moving for fees in late November 2018 is approximately $2,362,018. No party objects to a handsome 25% contingency on the present benefit to the Class.

But we are concerned with this handsome percentage after already awarding Class Counsel almost double their lodestar for most of the work in the case. The presently requested 25% fee will result in a multiplier of approximately 4 on the $2,362,018 lodestar. We are not suggesting a 4 multiplier always raises concerns. This multiplier of 4 can be a fair number especially in a case resulting in a lower dollar recovery to the Class. We want to incentivize skilled counsel – including those who may regularly represent defendants, engage in commercial litigation or do not always file class actions – to take the risk in bringing important cases for consumer classes. Many of the consumer cases result in lower recoveries than Class Counsel obtained for this national class. Mindful of the expense in the lower recovery cases, courts have allowed larger percentages of the class benefit as a recovery.

This case is different. The parties prudently sought to settle while beginning discovery. The Class benefit through voucher redemption required Class Counsel arguing for the wisdom of a voucher recovery when courts properly criticize many of these settlements. Class Counsel

invested money out of pocket, including agreeing to reduce its attorney's fee cap by $900,000 to allow more fulsome notice and then – when faced with months of delay due to objector-appellants' tacts in our Court of Appeals – settling to dismiss those appeals for $467,000 out of pocket. They paid off these objector-appellants from their fees. Not from the Class. And we should not penalize Class Counsel for having the courage – and a touch of fearlessness – in taking on the biggest case and then succeeding. Otherwise we may have dozens of smaller cases in a smattering of states where lawyers could fund the litigation and possibly no recovery in states where counsel would not take the risk.

As we did in our first fee award in July 2016, and for many of the same reasons warranting a fee then, we once again apply our Court of Appeals' comprehensive guidance in *Gunter* and *Baby Foods*.[18] Class Counsel provided a sizable benefit of approximately $30 Million to the Class in addition to the present benefit we calculated in July 2016. We do not double-count the benefit of injunctive relief. Even without the injunctive relief, this is a large Class benefit. While Class Counsel overcame objections to the initial fairness, we do not presently have objections to the requested fee percentage. This factor also favors a larger percentage recovery. Class Counsel continued to exhibit skill and efficiency in obtaining this voucher redemption. While its efforts in managing the Claims Administrator could have been more diligent, its skill in addressing the prudence of a voucher settlement warrants a larger percentage recovery. We are addressing a national consumer class action with over 18.4 Million members, over 1,000,000 claimants, issues in many states and continuing obligations to ensure fairness and transparency in the distributions. Class Counsel faced a substantial risk of little payment on the voucher redemption. Its efforts exceeded Justice Stores' expectations. It took the risk of placing much of the settlement consideration in a choice offered to consumers based on a same-retailer voucher with consumers

21

aging out of its marketplace. This factor weighs in favor of a larger percentage. Class Counsel invested 2473 hours since our last review. This investment should be rewarded when confirmed by contemporaneous time records and a sizable Class benefit.

The *Gunter* factor which warrants further analysis is the comparison of this fee percentage to other class action settlements. Courts reviewing large-sum Class benefits tend to lower the percentage. This should be particularly true in consumer cases when the individual consumer recovers less than $50.00. As we find below, Class Counsel fairly incurred less than $200,000 in reimbursable costs over four years. Not a significantly large investment for this size recovery. We also do not find this amount of voucher redemptions can be largely attributed to Class Counsel's efforts not already rewarded in our July 2016 award of fees. We often apply a sliding scale mandated by economies of scale; the same amount of work may be required to try the $1 Million recovery in a consumer case as this case. Class Counsel should not be grossly overpaid because the size of the Settlement Fund grew without their input. But the difficulty presented today arises from the number of claimants. The case always involved a potential $402 Million recovery – or Justice Stores would not have agreed to be exposed to this potential, albeit unlikely, recovery. Our review of situations involving the amount of funds comparable in magnitude to this Settlement Fund confirm courts have awarded 20 to 27% of the fund in attorney's fees.[19]

The remaining *Gunter* factors favor the requested percentage. Class Counsel should be credited for providing a choice through cash or a voucher system allowing differing recoveries for different states and thus avoiding many objections. Class Counsel should also be credited for allowing the extended time for consumers to redeem the vouchers. We also found offering consumers the choice to avoid the mandated voucher to a consumer market quickly aging out of the Justice Stores' space is innovative. Class Counsel seemingly studied the caselaw on coupon

settlements and structured a settlement offering the consumer a cash choice. The innovation in allowing consumers in different states to recover varying amounts provided a fairness not often sought by Class Counsel. It presumably would have been much easier to settle on the lower number and wait for the objection. To their credit, they innovatively set a structure addressing the varied state laws as applied to purchasers to tween merchandise who, even if their tastes would remain somewhat stable for several months, would inevitably soon avoid wearing tween merchandise.

The *Gunter* factors favor a 25% fee. Class Counsel undoubtedly invested time. Absent opposition, we award the 25% percent but do not set this high a percentage as a precedent which could not be subject to challenge in another case. This representation offered unique opportunities and Class Counsel's efforts should be rewarded. Using the lodestar cross-check, this recovery is approximately a 4 multiplier within the range of reasonableness, as more fully described in our July 29, 2016 Memorandum.[20] In the accompanying Order, we direct the Claims Administrator to pay Class Counsel $8,004,190.31 in full and complete satisfaction of their services performed to date based on the benefit to the Class through the voucher redemptions and related administrative costs.

### *We award $180,431.76 to reimburse Class Counsel's demonstrated costs.*

Class Counsel filed detailed costs summaries to support their request for reimbursement of $209,685.46. Most of the charges are normal and customary for postage, mailing, computer research, expert fees and reasonable travel. We questioned several costs entries at our distribution hearing, including expert fees for experts we did not see and a monthly Courtlink service. Class Counsel adequately explained these costs.

23

But as we addressed at our distribution hearing, several requests for reimbursement did not appear to benefit the Class: $1,297.56 for a counsel dinner at Osteria; a hotel stay for a Mr. Skipton of $580.26 in January 2016 after we had preliminarily approved the settlement; $3,000, $1,000 and $106.20 in payments for undefined reasons to a Texas citizen Bridget Stimpson; and, $2,308.60 and $926.22 for flights to Toronto, Canada. We also reduce a mileage charge to accurately reflect the distance between Pittsburgh and Cleveland: Class Counsel seeks $470.88 for driving 864 miles at $.545 from Cleveland to Pittsburgh in September 2018. But as counsel agreed at our hearing, Pittsburgh is 133.2 miles from Cleveland. We will reduce the request from $470.88 to $144.97 to accurately record the round-trip mileage and absent a challenge to Class Counsel also billing this mileage to another hourly client as well. Class Counsel also concedes its Cleveland counsel used chartered flights on four occasions due to its lawyers' schedules. They voluntarily reduce their request for reimbursement for Cleveland counsel's costs by $19,708.99 ($78,484.57 to $58,775.58). Given their good faith candor, we will not further deduct certain charges as excessive as they appear to relate to the same issue of charges due to lawyers' schedules by charging $406.40 for a "car service" in Philadelphia on June 12, 2016 and charging $666.75 paid for "ground transportation" for a July 2, 2015 trip.

In an accompanying Order, we award $180,431.76 payable from the Settlement Fund to reimburse Class Counsel's demonstrated costs.

### D. We award $78,000 to satisfy the Comlish Objectors' fees.

The Comlish Objectors request an award of attorneys' fees in the amount of $78,000 and incentive awards of $1,000 each.[21] They argue the requested fees and incentive awards are justified based on their successful objections which "induc[ed] the settling parties to withdraw the provision of the settlement that would revert unawarded attorneys' fees to class counsel (also

24

known as the 'kicker') and thereafter (2) persuading the Court to reduce class counsel's fee award."[22] The parties do not object to the award but Class Counsel objects paying these fees from its award.[23]

We reviewed the Comlish Objectors's fees. Attorney Adam Schulman, who presented oral argument at our May 20, 2016 fairness hearing, December 13, 2018 distribution hearing and our January 22, 2019 show cause hearing, represents investing 296.5 hours at his hourly rate of $400.00 an hour. Attorney Schulman's lodestar is $118,600 but we may – if asked – find limited billing questions. While we lack evidence as to the reasonableness of this hourly rate in this District for Attorney Schulman's experience, no party objects to the requested fee, we witnessed Attorney Schulman's advocacy, and he is entitled to the requested $78,000 fee. His efforts, seeking payment at less than lodestar, benefitted the Class and increased the value of the Settlement Fund for the Class. The Claims Administrator shall pay this $78,000 fee from the Settlement Fund.

We have no basis to award an incentive fee to Ms. Comlish or Ms. Artlip. We know of no role, no deposition, no appearance in court, and - from a review of Attorney Schulman's billing records – no mention of a meeting or communication with Ms. Artlip at all and maybe two or three correspondences to Ms. Comlish. They are not like the Class Representatives who demonstrated personal involvement to allow us to find some award warranted on July 29, 2016. Simply providing your name to Attorney Schulman is no basis for $1,000 incentive fee to these two Class members.

### E. We grant the Kallay Objectors' Motion for fees in part.

Nine class members known as the Kallay Objectors[24] represented by a variety of attorneys objected to at least six terms in the settlement. At least one of their attorneys appeared at our May 20, 2016 fairness hearing. The Kallay Objectors withdrew their appeal of our July 29, 2016 Orders.

25

They now seek $1,275,000 in fees arguing they improved the settlement fund for the Class Members, specifically claiming they caused the parties to eliminate a settlement term which would have allowed $5.1 Million of the Settlement Fund to revert to Justice Stores and eliminated a reversion of unawarded attorney's fees. Class Counsel opposes this request arguing at least ten other objectors raised these same "reverter" issues, their lawyer at the May 20, 2016 fairness hearing never argued about the reverter, the proposed lodestar of $533,917.50 is inflated because one of the lawyers (with an alleged $120,000 in time) never proffered his time records and the majority of the lodestar time is not related to the objections addressed at our fairness hearing – including time now being billed for this effort. After parsing through a variety of strained arguments, we find limited merit in the Kallay Objectors' motion as the lawyers did timely present – along with many other lawyers and four other arguments – a concern on the reverter.

As we do with Class Counsel, we review fee requests for objectors' lawyers to determine how their efforts benefitted the Class. They are not paid unless they add some benefit with their advocacy. How did their objection uniquely benefit the negotiated settlement for the Class? With objectors, we examine whether their lawyer's efforts are not duplicative and are substantial enough to challenge and eventually alter the settlement terms negotiated by the lawyers in the room for the Class benefit. Second guessing without substantial basis is not rewarded. Especially in this unique undertaking: a national class action with several state law consumer fraud schemes, challenging precedent on materiality and reliance, well represented retailer, and a relatively nominal consumer award with consumer fraud statutes awarding fees mostly based on lodestar considerations.

As with our July 29, 2016 Order on Class Counsel's fees, we prefer the lodestar calculation for services which arguably substantially created the initial recovery in the state-law consumer

fraud case where most of the state statutes award fees based on lodestar. We study the amount of time invested and effect upon the settlement terms to reach a reasonable fee, if warranted, for an objector's counsel. We want to encourage Class Members who find objectionable terms to retain counsel who will be paid for their service – but only for their service – and not a windfall based on value created by other lawyers.

The Kallay Objectors seemingly base most of their claim on the fact they were fighting first – albeit only in Ohio. Their lawyers, or some of them, also sought to bring a state by state strategy. Class counsel then filed this national case on February 12, 2015. Sometime later, the Kallay Objectors sought a multi-district litigation. After Justice Stores filed an answer to the Second Amended Complaint here, we held a June 2, 2015 pretrial conference where the lawyers represented ongoing good faith settlement discussions and would report back to us on a settlement by July 4, 2015. We set a date certain trial beginning on April 26, 2016. In early July, Class Counsel and Justice Stores reported they had reached a term sheet settlement after substantial negotiations to settle claims on a national basis.[25]

One of the lawyers for the Kallay Objectors appeared, along with Class Counsel, at the MDL oral argument in San Francisco on July 30, 2015. Class Counsel provided the Kallay Objectors with a copy of the term sheet. The MDL Panel denied multi-district treatment. A couple weeks later, one of the Kallay Objectors' counsel, Attorney Gerard M. McCabe, entered his appearance in this case.[26] By September 9, 2015, another of the Kallay Objectors' lawyers, Douglas Caiafa, wrote an eight-page single space letter to Class Counsel raising several pages of objections, including (at page 5) a concern with a reverter of funds in the proposed $27.8 Million portion of the Settlement Fund to Justice Stores.[27] On September 29, 2015, Class Counsel and Justice Stores jointly moved for preliminary approval and we set a hearing for October 19, 2015.

27

An attorney for the Kallay Objectors appeared at our October 19, 2015 hearing to contest preliminary approval but we denied his request as he had not filed papers and his concerns were germane to final approval. Following notice, Class Counsel and Justice Stores moved for final approval on March 18, 2016 and we set a hearing for final approval for May 20, 2016 to allow all parties, including Objectors, plenty of time to prepare and present argument. Several Class Members, either *pro se* or through counsel, filed objections. At least twelve of those objections challenged the settlement term allowing unclaimed funds from the $27.8 portion of the Settlement Fund to revert to Justice Stores.

The Kallay Objectors filed their objections towards the end of the objection period raising objections offered by others before them, including the reverter concern mentioned in Attorney Caiafa's September 9, 2015 letter to Class Counsel. They asked we deny final approval and demanded three items: gift cards instead of vouchers; pay cash and redeemed vouchers equal to the $27.8 Million settlement fund; and, order $6.6 Million paid to them (out of the agreed $14.1 Million cap for attorney's fees) comprised of $6,000 paid to each of their Kallay Objectors and the remainder in attorney's fees to them – without showing time entries. [28] They wanted their one-third contingency fee.

We held a full day fairness hearing on May 20, 2016. One lawyer for the Kallay Objectors lawyer, Attorney Goetz, argued. He challenged the amount of damages as not enough; no disclosure of the voucher value; and, we should not require Class Members to show proof of purchase.[29] Informed by over ten objections, we raised the reverter issue and the Parties agreed to modify the settlement terms to ensure no reverter of unclaimed funds by the Class Members or of unawarded attorney's fees. No Kallay Objector raised the reverter issue during our May 20, 2016 fairness hearing but did not need to either.

We approved the settlement as fair and reasonable, mentioning the objections on the reverter. The Kallay Objectors filed notices of appeal, along with several objector-appellants. The Kallay Objectors then voluntarily withdrew their appeals and, several months later, Class Counsel settled claims by the objector-appellants for $467,000 consisting largely of attorney's fees to those objector-appellants' lawyers. Spited, the Kallay Objectors' lawyer now want their fees. They seek a percentage of the fund created by the benefit in limiting the reverter; they cannot rely upon timesheets or contemporaneous records which are woefully inadequate in describing their services with general references leaving us guessing as to their work effort.

But they are not entitled to 25% of the reverter value. They added benefit at the same time as the Class Counsel. The Kallay Objectors demand we compensate them on the percentage of the benefit they provided to the Class. Attorney Goetz's arguments at our fairness hearing incorporated reverter concerns and he should not be punished by losing a fee when we saw him offer fine advocacy despite not having time records. But they offered no greater or lesser benefit than the other lawyers who challenged the reverter and their arguments. Simply being the first to raise the reverter objection does not prime the Kallay Objectors as entitled to more than any of the other objectors who raised the same issues. We count twelve objectors challenging the reverter. Even assuming we found any one of these twelve objectors had more sway over our rulings than others - which we do not – we would apportion the benefit among those who raised the issue. No other objector sought fees for raising this reverter concern. Only the Kallay Objectors. Class Counsel paid the other objectors' attorney's fees who appealed issues other than the reverter – since we approved the settlement absent the reverter. The Kallay Objectors do not cite, and we cannot find, authority for paying their attorneys for a benefit created by twelve objectors.

.

29

While we scrutinize overreaching, we want to encourage bona fide objections to settlements which are negotiated by a defendant who hopes to end the dispute and a class counsel at least marginally mindful of the attorney's fees available with an earlier recovery. The Kallay Objectors, and many other like-minded objectors, created a benefit beyond the statutory fee shifting under state consumer law. This benefit only accrued if we faced a balance in the Settlement Fund. All agree the collective efforts in removing the unlimited reverter arguably resulted in a $5.1 Million benefit to the Class.

We awarded 25% of the Class benefit to Class Counsel. Applying the same *Gunter* and *Baby Foods* factors, we award 25% of this more limited benefit to the Kallay Objectors' counsel. They invested time, took a risk in making objections, created a benefit along with others, provided skillful representation particularly at the May 2016 fairness hearing, and a 25% fee is fair in this consumer contingency case. The Kallay Objectors' fee drew several objections from Class Counsel. Many of the objections have merit, including challenges to woeful billing entries without offering us a description of the benefit to the Class. We cannot imagine a paying client would pay for many of the Kallay Objectors' billing entries.

On balance, the Kallay Objectors are entitled to a fee but they have not shown a basis for a lodestar of percentage of the benefit for anything more than one-twelfth of 25% of the benefit in their shared objection to the reverter. Unlike Class Counsel, the Kallay Objectors played a small supporting role in the success. They are one of a dozen objectors raising this reverter concern. In balancing all these factors, we find a total fee of $106,250 paid among the counsel for the Kallay Objectors from the Settlement Fund as they wish to allocate is appropriate. Some lawyers did more courtroom work such as Attorneys McDade and Goetz; others may have played a role in

30

setting the reverter concern such as Attorney Caiafa. They decided to join and, presumably based on this understanding, will now properly allocate this fee.

We also deny incentive compensation to the individual Kallay Objectors. We have no basis for their efforts other than signing a statement prepared by counsel. Providing your name to a lawyer to file an objection is not the Class obligation to pay you $1,000. As we described in examining the Class representatives' request for incentive fees in July 2016, we need to show a benefit conferred by the individual objectors to order the Class to pay an incentive fee. Nothing in this Order affects the individuals' ability to seek payment from their lawyers.

This objection based on funds once planned to revert to Justice Stores directly affects the amount in the Settlement Fund distributed to the Class. As such, the Claims Administrator shall distribute this $106,250 from the Settlement Fund and not from the allocation paid to Class Counsel. Attorney McDade shall promptly notify the Claims Administrator of the amounts and identity of recipients and provide further information required by the Claims Administrator.

## F. We deny the Comlish Objectors' disgorgement remedy from objector-appellants.

While finalizing drafts of their Appellee brief in our Court of Appeals, Class Counsel agreed to pay $467,000 out of pocket to six objector-appellants in exchange for their dismissal of appeals of our July 29, 2016 Orders. We are not aware – and either were the objectors's counsel at our January 22, 2019 show cause hearing – why they appealed our July 29, 2016 Orders. [30] Class Counsel paid $467,000 out of pocket from their award of attorney's fees which they would recover once the case returned to this Court. Class Counsel did not pay from the Settlement Funds. Class Counsel had the legal right to the money used to pay the objector-appellants once the appeals ended. They used their money in the best interests of the Class as they viewed the delay caused

31

by the appeals in April and May 2017 harmed the distribution given the class consisted of consumers of tween merchandise who would soon age out of the Justice Stores's consumer base.

The Comlish Objectors first sought to intervene seeking disgorgement after the Court of Appeals dismissed the appeals and now seek an order requiring the objector-appellants to disgorge the funds paid by the Class Counsel to them in exchange for dismissing their appeals. We denied their motion to intervene in June 2017 with leave to challenge final distributions. The Comlish Objectors then timely moved for an order requiring the objector-appellants and Class Counsel to disclose the transactions and, if warranted, require the objector-appellants disgorge their settlement consideration. Lacking details on this payment, and offended by the reality six or so Class Members could appeal and receive hundreds of thousands of dollars more than other Class Members, we asked counsel to brief our the ability of ordering disgorgement and required Class Counsel and each objector-appellant describe the terms of the payoffs, including an objector-appellant not challenged by the Comlish Objectors.[31] Under our Order, Class Counsel disclosed its payments negotiated through the Chief Mediator of our Court of Appeals. Class Counsel paid the funds. We also learned Justice Stores paid $15,000 towards the settlement.

We heard from the Comlish Objectors and counsel for the objector-appellants at our noticed January 22, 2019 show cause hearing. As we then knew Class Counsel paid the settlements from its pocket, the Comlish Objectors argued we should still order disgorgement based on our inherent power to supervise class actions including supervising the Settlement Fund. They argued – even though they did not appeal – our Court of Appeals could have reduced the fee award based on lodestar with a 1.75 multiplier and those speculative funds would be available to the Class. But the settlements resulting in withdrawal of the appeals eliminated this speculative Class benefit.

32

As the Chief Judge of our Court of Appeals, and several other thoughtful judges and class action practitioners , have commented, the filing of frivolous objections to negotiated class action settlements to obtain a payoff is, at best, troublesome.[32] Years ago, judges and eventually the securities marketplace criticized a practice of investors placing leverage on a public company by purchasing shares intending to start a hostile takeover of the company based on its "improving shareholder value" but then changed their mind about the value of new management and shareholder value when the company paid them off – a practice known as "greenmail."[33] It simply became easier to payoff the challenge and move on with the important transaction or business plan. We find little or no distinction in this objector-appellant conduct in the many lawyers in the class action objector practice. A handful of objectors representing clients on a contingency basis with small recoveries file frivolous objections, lose in the trial court, and then appeal to increase the leverage over the Class Counsel and Class who await their negotiated recovery. The parties, usually more well versed in the case and settlement negotiations, are faced with spending more time and money to defeat an appeal they deem frivolous while their clients await the recovery detailed in the class notice and confirmed as fair and reasonable by the trial judge. Easier to pay them off and move on. The problem is whether the payoff comes from the Class benefit.

We agree with the Comlish Objectors' hopes to stem this practice. The December 1, 2018 amendments to Fed.R.Civ.P. 23(e)(5) will hopefully allow greater judicial scrutiny of this practice. The amendments require the trial court to have a hearing before someone can payoff the objector-appellant to forego or withdraw an objection or dismiss an appeal. This amendment should prove to facilitate objections by good-faith objectors often not represented by counsel while discouraging bad-faith or professional objectors represented by counsel seeking fees. Under the December 1, 2018 amendment, we should not consider the benefit to the expediency of distributions by a

33

withdrawn appeal. As recently described by leading commentators, under the Rule 23(e)(5) amendment, "[t]he sole fact that the withdrawal of an objection or dismissal of an appeal will expedite distribution of the settlement funds does not justify payment to withdraw an improper objection or dismiss an improper appeal."[34]

But, after studying whether we could apply this amendment and asking counsel for input, we do not have the benefit of this December 1, 2018 amendment. All counsel argued, and we agree, the December 1, 2018 amendments to Rule 23 do not readily apply to these April and May 2017 settlements.[35]

Absent the authority provided by the December 1, 2018 amendment to Rule 23, we decline to extend our inherent authority to find objector-appellants must disgorge the unfortunate greenmail paid to dismiss their appeals. They released claims and dismissed appeals in exchange for $467,000. They got away with it before the December 1, 2018 amendment to Rule 23(e)(5). We cannot find they are unjustly enriched because the persons who paid them off and are arguably harmed – Class Counsel – is not seeking a remedy here. Absent rank speculation, we cannot find how our Court of Appeals would have affected our fee award of the lodestar plus a 1.75 multiplier when Class Counsel sought millions of dollars more and we agreed with several objectors as to a separate analysis of fees based on the stages of benefits to the Class. But Class Counsel paid them off to move closer to distributing the Class benefit. Class Counsel could have also considered the costs of appeal in legal fees as part (certainly not in whole) in deciding to pay the greenmail. No one should be awarded for this conduct but there is no basis to today disgorge payments made in mid-2017.

**G. We award the additional distribution to be defined in a further Order.**

In this evolving puzzle of obligations to be paid from the Settlement Fund, we are presently uncertain of the amount of money in the Settlement Fund remaining after paying the fees to counsel for the Comlish and Kallay Objectors, the approved reimbursements to the Claims Administrator, and fees and costs awarded to Class Counsel today. With no opposition, we direct an additional distribution of money left in the Settlement Fund after satisfying today's Orders. We see no present basis to hold $362,528.48 in the Settlement Fund for persons who did not cash the 2017 checks payable to them. We leave this issue to Class Counsel's discretion as they may wish to find out if these Class Members will seek a reissued check once they learn of the second distribution.

To ensure a proper calculation, Class Counsel shall move for the specific distribution based on all funds remaining in the Settlement Funds, including for uncashed checks from the 2017 distributions. Class Counsel shall attach the Claims Administrator's detailed supplemental affidavit as to money available in the Settlement Fund to be distributed after payments under today's Orders and reserving funds necessary for distribution costs and a realistic budget for approved administrative costs incurred in ensuring a timely and accurate distribution.

**III. Conclusion**

The lawyers diligently worked to provide a substantial Class benefit to 18.4 million consumers, with over one million persons taking advantage of the economic benefits. It is now time to distribute the balance in the Settlement Fund. While we must carefully examine the requests for money paid from the Class Settlement Fund to professionals, we find Class Counsel, and to a lesser extent, counsel for the Comlish and Kallay objectors, fulfilled their roles and improved the Class benefit. We do not share the same view of the six objector-appellants' counsel;

35

not because they appealed our Order but because they filed appeals arguing for the best interests of the Class and then sold out for hundreds of thousands of dollars in objector greenmail. We are optimistic as to the effect of amended Federal Rule 23(e)(5) in discouraging this lawyering practice based on fees alone.

We are also concerned with the record-keeping and supervision of this large Settlement Fund by the Claims Administrator. We should pay Claims Administrators for their demonstrated services. But the days of submitting a bill in a class settlement and expecting it will be automatically approved are hopefully over. We honor the representations made to induce our finding of fairness of the settlement terms to the Class. We do not approve attempts to change those terms, either because Justice Stores wants more reverter money or the Claims Administrator did not properly budget for its services. In accompanying Orders, we direct the Claims Administrator to distribute identified amounts to Class Counsel, counsel for the Comlish and Kallay objectors, Justice Stores for the $8 Million reverter, and promptly move for approval of the specific supplemental distribution to the 607,215 claimants.

---

[1] ECF Doc. No. 70.

[2] ECF Doc. No. 78 at 2.

[3] ECF Doc. No. 218.

[4] *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001).

[5] *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010).

[6] *In re Cendant Corp. Litig.*, 264 F.3d at 231 (3d Cir. 2001) (citation and internal quotation marks omitted); *see Ehrheart*, 609 F.3d at 593 ("Under Rule 23(e), a district court acts as a fiduciary, guarding the claims and rights of the absent class members.").

[7] ECF Doc. No. 93.

[8] ECF Doc. No. 153, p. 11 of 64. The Claims Administrator estimated the total exposure at $9,398,380 but properly deducted Class Counsel's agreement to contribute $928,662 from their attorney's fees.

[9] In July 2017, Class Counsel represented the appeal as a nine-month delay. Today, for purposes of the Class Administrator's costs, they represent the appeal as a seven-month delay. To be accurate, the appeal period is closer to nine months than seven months: August 11, 2016 (ECF Doc. No. 191) to April 28, 2017 (ECF Doc. No. 250-252).

[10] ECF Doc. No. 370-2.

[11] We appreciate accountants could disagree with our calculations in reviewing affidavits based on fees incurred as opposed to fees paid. If our calculations or understanding of these sworn statements is wrong based on the numbers, Class Counsel is welcome to ask for us to reconsider but at least offer three alternative Philadelphia-based accountants who could audit these bills and representations for us and we will select one to be paid to promptly prepare a report and recommendation under Fed.R.Civ.P. 53 and be paid for its reasonable fees from the funds allocated to Class Counsel under today's Order and paid upon final distribution.

[12] *See* ECF Doc. No. 343.

[13] ECF Doc. No. 343 at 3–4.

[14] ECF Doc. No. 185 at 2.

[15] ECF Doc. No. 303 at 2.

[16] ECF Doc. No. 301.

[17] ECF Doc. No. 340.

[18] *In re Baby Products Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013); *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000).

[19] *See, e.g., In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.*, 724 F. Supp. 160, 170 (S.D.N.Y. 1989) (27% fee from recovery of $20.2 million); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 750 (S.D.N.Y. 1985) (25% fee from recovery of $18.6 million), *aff'd*, 798 F.2d 35 (2d Cir. 1986); *In re Pepsico Securities Litigation,* Civ. No. 82–8403, 1985 WL 44682, at \*3 (S.D.N.Y. Apr. 26, 1985) (20% fee from recovery of $21.5 million); *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 47 F.R.D. 557, 559 (E.D. Pa. 1969) (25% fee recovery from recovery of $22.175 million).

[20] ECF Doc. No. 183, pp. 62-63.

[21] ECF Doc. No. 342.

[22] ECF Doc. No. 342 at 2.

²³ The Comlish Objectors request the fee and incentive award "be paid from class counsel's fee fund to, as a matter of equity, avoid double charging the class for objector participation that should not have been necessary." *See In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 103 F. App'x 695, 697 (3d Cir. 2004) (affirming award "to Objectors' counsel 1.4% of the Class Counsel's $90 million fee award or $1.26 million"); *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) ("[Objectors' fees and costs will be taken from class counsel's award to avoid dilution of the settlement fund."); *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 662 (E.D. Pa. 2015) ("I have reduced class counsel's requested fee award by the amount of CCAF's award.").

²⁴ The Kallay Objectors are Andrea Kallay, Robert Gallagher, Rebecca Joiner, David Legendre, Yanetsy Loor, Diana Amaya, Terri Holcomb, Dorlene Goldman and Emily Mohr. While seven law firms now seek payment, we heard from three lawyers, Gerald M. McCabe of Mitts Law, LLC in Philadelphia, Daniel P. Goetz in Cleveland, and Nicole Fiorelli of Painesville, Ohio.

²⁵ *See* ECF Doc. No. 346, Ex. "B".

²⁶ ECF Doc. No. 52.

²⁷ ECF Doc. No. 346, Ex. "C".

²⁸ ECF Doc. No. 132-2.

²⁹ ECF Doc. No. 187 at 131-163.

³⁰ Brent F. Vullings, Esquire of Vullings Law Group, LLC appealed from our July 29, 2016 Order based on an objection he filed on his wife's Michelle W. Vullings's behalf. He could not recall the basis of his appeal during our January 22, 2019 hearing requiring Class Counsel and the objectors to show cause why we should not order the objector-appellants to disgorge the funds as requested by the Comlish Objectors. He is not alone in this lost memory; we asked several objector-appellants' counsel for the basis of their appeals and none could recall during our January 22, 2019 hearing why they appealed our ruling. They showed up at our show cause hearing to make sure we knew they opposed disgorging the substantial sums paid by Class Counsel to them.

³¹ The Comlish Objectors, represented by the Center for Class Action Fairness, presented significant arguments at each of our hearings. They assisted us in reaching a fair settlement. They fairly seek, and we award, $78,000 for their services. We note they do not seek to be paid for this argument relating to Class Counsel's payments to settle appeals from five of the six objector-appellants. But they did not challenge a $135,000 payment to Objector Kelsey Foligno. We ordered disclosure of this payoff as well. The Comlish Objectors did not challenge this sizable payoff because Objector Foligno's counsel at Bandas Law Firm, P.C. threatened counsel for the Comlish Objectors. Counsel for the Comlish Objectors would not disclose the basis of his fear. The Comlish Objectors are enraged by a denial of a Class benefit when five objector-appellants get paid off but when facing challenges to their lawyers, they meekly walk away from challenging a $135,000 payoff which would appear to fit squarely within its other arguments. This conduct serves only to highlight the dirty underbelly of this business in class action professional objectors and, as we are disappointed to see, apparently those who tout they hope to police this conduct.

Fairness required we treat all the greenmailers in the same way. We trust the Comlish Objectors' counsel employed with the "Center for Class Action Fairness" will not be so easily intimidated as it seeks fairness in future class action settlements.

[32] John E. Lopatka and D.B. Smith, *Class Action Professional Objectors: What to Do About Them?*, 39 Fla.St. U.L.Rev (2012), http://ir.law.fsu.edu/lr/vol39/iss4/2. Chief Judge Smith's and Mr. Lopatka's suggestions enjoyed partial success in the December 1, 2018 amendment to Fed.R.Civ.P. 23(e)(5) requiring, among other protections, court approval of settlements resulting in the withdrawal of objections or voluntary dismissal of appeals filed by objectors.

[33] *Viacom Int'l Inc. v. Icahn,* 946 F.2d 998, 999 n.1 (2d Cir. 1991).

[34] Duke Law Bolch Judicial Institute, "Guidelines and Best Practices Implementing 2018 Amendments to Rule 23 Class Action Settlement Provisions, 25 (Aug. 2018).

[35] Rule 23(e)(5) addresses future payments: "no payment or other consideration may be provided in connection with…dismissing… an appeal" absent court approval. Class Counsel paid off these objectors in April and May 2017.